MICHAEL W. STEBBINS, Bar No. 138326
mstebbins@be-law.com
MELINDA M. MORTON, Bar No. 209373
mmorton@be-law.com
INA STANGENES, Bar No. 156559
istangenes@be-law.com
BERGESON, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110-2712
Telephone: (408) 291-6200
Facsimile: (408) 297-6000

Attorneys for Plaintiff
PHOENIX TECHNOLOGIES LTD.

Filed
MAR - 4 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

PHOENIX TECHNOLOGIES LTD., a Delaware Corporation,

    Plaintiff,

vs.

DAVID P. JABLON, an individual,

    Defendant.

Case No. C08 01286 PVT

**COMPLAINT FOR:**
**(1) BREACH OF WRITTEN CONTRACT;**
**(2) MISAPPROPRIATION OF TRADE SECRETS; (3) COMPUTER FRAUD AND ABUSE ACT; (4) ELECTRONIC COMMUNICATIONS PRIVACY ACT (TITLE II); (5) UNAUTHORIZED ACCESS TO COMPUTERS, COMPUTER SYSTEMS AND COMPUTER DATA; (6) UNFAIR COMPETITION UNDER BUS. & PROF. CODE § 172000 *ET SEQ*.; (7) COMMON LAW UNFAIR COMPETITION; (8) BREACH OF DUTY OF LOYALTY**

**DEMAND FOR JURY TRIAL**

Complaint Filed:
Trial Date:        None Set

PHOENIX'S COMPLAINT

Plaintiff Phoenix Technologies Ltd. ("Phoenix" or "plaintiff"), for its Complaint against Defendant David P. Jablon ("Jablon" or "defendant"), alleges as follows:

## NATURE OF THE ACTION

1. This action arises out of Jablon's breach of contract and misappropriation of valuable source code, and other trade secrets and proprietary information from Phoenix. Unless Jablon is enjoined from continuing his wrongful activities, Phoenix will likely suffer irreparable injury to its business for which pecuniary damages do not provide an adequate remedy.

## THE PARTIES

2. Phoenix is a corporation duly organized and existing under the laws of the state of Delaware with its principal place of business at 915 Murphy Ranch Road, Milpitas, California.

3. Phoenix is informed and believes, and on that basis alleges, that Jablon is an individual residing at 7 Buckskin Drive, Westboro, Massachusetts.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000. The Court also has subject matter jurisdiction under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2701 *et seq.*, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.* The Court has supplemental jurisdiction over Phoenix's related claims for relief arising under California law pursuant to 28 U.S.C. § 1367(a).

5. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Phoenix's claims took place within the District, defendant's tortious conduct was directed at this District, and Phoenix was injured by Jablon's tortious conduct in this District.

## INTRADISTRICT ASSIGNMENT

6. Intradistrict assignment, pursuant to Local Rule 3-2(c), is proper in the San Jose division, as at least a substantial part of the events or omissions which give rise to the claims occurred in Santa Clara County.

## FACTUAL ALLEGATIONS

### Jablon's Employment

7. Phoenix designs, develops, manufactures and sells core system software ("CSS"), the modern form of BIOS ("Basic Input Output System") software for personal computers, servers and embedded devices. Phoenix's CSS customers are principally original equipment manufacturers ("OEMs") and original design manufacturers ("ODMs"), who incorporate CSS products during the manufacturing process. The CSS is typically stored in non-volatile memory on a chip that resides on the motherboard built into a device manufactured by our customer. The CSS is executed during the power-up process in order to test, initialize and manage the functionality of the device's hardware. Phoenix was established in 1979 and its core system software helped launch the PC industry more than 20 years ago.

8. Phoenix also designs, develops and supports software products and services that provide the users of personal computers with enhanced device utility, reliability and security.

9. In 1999, Phoenix sought to broaden its security-related offerings through an entrepreneurial business unit devoted to the development, manufacture and delivery of security-related technologies. This business unit was eventually called the PhoenixNet division. PhoenixNet operated as the internet and technology infrastructure division of Phoenix between October 1999 and September 2001. PhoenixNet was one of four operating units of Phoenix during this period. PhoenixNet was focused on providing technology infrastructure that enabled security products and services to deliver a high level of trust to both devices and device-aware e-business applications through device authentication. Device authentication refers to the cryptographic verification of the identity of a particular personal computer or other digital device.

10. Although the principal initiative of this business unit was to provide "device authentication," PhoenixNet sought to offer products and services which could also provide "user authentication," which would cryptographically verify the identity of a device user.

11. In late 2000, Phoenix became aware of Integrated Sciences, Inc. ("ISI"), a one man company belonging to Jablon. ISI and/or Jablon owned certain patent applications for a cryptographic algorithm called SPEKE, which stands for "Strong Password-authenticated

Exponential Key Exchange." At the time, Phoenix believed SPEKE could provide the technology for the "user authentication" portion of its security initiative.

12. On February 16, 2001, Phoenix and Jablon entered into a Stock Purchase Agreement. Under this agreement, Jablon agreed to sell all of the outstanding capital stock of ISI to Phoenix. At or about the same time, Jablon entered into an Employment Agreement and an Employee Invention Assignment and Proprietary Information Agreement ("Confidentiality Agreement").

13. Jablon began work at Phoenix as Chief Technical Officer of the PhoenixNet division. In this position, Jablon worked on certain security-related technologies including StrongROM, which was intended to enhance certain security capabilities of the CSS. StrongROM was embedded as part of the CSS in a computing device's read-only memory ("ROM") chip which resides on the device's motherboard. StrongROM uses certain cryptographic algorithms and security keys to provide device authentication. StrongROM was never sold or licensed as a stand alone product or technology, however, it was employed as a small module of Phoenix's principal CSS products for several years.

14. In 2001, however, the computer industry was in the midst of a significant downturn which only got worse as the year progressed. As a result of this and other factors, the PhoenixNet division failed to flourish and Phoenix's overall business suffered. In October 2001, Phoenix reorganized itself to better align its corporate actions with corporate strategy. By virtue of this reorganization, Phoenix eliminated its various divisions, including PhoenixNet, and laid off numerous employees, including many who had worked in the PhoenixNet division. Although Phoenix continued to include security-related features in its CSS products, it largely eliminated the device authentication business which had been the focus of PhoenixNet. In December 2001, Phoenix effectively transferred this business to a third party.

15. In addition, the SPEKE technology which Phoenix had acquired from Jablon also proved to be a commercial failure. Following the elimination of PhoenixNet, SPEKE did not figure prominently in Phoenix's plans. Although the company marketed the technology and attempted to recoup some of the cost expended to acquire it, Phoenix succeeded in consummating

only three licenses for the technology with nominal revenues.

16. Jablon was employed by Phoenix until September 27, 2004. At the time of his termination, Jablon and Phoenix entered into a Separation Agreement, which Jablon signed on October 9, 2004. Attached hereto as Exhibit A is a true and correct copy of the Separation Agreement signed by Jablon which reconfirmed the obligations of an Employee Invention Assignment and Confidentiality Agreement ("Confidentiality Agreement") signed at the beginning of his employment. The Separation Agreement contains the following provisions pertinent to this action:

> 6. We wish to remind you of your obligations under the EMPLOYEE INVENTION ASSIGNEMENT and PROPRIETARY INFORMATION AGREEMENT which you signed upon your date of hire.
> . . .
> 9. In the event you breach any of your obligations under this Separation Agreement or as otherwise imposed by law, PHOENIX will be entitled to recover the benefit paid under the Agreement and to obtain all other relief provided by law or equity.
> . . .
> 10. This Agreement is governed by the laws of the State of California without reference to its laws regarding conflict of laws. You and PHOENIX will submit any disputes relating to this Agreement (other than those relating to intellectual property) to binding arbitration conducted by the American Arbitration Association in Santa Clara County, California. The prevailing party will recover from the losing party all costs and attorneys' fees incurred in any such arbitration or other legal proceeding.

(Separation Agreement, Ex. A.)

**Phoenix's Confidential and Proprietary Information and Trade Secrets**

17. As a condition of his employment with Phoenix, Jablon was required to sign, and did sign, the Confidentiality Agreement. Attached hereto as Exhibit B is a true and correct copy of the Confidentiality Agreement signed by Jablon. The Confidentiality Agreement contains the following provisions pertinent to this action:

> 1. I understand that Phoenix is engaged in a continuous program of research, development, production and marketing in connection with its business and that, as an essential part of my work with Phoenix, I am expected to make new contributions to and create inventions of value for Phoenix..
>
> 2. I agree to promptly disclose in writing in confidence to Phoenix all inventions, improvements, and other innovations of any kind, whether or not patentable or copyrightable or protectable as

trade secrets or mask works, that are made or conceived or first reduced to practice or created by me, either alone or jointly with others, during the period of my employment, whether or not such conception, first reduction to practice or creation occurs in the course of such employment ("Innovations"). . .

3.   I agree that all Innovations that (a) are not developed entirely on my own time, (b) are developed using equipment, supplies, facilities or trade secrets of Phoenix, (c) resulte from work performed by me for Phoenix, or (d) relate at the time of conception or reduction to practice to the business or the actual or demonstrably anticipated research or development of Phoenix, will be the sole and exclusive property of Phoenix, and I hereby assign to Phoenix any and all rights that I may have in any such Innovations and in any associated patents, patent applications, copyrights, trade secret rights, mask work rights, rights of priority or other intellectual property rights . . . .

. . .

6.   I understand that my employment with Phoenix creates a relationship of confidence and trust with respect to any information of a confidential or proprietary nature that may be disclosed to my [sic] by Phoenix or that I may learn in the course of my employment by Phoenix and that relates to the business, products, research or development of Phoenix, its suppliers and customers and their respective products ("Proprietary Information"). Such Proprietary Information includes but is not limited to Innovations, marketing plans, product plans, business strategies, financial information, forecasts, personnel information, customer lists and any other nonpublic technical or business information on that I knows [sic] or have reason to know Phoenix would desire to treat as confidential for any purposes, such as maintaining a competitive advantage or avoiding undesirable publicity.

7.   At all times, both during and after my employment, I will keep all such Proprietary Information in confidence and trust, and will not use or disclose any of such Proprietary Information without the prior written consent of Phoenix, except as may be necessary to perform my duties as an employee of Phoenix and for Phoenix's benefit. **Upon termination of my employment with Phoenix, I will promptly deliver to Phoenix all documents and materials of any nature pertaining to my work with Phoenix, and I will not take with me any documents or materials or copies thereof containing any Proprietary Information.**

. . .

11.   In the event of any violation of this Agreement by me, and in addition to any relief or remedies to which Phoenix may otherwise be entitled, **I agree that Phoenix shall have the right to an immediate injunction, and shall have the right to recover the reasonable attorneys' fees and court costs expended in connection with any litigation instituted to enforce this Agreement.**

. . .

1  (Confidentiality Agreement, Ex. B.) (Emphasis added.)

2  18.  Phoenix has developed the proprietary and trade secret technologies and source code related to its software products, including but not limited to StrongROM, at substantial effort and expense. Phoenix has also acquired or licensed technology from others ("Third Party Secrets"), including Jablon himself and other third parties, at considerable effort and expense. The proprietary and trade secret technologies and source code either developed and/or acquired by Phoenix (the "Phoenix Trade Secrets") are the result of significant expenditures on research and development, testing, analysis, business planning, market research, customer and supplier relationships, procurement processes and others.

19.  While Jablon was employed by Phoenix, he was involved in several research and development projects for the improvement of existing products and technologies or the creation of new ones to advance Phoenix's security-related technologies, products and services, including StrongROM. During each of these projects Jablon had access to Phoenix Trade Secrets, Third Party Secrets, and other confidential or proprietary information relating to the projects. In addition, Jablon had access to Phoenix Trade Secrets, Third Party Secrets, and other confidential or proprietary information regarding Phoenix's business relationships with licensees or other third parties who had business relationships with Phoenix. Jablon knew that such third-party information would likely be considered proprietary and confidential materials and that it was only shared with Phoenix pursuant to non-disclosure agreements or other confidential licensing arrangements under which Phoenix had an obligation to keep those materials confidential and to treat it as if it were Phoenix Trade Secrets.

20.  Phoenix's Trade Secrets and Third Party Secrets are valuable to Phoenix because they are not generally known to Phoenix's competitors and are not readily available to the public. Phoenix derives substantial economic value from its Phoenix Trade Secrets not being generally known to the public or its competitors, who could obtain economic value from their unauthorized disclosure or use.

21.  Because Phoenix Trade Secrets, Third Party Secrets and other confidential or proprietary information is so valuable, Phoenix has taken reasonable and appropriate measures to

1  protect such information. For example, all Phoenix employees, consultants and contractors are
2  required to sign a Confidentiality Agreement or similar non-disclosure agreement; all customers,
3  vendors and suppliers are required to sign a non-disclosure agreement; access to all of Phoenix's
4  offices is restricted and all employees must have a keycard to proceed past the public lobby in
5  Phoenix's buildings; all visitors to all of Phoenix's offices must sign into and out of a log and be
6  escorted by a Phoenix employee while on the premises; technical materials such as source code or
7  product specifications are customarily marked "confidential." In addition, the existence and
8  importance of Phoenix Trade Secrets and its confidential or proprietary information is addressed
9  and emphasized with new employees in connection with their joining Phoenix and again at exit
10 interviews.

11       22.    Jablon's Employment Agreement echoes the provisions of his Separation
12 Agreement and Confidentiality Agreement. Section 8(e) of the Employment Agreement states:
13 "On termination of employment for any reason, Employee will return to the Company all originals
14 and copies of all or any part of: lists and sources of customers and suppliers; lists of employees;
15 proposals to clients or drafts of proposals; business plans and projections; reports; job notes;
16 specifications; and drawings pertaining to the Company or its customers; or any and all other
17 things, equipment and written materials obtained by Employee during the course of employment
18 from the Company or from any client of the Company, unless Company provided in writing its
19 waiver of the foregoing."

**Jablon's Theft of Phoenix Trade Secrets**

21       23.    In November 2006, Jablon initiated an arbitration with the American Arbitration
22 Association relating to the Stock Purchase Agreement ("Arbitration"). Although he had already
23 received substantial cash and equity compensation in excess of millions of dollars Phoenix's
24 acquisition of his company and a technology of nominal commercial value, Jablon claimed to be
25 entitled to additional incentive-based "Earn-Out Consideration." Under the terms of the Stock
26 Purchase Agreement, the Arbitration is governed by California law but is to be conducted in
27 Boston, Massachusetts. The Arbitration is currently set to begin on April 14, 2008 before a single
28 arbitrator.

24. Discovery closed in the Arbitration on February 15, 2008. Depositions of current or former Phoenix personnel were scheduled in California for the week prior to the discovery cut-off. On February 12, 2008, immediately prior to a deposition of the former General Manager of the PhoenixNet division, Jablon produced a CD to counsel for Phoenix ("The Jablon CD").

25. The Jablon CD contains, among other things, source code files for Phoenix's StrongROM technology. These source code files contain substantially the following marking: "Copyright © 1985-2001 Phoenix Technologies Ltd. This program contains proprietary and confidential information. All rights reserved except as may be permitted by prior written consent." These materials constitute Phoenix Trade Secrets and/or Proprietary Information under the Confidentiality Agreement, and there is no legitimate justification for them to be in Jablon's possession.

26. The Jablon CD also contains source code files that constitute Third Party Secrets which Phoenix obtained via license from third parties. These source code files also indicate that they are to be treated as confidential and proprietary. Phoenix has an obligation to do so under the relevant license agreements.

27. Phoenix is informed and believes, and on that basis alleges, that Jablon has used or referred to the StrongROM source code files, other Phoenix Trade Secrets, Proprietary Information or Third Party Information in connection with his consulting work. Phoenix is also informed and believes, and on that basis alleges, that Jablon is in possession of other Phoenix Trade Secrets, Third Party Secrets and confidential or proprietary information which he has not yet revealed.

## FIRST CAUSE OF ACTION
### (Breach of Written Contract)

28. Phoenix realleges paragraphs 1-27 above as if fully set forth herein.

29. Upon joining Phoenix, Jablon was required to sign, and did sign, the Confidentiality Agreement. Pursuant to this agreement, Jablon agreed not to use or disclose Phoenix's Proprietary Information as defined in the Confidentiality Agreement. Moreover, pursuant to this agreement, Jablon agreed to return all documents and materials relating to his

work with Phoenix, and not to take any documents or materials or copies thereof containing any Proprietary Information.

30. At the time of his termination from Phoenix, by signing the Separation Agreement, Jablon reaffirmed his obligations under the Confidentiality Agreement.

31. The Confidentiality Agreement was supported by consideration and was a material inducement for Phoenix to agree to employ and/or continue to employ Jablon and pay him compensation. The Separation Agreement was supported by consideration and was a material inducement for Phoenix to agree to pay Jablon severance and agree to a limitation of the applicability of the release set forth in the agreement.

32. Phoenix performed all conditions and covenants required to be performed by it pursuant to the Confidentiality Agreement and Separation Agreement with Jablon, save and except those excused by the acts and omissions of Jablon.

33. Jablon has materially breached the Confidentiality Agreement and Separation Agreement with with Phoenix by, *inter alia,* using and disclosing Phoenix Trade Secrets and Third Party Secrets; removing Phoenix Trade Secrets and Third Party Secrets from Phoenix's premises without permission; and failing to return Phoenix Trade Secrets and Third Party Secrets upon termination of employment.

34. As a result of Jablon's continuing breach of the Confidentiality Agreement and Separation Agreement, Phoenix has suffered and will continue to suffer irreparable harm, for which it has no adequate remedy at law, thus entitling Phoenix to injunctive relief.

35. As a proximate result of the conduct alleged above, Phoenix has been damaged in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Misappropriation of Trade Secrets)**
(California Civil Code § 3426, *et seq.*)

36. Phoenix realleges paragraphs 1-35 above as if fully set forth herein.

37. The Phoenix Trade Secrets as described herein are trade secrets as defined by the California Uniform Trade Secrets Act, California Civil Code Section 3426 *et seq.* (the "UTSA").

Phoenix has taken reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, and this information derives economic value from not being generally known.

38. Phoenix is informed and believes and on that basis alleges that Jablon has acquired the Phoenix Trade Secrets by improper means, including, without limitation, theft and breach of duty to maintain secrecy. Such acts constitute misappropriation under the UTSA.

39. Phoenix is informed and believes and on that basis alleges that Jablon has misappropriated the Phoenix Trade Secrets as described herein, and is presently using the Phoenix Trade Secrets in connection with his own business activities, and not on behalf of Phoenix, without Phoenix's express or implied consent authorization or authority. Such acts constitute misappropriation of trade secrets under the UTSA.

40. Phoenix is informed and believes, and on that basis alleges that Jablon has either misappropriated or threatened to misappropriate, has either used or threatened to use, and has either disclosed or threatened to disclose the Phoenix Trade Secrets.

41. The conduct of Jablon has caused, and will continue to cause, irreparable harm to Phoenix. Unless and until enjoined, Jablon will continue to receive the benefit of the Phoenix Trade Secrets, which have aided and will continue to aid Jablon to compete unfairly against Phoenix. Moreover, Jablon will continue to use and disclose the Phoenix Trade Secrets to third parties. Phoenix will forever lose the value of its significant investment of time and money in the Phoenix Trade Secrets. Phoenix's competitive position, based upon its valuable knowledge, access to and use of the Phoenix Trade Secrets, will be irretrievably lost. Further, Jablon will be unjustly enriched in an amount that is separate and distinct from Phoenix's damages.

42. Phoenix is informed and believes, and on that basis alleges that Jablon has wrongfully acquired gains resulting from the conduct described in this Complaint, and accepted such gains with the knowledge that the gains came from such conduct. Thus, Jablon holds wrongfully acquired gains in constructive trust for the benefit of Phoenix, and Phoenix is entitled to an accounting of those gains.

43. As a proximate result of the actual and threatened misappropriation of the Phoenix Trade Secrets by Jablon, Phoenix has been damaged in that Jablon has and will continue to receive

the benefits of the Phoenix Trade Secrets, which have aided and continue to aid Jablon to compete unfairly against Phoenix, and Phoenix will suffer the loss of revenues from sale of its products and services. Phoenix is entitled to actual damages or royalties.

44. Phoenix is informed and believes and on that basis alleges that in misappropriating the Phoenix Trade Secrets, and engaging in the willful and malicious conduct and omissions alleged herein, Jablon are guilty of oppression, fraud and malice. Phoenix is therefore entitled to exemplary or punitive damages and attorneys' fees.

### THIRD CLAIM FOR RELIEF
(Computer Fraud and Abuse Act)
(18 U.S.C. § 1030)

45. Phoenix realleges paragraphs 1-44 above as if fully set forth herein.

46. Phoenix's computers are used in interstate and/or foreign commerce or communication.

47. Phoenix is informed and believes and thereon alleges that Jablon, who primarily worked remotely from his home in Massachusetts, knowingly and with intent to defraud accessed Phoenix's protected computers without authorization and/or exceeded his authorized access and so furthered his intended fraud and obtained Phoenix's valuable confidential and proprietary information, all in violation of the Computer Fraud and Abuse Act ("FAA"), 18 U.S.C. §1030.

48. Phoenix is informed and believes and thereon alleges that Jablon knowingly and intentionally accessed Phoenix's protected computers without authorization and purposely caused Phoenix damage by collecting and using confidential and proprietary information in violation of 18 U.S.C. § 1030.

49. Jablon's damage and illegal misuse of Phoenix's protected computers caused Phoenix to suffer a loss greater than $5,000 in value during a one year period, in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
(Electronic Communications Privacy Act (Title II))
(18 U.S.C. § 2701, *et seq.*)

50. Phoenix realleges paragraphs 1-49 above as if fully set forth herein.

51. Phoenix's confidential and proprietary electronic communications are not readily

accessible to the general public and are transferred by a system that affects interstate or foreign commerce.

52. Phoenix is informed and believes and thereon alleges that Jablon intentionally accessed, intercepted, disclosed and endeavored to disclose without authorization, or by intentionally exceeding an authorization to access, Phoenix's confidential and proprietary electronic communications, and thereby obtained unauthorized access to a wire or electronic communication while it was in electronic storage, all in violation of the Electronic Communications Privacy Act ("ECPA"),18 U.S.C. § 2701 *et seq.*

53. Phoenix is informed and believes and thereon alleges that Jablon used or endeavored to use without authorization or by intentionally exceeding authorization Phoenix's confidential and proprietary electronic communications, while knowing or having reason to know that the information was obtained through interception of electronic communications in violation of the ECPA, 18 U.S.C. § 2511.

54. Phoenix is entitled to an injunction restraining Jablon from engaging in further such acts in violation of the ECPA.

55. Phoenix is further entitled to recover from Jablon the damages it has sustained and will sustain as a result of Jablon's wrongful acts as alleged above. Phoenix is entitled to actual damages plus any profits made by Jablon as a result of the violation or statutory damages of $10,000. Phoenix is further entitled to punitive damages under 18 U.S.C. § 2520(b) due to Jablon's oppressive, malicious and reckless conduct.

56. Phoenix is entitled to attorneys' fees and litigation costs pursuant to 18 U.S.C. § 2520 (b)(3).

**FIFTH CLAIM FOR RELIEF**
**(Unauthorized Access to Computers, Computer Systems and Computer Data)**
**(California Penal Code §502)**

57. Phoenix realleges paragraphs 1-56 above as if fully set forth herein.

58. Phoenix is informed and believes, and on that basis alleges, that by the acts alleged in the preceding paragraphs, Jablon knowingly accessed and without permission used data,

computers, computer systems and/or a computer network in order to devise and/or execute a scheme or artifice to defraud, deceive or extort, and/or to wrongfully control or obtain money, property or data from Phoenix, in violation of California Penal Code § 502.

59. Phoenix is informed and believes, and on that basis alleges, that by the acts alleged in the preceding paragraphs, Jablon knowingly accessed and without permission took, copied and/or made use of data from a computer, computer system and/or a computer network owned by Phoenix, in violation of California Penal Code § 502.

60. Phoenix has suffered damage and loss as a result of Jablon's violations of Penal Code § 502. Phoenix is entitled to recover from Jablon for the actual damages sustained by Phoenix as a result of Jablon's wrongful acts as described in this Complaint, in an amount to be proven at trial.

61. Phoenix is entitled to injunctive relief under Penal Code § 502.

62. Phoenix is informed and believes and on that basis alleges that Jablon acted with oppression, malice, and fraud. Phoenix is therefore entitled to an award of punitive damages.

63. Phoenix is entitled to an award of attorneys' fees under Penal Code § 502.

### SIXTH CAUSE OF ACTION
**(Statutory Unfair Competition)**
(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

64. Phoenix realleges paragraphs 1-63 above as if fully set forth herein.

65. Phoenix is informed and believes, and on that basis alleges, that Jablon's wrongful conduct as set forth in the Complaint constitutes statutory unfair competition under California Business & Professions Code §§ 17200 *et seq.* ("Section 17200").

66. These acts and practices, as described in the preceding paragraphs, are unlawful and unfair in violation of Section 17200.

67. Phoenix is informed and believes, and on that basis alleges, that Jablon threatens and proposes to perform further acts of unfair competition and that, unless and until restrained by appropriate injunctive relief, Phoenix will continue to suffer irreparable harm for which there is no adequate remedy at law.

68. As a direct and proximate cause of Jablon's unfair competition, Jablon has been unjustly enriched as Phoenix's expense in an amount not yet ascertained. Phoenix is entitled to an accounting and restitution from Jablon in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
### (Common Law Unfair Competition)

69. Phoenix realleges paragraphs 1-68 above as if fully set forth herein.

70. Phoenix is informed and believes, and on that basis alleges, that Jablon's conduct as set forth in this Complaint constitutes unfair competition under the common law of the state of California.

71. Unless Jablon is restrained by appropriate injunctive relief, Phoenix will suffer immediate and irreparable harm for which there is no remedy at law.

72. Phoenix is informed and believes, and on that basis alleges that Jablon has wrongfully acquired gains resulting from the conduct described in this Complaint, and accepted such gains with the knowledge that the gains came from such conduct. Thus, Jablon holds the wrongfully acquired gains in constructive trust for the benefit of Phoenix, and Phoenix is entitled to an accounting of those gains

73. As a proximate result of Jablon's conduct, Phoenix has been damaged in an amount according to proof at trial.

74. Phoenix is informed and believes and on that basis alleges that Jablon's unfair competition was willful, oppressive and malicious conduct and that Jablon is guilty of oppression, fraud and malice. Phoenix is therefore entitled to exemplary or punitive damages

### EIGHTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

75. Phoenix realleges paragraphs 1-74 above as if fully set forth herein.

76. As an employee of Phoenix, Jablon at all times owed Phoenix a duty of loyalty, pursuant to which Jablon was bound at all times to give preference to the business of Phoenix, not to do anything which would cause Phoenix harm, to disclose to Phoenix all material information concerning its business, and to perform his duties to and exclusively for the benefit of Phoenix.

77. By engaging in the acts set forth in the Complaint, Jablon breached his duty of loyalty.

78. As a result of Jablon's breach of the duty of loyalty, Phoenix has been damaged in an amount to be proven at trial.

79. Phoenix is informed and believes and on that basis alleges that Jablon's breach of the duty of loyalty was willful, malicious, oppressive and fraudulent, justifying an award of punitive damages.

## PRAYER FOR RELIEF

Phoenix prays for judgment against Jablon as follows:

1. That Jablon and his agents, servants, employees, and all other persons acting in active concert or privately or in participation with him, and each of them, be preliminarily and permanently enjoined from the wrongful acts and conduct set forth above.

2. That Jablon and his agents, servants, employees, and all other persons acting in active concert or privately or in participation with him, and each of them, be preliminarily and permanently enjoined from:

   (a) accessing, using, copying, publishing, disclosing, using, attempting to use or disclose, transferring, selling or otherwise distributing, directly or indirectly, any Phoenix Trade Secrets and any product or technology developed with the use of, with reference to, derived from, or incorporating all or any part of the Phoenix Trade Secrets;

   (b) accessing, using, copying, publishing, disclosing, using, attempting to use or disclose, transferring, selling or otherwise distributing, directly or indirectly, any Phoenix Trade Secrets and any product or technology developed with the use of, with reference to, derived from, or incorporating all or any part of the Third Party Secrets; and

   (c) unfairly competing with Phoenix;

3. That Jablon be ordered to deliver to Phoenix:

   (a) all Phoenix documents, computer files, source code files, or other tangible Phoenix things, including, but not limited to, those things which refer to, reflect, constitute, or in

any way embody any of the Phoenix Trade Secrets or Third Party Secrets and all copies; and

   (b) any and all things created, incorporating, referencing, based upon, or derived from the Phoenix Trade Secrets and Third-Party Secrets.

  4. That Phoenix receive such other injunctive relief as Phoenix may request and the Court may deem just and proper.

  5. That Jablon be required to account for all gains, profits, and advantages derived from his acts of misappropriation and other violations of law.

  6. That all gains, profits and advantages derived by Jablon from acts of misappropriation and other violations of law be deemed to be in constructive trust for the benefit of Phoenix.

  7. For an order requiring Jablon to disgorge profits earned from his unlawful conduct.

  8. For an award of restitution, unjust enrichment, actual damages, statutory damages and compensatory damages according to proof at trial;

  9. For reimbursement of all compensation paid to Jablon under the Severance Agreement, and all consequential damages flowing from his breach of contract;

  10. For punitive and exemplary damages according to proof at trial;

  11. For attorney fees, costs of suit and prejudgment and postjudgment interest, as provided under applicable law; and

  12. For such other, further, and/or different relief, in law or equity, as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Phoenix Technologies Ltd. hereby demands a trial by jury on each of its claims for relief that are triable before a jury.

Dated: March 4, 2008    BERGESON, LLP

            By *[signature]*
            Michael W. Stebbins
            Attorneys for Plaintiff
            PHOENIX TECHNOLOGIES LTD.

§ JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
PHOENIX TECHNOLOGIES LTD., a Delaware Corporation

## DEFENDANTS
DAVID P. JABLON, an individual

C08 01286 PVT

(b) County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Michael W. Stebbins, Esq./Melinda M. Morton, Esq.
BERGESON, LLP, 303 Almaden Blvd., Suite 500
San Jose, CA 95110-2712
(408) 291-6200

Attorneys (If Known)

Kevin J. O'Connor, Esq./Christine M. Griffin, Esq.
Wolf, Block, Schorr and Solis-Cohen LLP
One Boston Place, Boston, MA 02108
Tel: (617) 226-4000

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [x] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [x] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| [ ] 110 Insurance | [ ] 310 Airplane | [ ] 362 Personal Injury— Med. Malpractice | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury — Product Liability | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | | | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | PROPERTY RIGHTS | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | | PERSONAL PROPERTY | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 340 Marine | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| | [ ] 345 Marine Product Liability | [ ] 371 Truth in Lending | [ ] 690 Other | | [ ] 490 Cable/Sat TV |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | [ ] 810 Selective Service |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [x] 190 Other Contract | [ ] 360 Other Personal Injury | | [ ] 720 Labor/Mgmt. Relations | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 195 Contract Product Liability | | | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | | PRISONER PETITIONS | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 892 Economic Stabilization Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | Habeas Corpus: | [ ] 791 Empl. Ret. Inc. Security Act | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 442 Employment | [ ] 530 General | | FEDERAL TAX SUITS | [ ] 894 Energy Allocation Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 535 Death Penalty | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 540 Mandamus & Other | IMMIGRATION | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities – Other | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus – Alien Detainee | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 440 Other Civil Rights | | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332
Brief description of cause:
Breach of Written Contract/Trade Secret Misappropriation

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $
- CHECK YES only if demanded in complaint:
- JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
- [ ] SAN FRANCISCO/OAKLAND
- [x] SAN JOSE

DATE
March 3, 2008

SIGNATURE OF ATTORNEY OF RECORD
*/s/ Michael W. Stebbins/*

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.  **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V. **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**       Example:        U.S. Civil Statute: 47 USC 553
                                    Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
**Date and Attorney Signature.** Date and sign the civil cover sheet.