1  MICHAEL W. STEBBINS, Bar No. 138326
   mstebbins@be-law.com
2  MELINDA M. MORTON, Bar No. 209373
   mmorton@be-law.com
3  INA STANGENES, Bar No. 156559
   istangenes@be-law.com
4  BERGESON, LLP
   303 Almaden Boulevard, Suite 500
5  San Jose, CA 95110-2712
   Telephone: (408) 291-6200
6  Facsimile: (408) 297-6000

7  Attorneys for Plaintiff
   PHOENIX TECHNOLOGIES LTD.

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                 SAN JOSE DIVISION

12 PHOENIX TECHNOLOGIES LTD., a Delaware   Case No. C08 01286 PVT
   Corporation,

13                                          EXHIBITS A AND C-E TO THE
                  Plaintiff,                DECLARATION OF MICHAEL W.
14                                          STEBBINS IN SUPPORT OF
                                            APPLICATION FOR TEMPORARY
15        vs.                               RESTRAINING ORDER, ORDER TO
                                            SHOW CAUSE RE: PRELIMINARY
16 DAVID P. JABLON, an individual,          INJUNCTION, AND AN ORDER
                                            AUTHORIZING EXPEDITED DISCOVERY
17                Defendant.
                                            Complaint Filed:  March 4, 2008
18                                          Trial Date:       None Set

19

20

21

22

23

24

25

26

27

28

1



## Michael Stebbins

| | |
|---|---|
| **From:** | Michael Stebbins |
| **Sent:** | Monday, March 03, 2008 1:50 PM |
| **To:** | 'O'Connor, Kevin J.' |
| **Cc:** | Virginia Ross |
| **Subject:** | Phoenix.Jablon |
| **Attachments:** | Complaint.pdf |

Kevin:

As indicated in our telephone conversation a few minutes ago, attached is a copy of a complaint that will be filed tomorrow in the USDC, ND Cal., San Jose Division.  This complaint will be accompanied by an application for TRO, OSC re: preliminary injunction, and expedited discovery.  We will e-mail you copies of the public/redacted version of the application papers after they have been filed.  Hard copies of the documents will also be sent to you as well.

Michael W. Stebbins, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Telephone:  408 291-6200 Main
Telephone:  408 291-6207 Direct
Facsimile:  408 297-6000

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law.  If you are not an intended recipient, do not forward this email.  Interception of this message may be a federal crime.  Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited.  If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.  2008 Bergeson, LLP [All Rights Reserved].

1  MICHAEL W. STEBBINS, Bar No. 138326
   mstebbins@be-law.com
2  MELINDA M. MORTON, Bar No. 209373
   mmorton@be-law.com
3  INA STANGENES, Bar No. 156559
   istangenes@be-law.com
4  BERGESON, LLP
   303 Almaden Boulevard, Suite 500
5  San Jose, CA 95110-2712
   Telephone:  (408) 291-6200
6  Facsimile:  (408) 297-6000

7  Attorneys for Plaintiff
   PHOENIX TECHNOLOGIES LTD.

8

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                      SAN JOSE DIVISION

12  PHOENIX TECHNOLOGIES LTD., a Delaware    Case No.
    Corporation,
13                                            **COMPLAINT FOR:**
                          Plaintiff,          **(1) BREACH OF WRITTEN CONTRACT;**
14                                            **(2) MISAPPROPRIATION OF TRADE**
            vs.                               **SECRETS; (3) COMPUTER FRAUD AND**
15                                            **ABUSE ACT; (4) ELECTRONIC**
                                              **COMMUNICATIONS PRIVACY ACT**
16  DAVID P. JABLON, an individual,          **(TITLE II); (5) UNAUTHORIZED ACCESS**
                                              **TO COMPUTERS, COMPUTER SYSTEMS**
17                        Defendant.          **AND COMPUTER DATA; (6) UNFAIR**
                                              **COMPETITION UNDER BUS. & PROF.**
18                                            **CODE § 172000 *ET SEQ.*; (7) COMMON**
                                              **LAW UNFAIR COMPETITION; (8)**
19                                            **BREACH OF DUTY OF LOYALTY**

20                                            **DEMAND FOR JURY TRIAL**

21                                            Complaint Filed:
                                              Trial Date:        None Set
22

23

24

25

26

27

28

1    Plaintiff Phoenix Technologies Ltd. ("Phoenix" or "plaintiff"), for its Complaint against

2    Defendant David P. Jablon ("Jablon" or "defendant"), alleges as follows:

3                              **NATURE OF THE ACTION**

4        1.    This action arises out of Jablon's breach of contract and misappropriation of

5    valuable source code, and other trade secrets and proprietary information from Phoenix.  Unless

6    Jablon is enjoined from continuing his wrongful activities, Phoenix will likely suffer irreparable

7    injury to its business for which pecuniary damages do not provide an adequate remedy.

8                                   **THE PARTIES**

9        2.    Phoenix is a corporation duly organized and existing under the laws of the state of

10   Delaware with its principal place of business at 915 Murphy Ranch Road, Milpitas, California.  .

11       3.    Phoenix is informed and believes, and on that basis alleges, that Jablon is an

12   individual residing at 7 Buckskin Drive, Westboro, Massachusetts.

13                           **JURISDICTION AND VENUE**

14       4.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

15   there is complete diversity of citizenship of the parties and the amount in controversy exceeds

16   $75,000.  The Court also has subject matter jurisdiction under the Electronic Communications

17   Privacy Act ("ECPA"), 18 U.S.C. § 2701 *et seq.*, and the Computer Fraud and Abuse Act

18   ("CFAA"), 18 U.S.C. § 1030 *et seq.*  The Court has supplemental jurisdiction over Phoenix's

19   related claims for relief arising under California law pursuant to 28 U.S.C. § 1367(a).

20       5.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part

21   of the events that gave rise to Phoenix's claims took place within the District, defendant's tortious

22   conduct was directed at this District, and Phoenix was injured by Jablon's tortious conduct in this

23   District.

24                           **INTRADISTRICT ASSIGNMENT**

25       6.    Intradistrict assignment, pursuant to Local Rule 3-2(c), is proper in the San Jose

26   division, as at least a substantial part of the events or omissions which give rise to the claims

27   occurred in Santa Clara County.

28

**FACTUAL ALLEGATIONS**

**Jablon's Employment**

7.     Phoenix designs, develops, manufactures and sells core system software ("CSS"), the modern form of BIOS ("Basic Input Output System") software for personal computers, servers and embedded devices.  Phoenix's CSS customers are principally original equipment manufacturers ("OEMs") and original design manufacturers ("ODMs"), who incorporate CSS products during the manufacturing process.  The CSS is typically stored in non-volatile memory on a chip that resides on the motherboard built into a device manufactured by our customer.  The CSS is executed during the power-up process in order to test, initialize and manage the functionality of the device's hardware.  Phoenix was established in 1979 and its core system software helped launch the PC industry more than 20 years ago.

8.     Phoenix also designs, develops and supports software products and services that provide the users of personal computers with enhanced device utility, reliability and security.

9.     In 1999, Phoenix sought to broaden its security-related offerings through an entrepreneurial business unit devoted to the development, manufacture and delivery of security-related technologies.  This business unit was eventually called the PhoenixNet division.  PhoenixNet operated as the internet and technology infrastructure division of Phoenix between October 1999 and September 2001.  PhoenixNet was one of four operating units of Phoenix during this period.  PhoenixNet was focused on providing technology infrastructure that enabled security products and services to deliver a high level of trust to both devices and device-aware e-business applications through device authentication.  Device authentication refers to the cryptographic verification of the identity of a particular personal computer or other digital device.

10.     Although the principal initiative of this business unit was to provide "device authentication," PhoenixNet sought to offer products and services which could also provide "user authentication," which would cryptographically verify the identity of a device user.

11.     In late 2000, Phoenix became aware of Integrated Sciences, Inc. ("ISI"), a one man company belonging to Jablon.  ISI and/or Jablon owned certain patent applications for a cryptographic algorithm called SPEKE, which stands for "Strong Password-authenticated

1    Exponential Key Exchange." At the time, Phoenix believed SPEKE could provide the technology

2    for the "user authentication" portion of its security initiative.

3          12.      On February 16, 2001, Phoenix and Jablon entered into a Stock Purchase

4    Agreement. Under this agreement, Jablon agreed to sell all of the outstanding capital stock of ISI

5    to Phoenix. At or about the same time, Jablon entered into an Employment Agreement and an

6    Employee Invention Assignment and Proprietary Information Agreement ("Confidentiality

7    Agreement").

8          13.      Jablon began work at Phoenix as Chief Technical Officer of the PhoenixNet

9    division. In this position, Jablon worked on certain security-related technologies including

10   StrongROM, which was intended to enhance certain security capabilities of the CSS. StrongROM

11   was embedded as part of the CSS in a computing device's read-only memory ("ROM") chip

12   which resides on the device's motherboard. StrongROM uses certain cryptographic algorithms

13   and security keys to provide device authentication. StrongROM was never sold or licensed as a

14   stand alone product or technology, however, it was employed as a module of Phoenix's principal

15   CSS products for several years.

16         14.      Is 2001, however, the computer industry was in the midst of a significant downturn

17   which only got worse as the year progressed. As a result of this and other factors, the PhoenixNet

18   division failed to flourish and Phoenix's overall business suffered. In October 2001, Phoenix

19   reorganized itself to better align its corporate actions with corporate strategy. By virtue of this

20   reorganization, Phoenix eliminated its various divisions, including PhoenixNet, and laid off

21   numerous employees, including many who had worked in the PhoenixNet division. Although

22   Phoenix continued to include security-related features in its CSS products, it largely eliminated the

23   device authentication business which had been the focus of PhoenixNet. In December 2001,

24   Phoenix effectively transferred this business to a third party.

25         15.      In addition, the SPEKE technology which Phoenix had acquired from Jablon also

26   proved to be a commercial failure. Following the elimination of PhoenixNet, SPEKE did not

27   figure prominently in Phoenix's plans. Although the company marketed the technology and

28   attempted to recoup some of the cost expended to acquire it, Phoenix succeeded in consummating

1   only three licenses for the technology with nominal revenues.

2        16.    Jablon was employed by Phoenix until September 27, 2004.  At the time of his

3   termination, Jablon and Phoenix entered into a Separation Agreement, which Jablon signed on

4   October 9, 2004.  Attached hereto as Exhibit A is a true and correct copy of the Separation

5   Agreement signed by Jablon which reconfirmed the obligations of an Employee Invention

6   Assignment and Confidentiality Agreement ("Confidentiality Agreement") signed at the beginning

7   of his employment.  The Separation Agreement contains the following provisions pertinent to this

8   action:

9           6.    We wish to remind you of your obligations under the EMPLOYEE
    INVENTION ASSIGNEMENT and PROPRIETARY INFORMATION
10          AGREEMENT which you signed upon your date of hire.
    . . .
11          9.    In the event you breach any of your obligations under this Separation
    Agreement or as otherwise imposed by law, PHOENIX will be entitled to recover
12          the benefit paid under the Agreement and to obtain all other relief provided by law
    or equity.
13          . . .
14          10.    This Agreement is governed by the laws of the State of California without
    reference to its laws regarding conflict of laws.  You and PHOENIX will submit
15          any disputes relating to this Agreement (other than those relating to intellectual
    property) to binding arbitration conducted by the American Arbitration Association
16          in Santa Clara County, California.  The prevailing party will recover from the
    losing party all costs and attorneys' fees incurred in any such arbitration or other
17          legal proceeding.

18  (Separation Agreement, Ex. A.)

19        **Phoenix's Confidential and Proprietary Information and Trade Secrets**

20       17.    As a condition of his employment with Phoenix, Jablon was required to sign, and

21  did sign, the Confidentiality Agreement.  Attached hereto as Exhibit B is a true and correct copy

22  of the Confidentiality Agreement signed by Jablon.  The Confidentiality Agreement contains the

23  following provisions pertinent to this action:

24          1.    I understand that Phoenix is engaged in a continuous
    program of research, development, production and marketing in
25          connection with its business and that, as an essential part of my
    work with Phoenix, I am expected to make new contributions to and
26          create inventions of value for Phoenix..

27          2.    I agree to promptly disclose in writing in confidence to
    Phoenix all inventions, improvements, and other innovations of any
28          kind, whether or not patentable or copyrightable or protectable as

trade secrets or mask works, that are made or conceived or first reduced to practice or created by me, either alone or jointly with others, during the period of my employment, whether or not such conception, first reduction to practice or creation occurs in the course of such employment ("Innovations"). . .

3.     I agree that all Innovations that (a) are not developed entirely on my own time, (b) are developed using equipment, supplies, facilities or trade secrets of Phoenix, (c) resulte from work performed by me for Phoenix, or (d) relate at the time of conception or reduction to practice to the business or the actual or demonstrably anticipated research or development of Phoenix, will be the sole and exclusive property of Phoenix, and I hereby assign to Phoenix any and all rights that I may have in any such Innovations and in any associated patents, patent applications, copyrights, trade secret rights, mask work rights, rights of priority or other intellectual property rights . . . .

. . .

6.     I understand that my employment with Phoenix creates a relationship of confidence and trust with respect to any information of a confidential or proprietary nature that may be disclosed to my [sic] by Phoenix or that I may learn in the course of my employment by Phoenix and that relates to the business, products, research or development of Phoenix, its suppliers and customers and their respective products ("Proprietary Information"). Such Proprietary Information includes but is not limited to Innovations, marketing plans, product plans, business strategies, financial information, forecasts, personnel information, customer lists and any other nonpublic technical or business information on that I knows [sic] or have reason to know Phoenix would desire to treat as confidential for any purposes, such as maintaining a competitive advantage or avoiding undesirable publicity.

7.     At all times, both during and after my employment, I will keep all such Proprietary Information in confidence and trust, and will not use or disclose any of such Proprietary Information without the prior written consent of Phoenix, except as may be necessary to perform my duties as an employee of Phoenix and for Phoenix's benefit. **Upon termination of my employment with Phoenix, I will promptly deliver to Phoenix all documents and materials of any nature pertaining to my work with Phoenix, and I will not take with me any documents or materials or copies thereof containing any Proprietary Information.**

. . .

11.     In the event of any violation of this Agreement by me, and in addition to any relief or remedies to which Phoenix may otherwise be entitled, I agree that Phoenix shall have the right to an immediate injunction, and shall have the right to recover the reasonable attorneys' fees and court costs expended in connection with any litigation instituted to enforce this Agreement.

. . .

1         13.    I understand that this Agreement will be governed by the laws of the State of California.

2

3    (Confidentiality Agreement, Ex. B.) (Emphasis added.)

4         18.    Phoenix has developed the proprietary and trade secret technologies and source

5    code related to its software products, including but not limited to StrongROM, at substantial effort

6    and expense. Phoenix has also acquired or licensed technology from others ("Third Party

7    Secrets"), including Jablon himself and other third parties, at considerable effort and expense. The

8    proprietary and trade secret technologies and source code either developed and/or acquired by

9    Phoenix (the "Phoenix Trade Secrets") are the result of significant expenditures on research and

10   development, testing, analysis, business planning, market research, customer and supplier

11   relationships, procurement processes and others.

12        19.    While Jablon was employed by Phoenix, he was involved in several research and

13   development projects for the improvement of existing products and technologies or the creation of

14   new ones to advance Phoenix's security-related technologies, products and services, including

15   StrongROM. During each of these projects Jablon had access to Phoenix Trade Secrets, Third

16   Party Secrets, and other confidential or proprietary information relating to the projects. In

17   addition, Jablon had access to Phoenix Trade Secrets, Third Party Secrets, and other confidential

18   or proprietary information regarding Phoenix's business relationships with licensees or other third

19   parties who had business relationships with Phoenix. Jablon knew that such third-party

20   information would likely be considered proprietary and confidential materials and that it was only

21   shared with Phoenix pursuant to non-disclosure agreements or other confidential licensing

22   arrangements under which Phoenix had an obligation to keep those materials confidential and to

23   treat it as if it were Phoenix Trade Secrets.

24        20.    Phoenix's Trade Secrets and Third Party Secrets are valuable to Phoenix because

25   they are not generally known to Phoenix's competitors and are not readily available to the public.

26   Phoenix derives substantial economic value from its Phoenix Trade Secrets not being generally

27   known to the public or its competitors, who could obtain economic value from their unauthorized

28   disclosure or use.

21.     Because Phoenix Trade Secrets, Third Party Secrets and other confidential or proprietary information is so valuable, Phoenix has taken reasonable and appropriate measures to protect such information. For example, all Phoenix employees, consultants and contractors are required to sign a Confidentiality Agreement or similar non-disclosure agreement; all customers, vendors and suppliers are required to sign a non-disclosure agreement; access to all of Phoenix's offices is restricted and all employees must have a keycard to proceed past the public lobby in Phoenix's buildings; all visitors to all of Phoenix's offices must sign into and out of a log and be escorted by a Phoenix employee while on the premises; technical materials such as source code or product specifications are customarily marked "confidential." In addition, the existence and importance of Phoenix Trade Secrets and its confidential or proprietary information is addressed and emphasized with new employees in connection with their joining Phoenix and again at exit interviews.

22.     Jablon's Employment Agreement echoes the provisions of his Separation Agreement and Confidentiality Agreement. Section 8(e) of the Employment Agreement states: "On termination of employment for any reason, Employee will return to the Company all originals and copies of all or any part of: lists and sources of customers and suppliers; lists of employees; proposals to clients or drafts of proposals; business plans and projections; reports; job notes; specifications; and drawings pertaining to the Company or its customers; or any and all other things, equipment and written materials obtained by Employee during the course of employment from the Company or from any client of the Company, unless Company provided in writing its waiver of the foregoing."

**Jablon's Theft of Phoenix Trade Secrets**

23.     In November 2006, Jablon initiated an arbitration with the American Arbitration Association relating to the Stock Purchase Agreement ("Arbitration"). Although he had already received cash and equity compensation exceeding $6 million for Phoenix's acquisition of his company and a technology of nominal commercial value, Jablon claimed to be entitled to additional incentive-based "Earn-Out Consideration." Under the terms of the Stock Purchase Agreement, the Arbitration is governed by California law but is to be conducted in Boston,

1    Massachusetts. The Arbitration is currently set to begin on April 14, 2008 before a single

2    arbitrator.

3         24.    Discovery closed in the Arbitration on February 15, 2008. Depositions of current

4    or former Phoenix personnel were scheduled in California for the week prior to the discovery cut-

5    off. On February 12, 2008, immediately prior to a deposition of the former General Manager of

6    the PhoenixNet division, Jablon produced a CD to counsel for Phoenix, Bates labeled J03639

7    ("The Jablon CD").

8         25.    The Jablon CD contains, among other things, source code files for Phoenix's

9    StrongROM technology. These source code files contain substantially the following marking:

10   "Copyright © 1985-2001 Phoenix Technologies Ltd. This program contains proprietary and

11   confidential information. All rights reserved except as may be permitted by prior written

12   consent." These materials constitute Phoenix Trade Secrets and/or Proprietary Information under

13   the Confidentiality Agreement, and there is no legitimate justification for them to be in Jablon's

14   possession.

15        26.    The Jablon CD also contains source code files that constitute Third Party Secrets

16   which Phoenix obtained via license from third parties. These source code files also indicate that

17   they are to be treated as confidential and proprietary. Phoenix has an obligation to do so under the

18   relevant license agreements.

19        27.    Phoenix is informed and believes, and on that basis alleges, that Jablon has used or

20   referred to the StrongROM source code files, other Phoenix Trade Secrets, Proprietary

21   Information or Third Party Information in connection with his consulting work. Phoenix is also

22   informed and believes, and on that basis alleges, that Jablon is in possession of other Phoenix

23   Trade Secrets, Third Party Secrets and confidential or proprietary information which he has not

24   yet revealed.

**FIRST CAUSE OF ACTION**
**(Breach of Written Contract)**

25

26

27        28.    Phoenix realleges paragraphs 1-27 above as if fully set forth herein.

28        29.    Upon joining Phoenix, Jablon was required to sign, and did sign, the

1   Confidentiality Agreement. Pursuant to this agreement, Jablon agreed not to use or disclose

2   Phoenix's Proprietary Information as defined in the Confidentiality Agreement. Moreover,

3   pursuant to this agreement, Jablon agreed to return all documents and materials relating to his

4   work with Phoenix, and not to take any documents or materials or copies thereof containing any

5   Proprietary Information.

6       30.    At the time of his termination from Phoenix, by signing the Separation Agreement,

7   Jablon reaffirmed his obligations under the Confidentiality Agreement.

8       31.    The Confidentiality Agreement was supported by consideration and was a material

9   inducement for Phoenix to agree to employ and/or continue to employ Jablon and pay him

10  compensation. The Separation Agreement was supported by consideration and was a material

11  inducement for Phoenix to agree to pay Jablon severance and agree to a limitation of the

12  applicability of the release set forth in the agreement.

13      32.    Phoenix performed all conditions and covenants required to be performed by it

14  pursuant to the Confidentiality Agreement and Separation Agreement with Jablon, save and except

15  those excused by the acts and omissions of Jablon.

16      33.    Jablon has materially breached the Confidentiality Agreement and Separation

17  Agreement with with Phoenix by, *inter alia,* using and disclosing Phoenix Trade Secrets and Third

18  Party Secrets; removing Phoenix Trade Secrets and Third Party Secrets from Phoenix's premises

19  without permission; and failing to return Phoenix Trade Secrets and Third Party Secrets upon

20  termination of employment.

21      34.    As a result of Jablon's continuing breach of the Confidentiality Agreement and

22  Separation Agreement, Phoenix has suffered and will continue to suffer irreparable harm, for

23  which it has no adequate remedy at law, thus entitling Phoenix to injunctive relief.

24      35.    As a proximate result of the conduct alleged above, Phoenix has been damaged in

25  an amount to be proven at trial.

26                          **SECOND CAUSE OF ACTION**
                            **(Misappropriation of Trade Secrets)**
27                          (California Civil Code § 3426, *et seq.*)

28      36. Phoenix realleges paragraphs 1-35 above as if fully set forth herein.

9

37.    The Phoenix Trade Secrets as described herein are trade secrets as defined by the California Uniform Trade Secrets Act, California Civil Code Section 3426 *et seq.* (the "UTSA"). Phoenix has taken reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, and this information derives economic value from not being generally known.

38.    Phoenix is informed and believes and on that basis alleges that Jablon has acquired the Phoenix Trade Secrets by improper means, including, without limitation, theft and breach of duty to maintain secrecy.  Such acts constitute misappropriation under the UTSA.

39.    Phoenix is informed and believes and on that basis alleges that Jablon has misappropriated the Phoenix Trade Secrets as described herein, and is presently using the Phoenix Trade Secrets in connection with his own business activities, and not on behalf of Phoenix, without Phoenix's express or implied consent authorization or authority.  Such acts constitute misappropriation of trade secrets under the UTSA.

40.    Phoenix is informed and believes, and on that basis alleges that Jablon has either misappropriated or threatened to misappropriate, has either used or threatened to use, and has either disclosed or threatened to disclose the Phoenix Trade Secrets.

41.    The conduct of Jablon has caused, and will continue to cause, irreparable harm to Phoenix.  Unless and until enjoined, Jablon will continue to receive the benefit of the Phoenix Trade Secrets, which have aided and will continue to aid Jablon to compete unfairly against Phoenix.  Moreover, Jablon will continue to use and disclose the Phoenix Trade Secrets to third parties.  Phoenix will forever lose the value of its significant investment of time and money in the Phoenix Trade Secrets.  Phoenix's competitive position, based upon its valuable knowledge, access to and use of the Phoenix Trade Secrets, will be irretrievably lost.  Further, Jablon will be unjustly enriched in an amount that is separate and distinct from Phoenix's damages.

42.    Phoenix is informed and believes, and on that basis alleges that Jablon has wrongfully acquired gains resulting from the conduct described in this Complaint, and accepted such gains with the knowledge that the gains came from such conduct.  Thus, Jablon holds wrongfully acquired gains in constructive trust for the benefit of Phoenix, and Phoenix is entitled to an accounting of those gains.

43.    As a proximate result of the actual and threatened misappropriation of the Phoenix Trade Secrets by Jablon, Phoenix has been damaged in that Jablon has and will continue to receive the benefits of the Phoenix Trade Secrets, which have aided and continue to aid Jablon to compete unfairly against Phoenix, and Phoenix will suffer the loss of revenues from sale of its products and services. Phoenix is entitled to actual damages or royalties.

44.    Phoenix is informed and believes and on that basis alleges that in misappropriating the Phoenix Trade Secrets, and engaging in the willful and malicious conduct and omissions alleged herein, Jablon are guilty of oppression, fraud and malice. Phoenix is therefore entitled to exemplary or punitive damages and attorneys' fees.

## THIRD CLAIM FOR RELIEF
### (Computer Fraud and Abuse Act)
#### (18 U.S.C. § 1030)

45.    Phoenix realleges paragraphs 1-44 above as if fully set forth herein.

46.    Phoenix's computers are used in interstate and/or foreign commerce or communication.

47.    Phoenix is informed and believes and thereon alleges that Jablon, who primarily worked remotely from his home in Massachusetts, knowingly and with intent to defraud accessed Phoenix's protected computers without authorization and/or exceeded his authorized access and so furthered his intended fraud and obtained Phoenix's valuable confidential and proprietary information, all in violation of the Computer Fraud and Abuse Act ("FAA"), 18 U.S.C. §1030.

48.    Phoenix is informed and believes and thereon alleges that Jablon knowingly and intentionally accessed Phoenix's protected computers without authorization and purposely caused Phoenix damage by collecting and using confidential and proprietary information in violation of 18 U.S.C. § 1030.

49.    Jablon's damage and illegal misuse of Phoenix's protected computers caused Phoenix to suffer a loss greater than $5,000 in value during a one year period, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Electronic Communications Privacy Act (Title II))
#### (18 U.S.C. § 2701, et seq.)

50.    Phoenix realleges paragraphs 1-49 above as if fully set forth herein.

51.    Phoenix's confidential and proprietary electronic communications are not readily accessible to the general public and are transferred by a system that affects interstate or foreign commerce.

52.    Phoenix is informed and believes and thereon alleges that Jablon intentionally accessed, intercepted, disclosed and endeavored to disclose without authorization, or by intentionally exceeding an authorization to access, Phoenix's confidential and proprietary electronic communications, and thereby obtained unauthorized access to a wire or electronic communication while it was in electronic storage, all in violation of the Electronic Communications Privacy Act ("ECPA"),18 U.S.C. § 2701 *et seq.*

53.    Phoenix is informed and believes and thereon alleges that Jablon used or endeavored to use without authorization or by intentionally exceeding authorization Phoenix's confidential and proprietary electronic communications, while knowing or having reason to know that the information was obtained through interception of electronic communications in violation of the ECPA, 18 U.S.C. § 2511.

54.    Phoenix is entitled to an injunction restraining Jablon from engaging in further such acts in violation of the ECPA.

55.    Phoenix is further entitled to recover from Jablon the damages it has sustained and will sustain as a result of Jablon's wrongful acts as alleged above.  Phoenix is entitled to actual damages plus any profits made by Jablon as a result of the violation or statutory damages of $10,000.  Phoenix is further entitled to punitive damages under 18 U.S.C. § 2520(b) due to Jablon's oppressive, malicious and reckless conduct.

56.    Phoenix is entitled to attorneys' fees and litigation costs pursuant to 18 U.S.C. § 2520 (b)(3).

### FIFTH CLAIM FOR RELIEF
**(Unauthorized Access to Computers, Computer Systems and Computer Data)**
(California Penal Code §502)

57.    Phoenix realleges paragraphs 1-56 above as if fully set forth herein.

12
PHOENIX'S COMPLAINT

58.    Phoenix is informed and believes, and on that basis alleges, that by the acts alleged in the preceding paragraphs, Jablon knowingly accessed and without permission used data, computers, computer systems and/or a computer network in order to devise and/or execute a scheme or artifice to defraud, deceive or extort, and/or to wrongfully control or obtain money, property or data from Phoenix, in violation of California Penal Code § 502.

59.    Phoenix is informed and believes, and on that basis alleges, that by the acts alleged in the preceding paragraphs, Jablon knowingly accessed and without permission took, copied and/or made use of data from a computer, computer system and/or a computer network owned by Phoenix, in violation of California Penal Code § 502.

60.    Phoenix has suffered damage and loss as a result of Jablon's violations of Penal Code § 502. Phoenix is entitled to recover from Jablon for the actual damages sustained by Phoenix as a result of Jablon's wrongful acts as described in this Complaint, in an amount to be proven at trial.

61.    Phoenix is entitled to injunctive relief under Penal Code § 502.

62.    Phoenix is informed and believes and on that basis alleges that Jablon acted with oppression, malice, and fraud. Phoenix is therefore entitled to an award of punitive damages.

63.    Phoenix is entitled to an award of attorneys' fees under Penal Code § 502.

**SIXTH CAUSE OF ACTION**
**(Statutory Unfair Competition)**
(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

64.    Phoenix realleges paragraphs 1-63 above as if fully set forth herein.

65.    Phoenix is informed and believes, and on that basis alleges, that Jablon's wrongful conduct as set forth in the Complaint constitutes statutory unfair competition under California Business & Professions Code §§ 17200 *et seq.* ("Section 17200").

66.    These acts and practices, as described in the preceding paragraphs, are unlawful and unfair in violation of Section 17200.

67.    Phoenix is informed and believes, and on that basis alleges, that Jablon threatens and proposes to perform further acts of unfair competition and that, unless and until restrained by

1  appropriate injunctive relief, Phoenix will continue to suffer irreparable harm for which there is no

2  adequate remedy at law.

3       68.    As a direct and proximate cause of Jablon's unfair competition, Jablon has been

4  unjustly enriched as Phoenix's expense in an amount not yet ascertained.  Phoenix is entitled to an

5  accounting and restitution from Jablon in an amount to be determined at trial.

6

7  **SEVENTH CAUSE OF ACTION**<br>**(Common Law Unfair Competition)**

8       69.    Phoenix realleges paragraphs 1-68 above as if fully set forth herein.

9       70.    Phoenix is informed and believes, and on that basis alleges, that Jablon's conduct

10  as set forth in this Complaint constitutes unfair competition under the common law of the state of

11  California.

12       71.    Unless Jablon is restrained by appropriate injunctive relief, Phoenix will suffer

13  immediate and irreparable harm for which there is no remedy at law.

14       72.    Phoenix is informed and believes, and on that basis alleges that Jablon has

15  wrongfully acquired gains resulting from the conduct described in this Complaint, and accepted

16  such gains with the knowledge that the gains came from such conduct.  Thus, Jablon holds the

17  wrongfully acquired gains in constructive trust for the benefit of Phoenix, and Phoenix is entitled

18  to an accounting of those gains

19       73.    As a proximate result of Jablon's conduct, Phoenix has been damaged in an amount

20  according to proof at trial.

21       74.    Phoenix is informed and believes and on that basis alleges that Jablon's unfair

22  competition was willful, oppressive and malicious conduct and that Jablon is guilty of oppression,

23  fraud and malice.  Phoenix is therefore entitled to exemplary or punitive damages.

24  **EIGHTH CAUSE OF ACTION**<br>**(Breach of Duty of Loyalty)**

25

26       75.    Phoenix realleges paragraphs 1-74 above as if fully set forth herein.

27       76.    As an employee of Phoenix, Jablon at all times owed Phoenix a duty of loyalty,

28  pursuant to which Jablon was bound at all times to give preference to the business of Phoenix, not

14<br>

1  to do anything which would cause Phoenix harm, to disclose to Phoenix all material information

2  concerning its business, and to perform his duties to and exclusively for the benefit of Phoenix.

3       77.    By engaging in the acts set forth in the Complaint, Jablon breached his duty of

4  loyalty.

5       78.    As a result of Jablon's breach of the duty of loyalty, Phoenix has been damaged in

6  an amount to be proven at trial.

7       79.    Phoenix is informed and believes and on that basis alleges that Jablon's breach of

8  the duty of loyalty was willful, malicious, oppressive and fraudulent, justifying an award of

9  punitive damages.

10

11                                     **PRAYER FOR RELIEF**

12  Phoenix prays for judgment against Jablon as follows:

13       1.    That Jablon and his agents, servants, employees, and all other persons acting in

14  active concert or privately or in participation with him, and each of them, be preliminarily and

15  permanently enjoined from the wrongful acts and conduct set forth above.

16       2.    That Jablon and his agents, servants, employees, and all other persons acting in

17  active concert or privately or in participation with him, and each of them, be preliminarily and

18  permanently enjoined from:

19           (a)    accessing, using, copying, publishing, disclosing, using, attempting to use

20  or disclose, transferring, selling or otherwise distributing, directly or indirectly, any Phoenix Trade

21  Secrets and any product or technology developed with the use of, with reference to, derived from,

22  or incorporating all or any part of the Phoenix Trade Secrets;

23           (b)    accessing, using, copying, publishing, disclosing, using, attempting to use

24  or disclose, transferring, selling or otherwise distributing, directly or indirectly, any Phoenix Trade

25  Secrets and any product or technology developed with the use of, with reference to, derived from,

26  or incorporating all or any part of the Third Party Secrets; and

27           (c)    unfairly competing with Phoenix;

28  / / /

1   3.   That Jablon be ordered to deliver to Phoenix:

2   (a)   all Phoenix documents, computer files, source code files, or other tangible

3   Phoenix things, including, but not limited to, those things which refer to, reflect, constitute, or in

4   any way embody any of the Phoenix Trade Secrets or Third Party Secrets and all copies; and

5   (b)   any and all things created, incorporating, referencing, based upon, or

6   derived from the Phoenix Trade Secrets and Third-Party Secrets.

7   4.   That Phoenix receive such other injunctive relief as Phoenix may request and the

8   Court may deem just and proper.

9   5.   That Jablon be required to account for all gains, profits, and advantages derived

10   from his acts of misappropriation and other violations of law.

11   6.   That all gains, profits and advantages derived by Jablon from acts of

12   misappropriation and other violations of law be deemed to be in constructive trust for the benefit

13   of Phoenix.

14   7.   For an order requiring Jablon to disgorge profits earned from his unlawful conduct.

15   8.   For an award of restitution, unjust enrichment, actual damages, statutory damages

16   and compensatory damages according to proof at trial;

17   9.   For reimbursement of all compensation paid to Jablon under the Severance

18   Agreement, and all consequential damages flowing from his breach of contract;

19   10.   For punitive and exemplary damages according to proof at trial;

20   11.   For attorney fees, costs of suit and prejudgment and postjudgment interest, as

21   provided under applicable law; and

22

23   / / /

24

25   / / /

26

27   / / /

28

1    12.    For such other, further, and/or different relief, in law or equity, as the Court may

2    deem just and proper.

3

4                              **DEMAND FOR JURY TRIAL**

5        Plaintiff Phoenix Technologies Ltd. hereby demands a trial by jury on each of its claims

6    for relief that are triable before a jury.

7    Dated: February __, 2008              BERGESON, LLP

8

9                                  By:_____
                                         Michael W. Stebbins
10                                       Attorneys for Plaintiff
                                         PHOENIX TECHNOLOGIES LTD.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        17

**Michael Stebbins**

| | |
|---|---|
| **From:** | Michael Stebbins |
| **Sent:** | Monday, March 03, 2008 3:23 PM |
| **To:** | 'jablon1363@yahoo.com' |
| **Cc:** | Virginia Ross; 'O'Connor, Kevin J.' |
| **Subject:** | Phoenix.Jablon |
| **Attachments:** | Complaint.pdf |

Dear Mr. Jablon:

Under the relevant procedural rules regarding such matters, I called your attorney, Kevin O'Connor, to indicate that my client, Phoenix Technologies Ltd., would be filing a complaint against you tomorrow in USDC, ND Cal., San Jose Division.

Perhaps predictably, Mr. O'Connor indicated that he would not be accepting service on your behalf although I suspect he will be acting as your attorney in the matter. Notwithstanding Mr. O'Connor's request that I not call or e-mail you, under the rules, I must provide notice to either your attorney or you personally. Because I am virtually certain he has already spoken to you and forwarded you the original e-mail attaching the complaint, and in deference to his request that I not call you, I will only send this e-mail to what I understand to be your personal e-mail account.

[Please see the e-mail chain I have appended to this e-mail below. Although I waited over an hour for Mr. O'Connor to respond to my last e-mail below, he did not respond.]

In any event, there is no question that we are required to provide the defendant in such an action with notice that we will be filing such a complaint and that we will also be filing an application for TRO, OSC re: preliminary injunction, and expedited discovery.

Attached is a copy of the complaint. We will serve you with copies of the public/redacted version of the application papers after they have been filed. We will also serve Mr. O'Connor with a copy of the documents.

Michael W. Stebbins, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Telephone: 408 291-6200 Main
Telephone: 408 291-6207 Direct
Facsimile: 408 297-6000

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law. If you are not an intended recipient, do not forward this email. Interception of this message may be a federal crime. Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited. If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein. 2008 Bergeson, LLP [All Rights Reserved].

Thanks for your e-mail, Kevin.

However, I am required by the Local Rules (L.R. 65-1) to provide notice of an application for TRO to either opposing counsel or the party. I am trying to do that. Because you say that you will not accept service (and, by implication, may not be representing him in the action, although I suspect that you will), I must contact Mr. Jablon directly.

As you know by now, since sending my last e-mail I left you a voice mail in which I indicated that I would *not* be calling him since I am certain you have already spoken to him (accordingly to your assistant, you were on the phone when I called you shortly after I sent my last e-mail). Nevertheless, I must ensure that he has been provided with a copy of the complaint. If you can provide me with that assurance and confirm that you have spoken with him (and, perhaps, already forwarded my e-mail), then I will not send a copy of the complaint via e-mail to his Jablon1363@yahoo.com account.

Otherwise, I will send the e-mail.

I understand that your first instinct is to make even these perfunctory procedural steps as difficult as possible, however, I respectfully submit that throwing up any such road blocks on this issue is really unwise and will make no difference in the end.

Thank you for your cooperation.

Michael W. Stebbins, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Telephone: 408 291-6200 Main
Telephone: 408 291-6207 Direct
Facsimile: 408 297-6000

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law. If you are not an intended recipient, do not forward this email. Interception of this message may be a federal crime. Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited. If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein. 2008 Bergeson, LLP [All Rights Reserved].

**From:** O'Connor, Kevin J. [mailto:koconnor@WOLFBLOCK.com]
**Sent:** Monday, March 03, 2008 2:13 PM
**To:** Michael Stebbins
**Cc:** Virginia Ross; Griffin, Christine M.
**Subject:** RE: Phoenix.Jablon

You should not be contacting my client directly by phone or email. If you want to sue him, go ahead and serve him and go through formal processes. If he wants to have a lawyer contact you, he will.

Kevin J. O'Connor

3/4/2008

WolfBlock LLP
One Boston Place, 40th Floor
Boston, MA 02108
Direct: (617) 226-4005
Fax: (617) 226-4505
koconnor@wolfblock.com
www.wolfblock.com


**From:** Michael Stebbins [mailto:MStebbins@be-law.com]
**Sent:** Monday, March 03, 2008 5:04 PM
**To:** O'Connor, Kevin J.
**Cc:** Virginia Ross
**Subject:** RE: Phoenix.Jablon

I understand. This is not service, however, but merely notice to you. I will then call him and send him an e-mail.


Michael W. Stebbins, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Telephone: 408 291-6200 Main
Telephone: 408 291-6207 Direct
Facsimile: 408 297-6000

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law. If you are not an intended recipient, do not forward this email. Interception of this message may be a federal crime. Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited. If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein. 2008 Bergeson, LLP [All Rights Reserved].


**From:** O'Connor, Kevin J. [mailto:koconnor@WOLFBLOCK.com]
**Sent:** Monday, March 03, 2008 2:00 PM
**To:** Michael Stebbins
**Cc:** Virginia Ross
**Subject:** RE: Phoenix.Jablon

Mike,

Thanks for the copy. I am not authorized to accept service for Mr. Jablon.

Kevin


3/4/2008

Kevin J. O'Connor
WolfBlock LLP
One Boston Place, 40th Floor
Boston, MA 02108
Direct: (617) 226-4005
Fax: (617) 226-4505
koconnor@wolfblock.com
www.wolfblock.com

**From:** Michael Stebbins [mailto:MStebbins@be-law.com]
**Sent:** Monday, March 03, 2008 4:50 PM
**To:** O'Connor, Kevin J.
**Cc:** Virginia Ross
**Subject:** Phoenix.Jablon

Kevin:

As indicated in our telephone conversation a few minutes ago, attached is a copy of a complaint that will be filed tomorrow in the USDC, ND Cal., San Jose Division. This complaint will be accompanied by an application for TRO, OSC re: preliminary injunction, and expedited discovery. We will e-mail you copies of the public/redacted version of the application papers after they have been filed. Hard copies of the documents will also be sent to you as well.


Michael W. Stebbins, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Telephone: 408 291-6200 Main
Telephone: 408 291-6207 Direct
Facsimile: 408 297-6000

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law. If you are not an intended recipient, do not forward this email. Interception of this message may be a federal crime. Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited. If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein. 2008 Bergeson, LLP [All Rights Reserved].

1   MICHAEL W. STEBBINS, Bar No. 138326
    mstebbins@be-law.com
2   MELINDA M. MORTON, Bar No. 209373
    mmorton@be-law.com
3   INA STANGENES, Bar No. 156559
    istangenes@be-law.com
4   BERGESON, LLP
    303 Almaden Boulevard, Suite 500
5   San Jose, CA 95110-2712
    Telephone:  (408) 291-6200
6   Facsimile:   (408) 297-6000

7   Attorneys for Plaintiff
    PHOENIX TECHNOLOGIES LTD.
8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12  PHOENIX TECHNOLOGIES LTD., a Delaware    Case No.
    Corporation,
13                                           COMPLAINT FOR:
                            Plaintiff,       (1) BREACH OF WRITTEN CONTRACT;
14                                           (2) MISAPPROPRIATION OF TRADE
            vs.                              SECRETS; (3) COMPUTER FRAUD AND
15                                           ABUSE ACT; (4) ELECTRONIC
                                             COMMUNICATIONS PRIVACY ACT
16  DAVID P. JABLON, an individual,          (TITLE II); (5) UNAUTHORIZED ACCESS
                                             TO COMPUTERS, COMPUTER SYSTEMS
17                          Defendant.       AND COMPUTER DATA; (6) UNFAIR
                                             COMPETITION UNDER BUS. & PROF.
18                                           CODE § 172000 *ET SEQ.*; (7) COMMON
                                             LAW UNFAIR COMPETITION; (8)
19                                           BREACH OF DUTY OF LOYALTY

20                                           DEMAND FOR JURY TRIAL

21                                           Complaint Filed:
                                             Trial Date:        None Set
22

23

24

25

26

27

28

                            PHOENIX'S COMPLAINT

1    Plaintiff Phoenix Technologies Ltd. ("Phoenix" or "plaintiff"), for its Complaint against

2    Defendant David P. Jablon ("Jablon" or "defendant"), alleges as follows:

3                              **NATURE OF THE ACTION**

4        1.      This action arises out of Jablon's breach of contract and misappropriation of

5    valuable source code, and other trade secrets and proprietary information from Phoenix.  Unless

6    Jablon is enjoined from continuing his wrongful activities, Phoenix will likely suffer irreparable

7    injury to its business for which pecuniary damages do not provide an adequate remedy.

8                                **THE PARTIES**

9        2.      Phoenix is a corporation duly organized and existing under the laws of the state of

10   Delaware with its principal place of business at 915 Murphy Ranch Road, Milpitas, California. .

11       3.      Phoenix is informed and believes, and on that basis alleges, that Jablon is an

12   individual residing at 7 Buckskin Drive, Westboro, Massachusetts.

13                         **JURISDICTION AND VENUE**

14       4.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

15   there is complete diversity of citizenship of the parties and the amount in controversy exceeds

16   $75,000.  The Court also has subject matter jurisdiction under the Electronic Communications

17   Privacy Act ("ECPA"), 18 U.S.C. § 2701 *et seq.*, and the Computer Fraud and Abuse Act

18   ("CFAA"), 18 U.S.C. § 1030 *et seq.*  The Court has supplemental jurisdiction over Phoenix's

19   related claims for relief arising under California law pursuant to 28 U.S.C. § 1367(a).

20       5.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part

21   of the events that gave rise to Phoenix's claims took place within the District, defendant's tortious

22   conduct was directed at this District, and Phoenix was injured by Jablon's tortious conduct in this

23   District.

24                      **INTRADISTRICT ASSIGNMENT**

25       6.      Intradistrict assignment, pursuant to Local Rule 3-2(c), is proper in the San Jose

26   division, as at least a substantial part of the events or omissions which give rise to the claims

27   occurred in Santa Clara County.

28

1
                 **FACTUAL ALLEGATIONS**

2
                  **Jablon's Employment**

3        7.     Phoenix designs, develops, manufactures and sells core system software ("CSS"),

4 the modern form of BIOS ("Basic Input Output System") software for personal computers, servers

5 and embedded devices. Phoenix's CSS customers are principally original equipment

6 manufacturers ("OEMs") and original design manufacturers ("ODMs"), who incorporate CSS

7 products during the manufacturing process. The CSS is typically stored in non-volatile memory

8 on a chip that resides on the motherboard built into a device manufactured by our customer. The

9 CSS is executed during the power-up process in order to test, initialize and manage the

10 functionality of the device's hardware. Phoenix was established in 1979 and its core system

11 software helped launch the PC industry more than 20 years ago.

12        8.     Phoenix also designs, develops and supports software products and services that

13 provide the users of personal computers with enhanced device utility, reliability and security.

14        9.     In 1999, Phoenix sought to broaden its security-related offerings through an

15 entrepreneurial business unit devoted to the development, manufacture and delivery of security-

16 related technologies. This business unit was eventually called the PhoenixNet division.

17 PhoenixNet operated as the internet and technology infrastructure division of Phoenix between

18 October 1999 and September 2001. PhoenixNet was one of four operating units of Phoenix

19 during this period. PhoenixNet was focused on providing technology infrastructure that enabled

20 security products and services to deliver a high level of trust to both devices and device-aware e-

21 business applications through device authentication. Device authentication refers to the

22 cryptographic verification of the identity of a particular personal computer or other digital device.

23       10.    Although the principal initiative of this business unit was to provide "device

24 authentication," PhoenixNet sought to offer products and services which could also provide "user

25 authentication," which would cryptographically verify the identity of a device user.

26       11.    In late 2000, Phoenix became aware of Integrated Sciences, Inc. ("ISI"), a one-man

27 company belonging to Jablon. ISI and/or Jablon owned certain patent applications for a

28 cryptographic algorithm called SPEKE, which stands for "Strong Password-authenticated

1  Exponential Key Exchange."  At the time, Phoenix believed SPEKE could provide the technology

2  for the "user authentication" portion of its security initiative.

3        12.     On February 16, 2001, Phoenix and Jablon entered into a Stock Purchase

4  Agreement.  Under this agreement, Jablon agreed to sell all of the outstanding capital stock of ISI

5  to Phoenix.  At or about the same time, Jablon entered into an Employment Agreement and an

6  Employee Invention Assignment and Proprietary Information Agreement ("Confidentiality

7  Agreement").

8        13.     Jablon began work at Phoenix as Chief Technical Officer of the PhoenixNet

9  division.  In this position, Jablon worked on certain security-related technologies including

10  StrongROM, which was intended to enhance certain security capabilities of the CSS.  StrongROM

11  was embedded as part of the CSS in a computing device's read-only memory ("ROM") chip

12  which resides on the device's motherboard.  StrongROM uses certain cryptographic algorithms

13  and security keys to provide device authentication.  StrongROM was never sold or licensed as a

14  stand alone product or technology, however, it was employed as a module of Phoenix's principal

15  CSS products for several years.

16        14.     Is 2001, however, the computer industry was in the midst of a significant downturn

17  which only got worse as the year progressed.  As a result of this and other factors, the PhoenixNet

18  division failed to flourish and Phoenix's overall business suffered.  In October 2001, Phoenix

19  reorganized itself to better align its corporate actions with corporate strategy.  By virtue of this

20  reorganization, Phoenix eliminated its various divisions, including PhoenixNet, and laid off

21  numerous employees, including many who had worked in the PhoenixNet division.  Although

22  Phoenix continued to include security-related features in its CSS products, it largely eliminated the

23  device authentication business which had been the focus of PhoenixNet.  In December 2001,

24  Phoenix effectively transferred this business to a third party.

25        15.     In addition, the SPEKE technology which Phoenix had acquired from Jablon also

26  proved to be a commercial failure.  Following the elimination of PhoenixNet, SPEKE did not

27  figure prominently in Phoenix's plans.  Although the company marketed the technology and

28  attempted to recoup some of the cost expended to acquire it, Phoenix succeeded in consummating

1 only three licenses for the technology with nominal revenues.

2       16.    Jablon was employed by Phoenix until September 27, 2004. At the time of his

3 termination, Jablon and Phoenix entered into a Separation Agreement, which Jablon signed on

4 October 9, 2004. Attached hereto as Exhibit A is a true and correct copy of the Separation

5 Agreement signed by Jablon which reconfirmed the obligations of an Employee Invention

6 Assignment and Confidentiality Agreement ("Confidentiality Agreement") signed at the beginning

7 of his employment. The Separation Agreement contains the following provisions pertinent to this

8 action:

9         6.    We wish to remind you of your obligations under the EMPLOYEE
        INVENTION ASSIGNEMENT and PROPRIETARY INFORMATION
10         AGREEMENT which you signed upon your date of hire.

11         9.    In the event you breach any of your obligations under this Separation
        Agreement or as otherwise imposed by law, PHOENIX will be entitled to recover
12         the benefit paid under the Agreement and to obtain all other relief provided by law
        or equity.

13         10.    This Agreement is governed by the laws of the State of California without
14         reference to its laws regarding conflict of laws. You and PHOENIX will submit
        any disputes relating to this Agreement (other than those relating to intellectual
15         property) to binding arbitration conducted by the American Arbitration Association
        in Santa Clara County, California. The prevailing party will recover from the
16         losing party all costs and attorneys' fees incurred in any such arbitration or other
        legal proceeding.

17

18 (Separation Agreement, Ex. A.)

19       **Phoenix's Confidential and Proprietary Information and Trade Secrets**

20       17.    As a condition of his employment with Phoenix, Jablon was required to sign, and

21 did sign, the Confidentiality Agreement. Attached hereto as Exhibit B is a true and correct copy

22 of the Confidentiality Agreement signed by Jablon. The Confidentiality Agreement contains the

23 following provisions pertinent to this action:

24         1.    I understand that Phoenix is engaged in a continuous
        program of research, development, production and marketing in
25         connection with its business and that, as an essential part of my
        work with Phoenix, I am expected to make new contributions to and
26         create inventions of value for Phoenix..

27         2.    I agree to promptly disclose in writing in confidence to
        Phoenix all inventions, improvements, and other innovations of any
28         kind, whether or not patentable or copyrightable or protectable as

trade secrets or mask works, that are made or conceived or first reduced to practice or created by me, either alone or jointly with others, during the period of my employment, whether or not such conception, first reduction to practice or creation occurs in the course of such employment ("Innovations"). . .

3.    I agree that all Innovations that (a) are not developed entirely on my own time, (b) are developed using equipment, supplies, facilities or trade secrets of Phoenix, (c) resulte from work performed by me for Phoenix, or (d) relate at the time of conception or reduction to practice to the business or the actual or demonstrably anticipated research or development of Phoenix, will be the sole and exclusive property of Phoenix, and I hereby assign to Phoenix any and all rights that I may have in any such Innovations and in any associated patents, patent applications, copyrights, trade secret rights, mask work rights, rights of priority or other intellectual property rights . . . .

. . .

6.    I understand that my employment with Phoenix creates a relationship of confidence and trust with respect to any information of a confidential or proprietary nature that may be disclosed to my [sic] by Phoenix or that I may learn in the course of my employment by Phoenix and that relates to the business, products, research or development of Phoenix, its suppliers and customers and their respective products ("Proprietary Information").  Such Proprietary Information includes but is not limited to Innovations, marketing plans, product plans, business strategies, financial information, forecasts, personnel information, customer lists and any other nonpublic technical or business information on that I knows [sic] or have reason to know Phoenix would desire to treat as confidential for any purposes, such as maintaining a competitive advantage or avoiding undesirable publicity.

7.    At all times, both during and after my employment, I will keep all such Proprietary Information in confidence and trust, and will not use or disclose any of such Proprietary Information without the prior written consent of Phoenix, except as may be necessary to perform my duties as an employee of Phoenix and for Phoenix's benefit.  **Upon termination of my employment with Phoenix, I will promptly deliver to Phoenix all documents and materials of any nature pertaining to my work with Phoenix, and I will not take with me any documents or materials or copies thereof containing any Proprietary Information.**
. . .

11.    In the event of any violation of this Agreement by me, and in addition to any relief or remedies to which Phoenix may otherwise be entitled, I agree that Phoenix shall have the right to an immediate injunction, and shall have the right to recover the reasonable attorneys' fees and court costs expended in connection with any litigation instituted to enforce this Agreement.
. . .

1

        13.    I understand that this Agreement will be governed by the laws of the State of California.

2

3

(Confidentiality Agreement, Ex. B.) (Emphasis added.)

4

        18.    Phoenix has developed the proprietary and trade secret technologies and source

5 code related to its software products, including but not limited to StrongROM, at substantial effort

6 and expense. Phoenix has also acquired or licensed technology from others ("Third Party

7 Secrets"), including Jablon himself and other third parties, at considerable effort and expense. The

8 proprietary and trade secret technologies and source code either developed and/or acquired by

9 Phoenix (the "Phoenix Trade Secrets") are the result of significant expenditures on research and

10 development, testing, analysis, business planning, market research, customer and supplier

11 relationships, procurement processes and others.

12

        19.    While Jablon was employed by Phoenix, he was involved in several research and

13 development projects for the improvement of existing products and technologies or the creation of

14 new ones to advance Phoenix's security-related technologies, products and services, including

15 StrongROM. During each of these projects Jablon had access to Phoenix Trade Secrets, Third

16 Party Secrets, and other confidential or proprietary information relating to the projects. In

17 addition, Jablon had access to Phoenix Trade Secrets, Third Party Secrets, and other confidential

18 or proprietary information regarding Phoenix's business relationships with licensees or other third

19 parties who had business relationships with Phoenix. Jablon knew that such third-party

20 information would likely be considered proprietary and confidential materials and that it was only

21 shared with Phoenix pursuant to non-disclosure agreements or other confidential licensing

22 arrangements under which Phoenix had an obligation to keep those materials confidential and to

23 treat it as if it were Phoenix Trade Secrets.

24

        20.    Phoenix's Trade Secrets and Third Party Secrets are valuable to Phoenix because

25 they are not generally known to Phoenix's competitors and are not readily available to the public.

26 Phoenix derives substantial economic value from its Phoenix Trade Secrets not being generally

27 known to the public or its competitors, who could obtain economic value from their unauthorized

28 disclosure or use.

21.     Because Phoenix Trade Secrets, Third Party Secrets and other confidential or proprietary information is so valuable, Phoenix has taken reasonable and appropriate measures to protect such information. For example, all Phoenix employees, consultants and contractors are required to sign a Confidentiality Agreement or similar non-disclosure agreement; all customers, vendors and suppliers are required to sign a non-disclosure agreement; access to all of Phoenix's offices is restricted and all employees must have a keycard to proceed past the public lobby in Phoenix's buildings; all visitors to all of Phoenix's offices must sign into and out of a log and be escorted by a Phoenix employee while on the premises; technical materials such as source code or product specifications are customarily marked "confidential." In addition, the existence and importance of Phoenix Trade Secrets and its confidential or proprietary information is addressed and emphasized with new employees in connection with their joining Phoenix and again at exit interviews.

22.     Jablon's Employment Agreement echoes the provisions of his Separation Agreement and Confidentiality Agreement. Section 8(e) of the Employment Agreement states: "On termination of employment for any reason, Employee will return to the Company all originals and copies of all or any part of: lists and sources of customers and suppliers; lists of employees; proposals to clients or drafts of proposals; business plans and projections; reports; job notes; specifications; and drawings pertaining to the Company or its customers; or any and all other things, equipment and written materials obtained by Employee during the course of employment from the Company or from any client of the Company, unless Company provided in writing its waiver of the foregoing."

**Jablon's Theft of Phoenix Trade Secrets**

23.     In November 2006, Jablon initiated an arbitration with the American Arbitration Association relating to the Stock Purchase Agreement ("Arbitration"). Although he had already received cash and equity compensation exceeding $6 million for Phoenix's acquisition of his company and a technology of nominal commercial value, Jablon claimed to be entitled to additional incentive-based "Earn-Out Consideration." Under the terms of the Stock Purchase Agreement, the Arbitration is governed by California law but is to be conducted in Boston,

1  Massachusetts.  The Arbitration is currently set to begin on April 14, 2008 before a single

2  arbitrator.

3        24.    Discovery closed in the Arbitration on February 15, 2008.  Depositions of current

4  or former Phoenix personnel were scheduled in California for the week prior to the discovery cut-

5  off.  On February 12, 2008, immediately prior to a deposition of the former General Manager of

6  the PhoenixNet division, Jablon produced a CD to counsel for Phoenix, Bates labeled J03639

7  ("The Jablon CD").

8        25.    The Jablon CD contains, among other things, source code files for Phoenix's

9  StrongROM technology.  These source code files contain substantially the following marking:

10  "Copyright © 1985-2001 Phoenix Technologies Ltd.  This program contains proprietary and

11  confidential information.  All rights reserved except as may be permitted by prior written

12  consent."  These materials constitute Phoenix Trade Secrets and/or Proprietary Information under

13  the Confidentiality Agreement, and there is no legitimate justification for them to be in Jablon's

14  possession.

15        26.    The Jablon CD also contains source code files that constitute Third Party Secrets

16  which Phoenix obtained via license from third parties.  These source code files also indicate that

17  they are to be treated as confidential and proprietary.  Phoenix has an obligation to do so under the

18  relevant license agreements.

19        27.    Phoenix is informed and believes, and on that basis alleges, that Jablon has used or

20  referred to the StrongROM source code files, other Phoenix Trade Secrets, Proprietary

21  Information or Third Party Information in connection with his consulting work.  Phoenix is also

22  informed and believes, and on that basis alleges, that Jablon is in possession of other Phoenix

23  Trade Secrets, Third Party Secrets and confidential or proprietary information which he has not

24  yet revealed.

25                            **FIRST CAUSE OF ACTION**
                            **(Breach of Written Contract)**

26

27        28.    Phoenix realleges paragraphs 1-27 above as if fully set forth herein.

28        29.    Upon joining Phoenix, Jablon was required to sign, and did sign, the

1   Confidentiality Agreement.  Pursuant to this agreement, Jablon agreed not to use or disclose

2   Phoenix's Proprietary Information as defined in the Confidentiality Agreement.  Moreover,

3   pursuant to this agreement, Jablon agreed to return all documents and materials relating to his

4   work with Phoenix, and not to take any documents or materials or copies thereof containing any

5   Proprietary Information.

6        30.     At the time of his termination from Phoenix, by signing the Separation Agreement,

7   Jablon reaffirmed his obligations under the Confidentiality Agreement.

8        31.     The Confidentiality Agreement was supported by consideration and was a material

9   inducement for Phoenix to agree to employ and/or continue to employ Jablon and pay him

10  compensation.  The Separation Agreement was supported by consideration and was a material

11  inducement for Phoenix to agree to pay Jablon severance and agree to a limitation of the

12  applicability of the release set forth in the agreement.

13       32.     Phoenix performed all conditions and covenants required to be performed by it

14  pursuant to the Confidentiality Agreement and Separation Agreement with Jablon, save and except

15  those excused by the acts and omissions of Jablon.

16       33.     Jablon has materially breached the Confidentiality Agreement and Separation

17  Agreement with with Phoenix by, *inter alia,* using and disclosing Phoenix Trade Secrets and Third

18  Party Secrets; removing Phoenix Trade Secrets and Third Party Secrets from Phoenix's premises

19  without permission; and failing to return Phoenix Trade Secrets and Third Party Secrets upon

20  termination of employment.

21       34.     As a result of Jablon's continuing breach of the Confidentiality Agreement and

22  Separation Agreement, Phoenix has suffered and will continue to suffer irreparable harm, for

23  which it has no adequate remedy at law, thus entitling Phoenix to injunctive relief.

24       35.     As a proximate result of the conduct alleged above, Phoenix has been damaged in

25  an amount to be proven at trial.

26                    **SECOND CAUSE OF ACTION**
                      **(Misappropriation of Trade Secrets)**
27                    (California Civil Code § 3426, *et seq.*)

28       36. Phoenix realleges paragraphs 1-35 above as if fully set forth herein.

37.   The Phoenix Trade Secrets as described herein are trade secrets as defined by the California Uniform Trade Secrets Act, California Civil Code Section 3426 *et seq.* (the "UTSA"). Phoenix has taken reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, and this information derives economic value from not being generally known.

38.   Phoenix is informed and believes and on that basis alleges that Jablon has acquired the Phoenix Trade Secrets by improper means, including, without limitation, theft and breach of duty to maintain secrecy.  Such acts constitute misappropriation under the UTSA.

39.   Phoenix is informed and believes and on that basis alleges that Jablon has misappropriated the Phoenix Trade Secrets as described herein, and is presently using the Phoenix Trade Secrets in connection with his own business activities, and not on behalf of Phoenix, without Phoenix's express or implied consent authorization or authority.  Such acts constitute misappropriation of trade secrets under the UTSA.

40.   Phoenix is informed and believes, and on that basis alleges that Jablon has either misappropriated or threatened to misappropriate, has either used or threatened to use, and has either disclosed or threatened to disclose the Phoenix Trade Secrets.

41.   The conduct of Jablon has caused, and will continue to cause, irreparable harm to Phoenix.  Unless and until enjoined, Jablon will continue to receive the benefit of the Phoenix Trade Secrets, which have aided and will continue to aid Jablon to compete unfairly against Phoenix.  Moreover, Jablon will continue to use and disclose the Phoenix Trade Secrets to third parties.  Phoenix will forever lose the value of its significant investment of time and money in the Phoenix Trade Secrets.  Phoenix's competitive position, based upon its valuable knowledge, access to and use of the Phoenix Trade Secrets, will be irretrievably lost.  Further, Jablon will be unjustly enriched in an amount that is separate and distinct from Phoenix's damages.

42.   Phoenix is informed and believes, and on that basis alleges that Jablon has wrongfully acquired gains resulting from the conduct described in this Complaint, and accepted such gains with the knowledge that the gains came from such conduct.  Thus, Jablon holds wrongfully acquired gains in constructive trust for the benefit of Phoenix, and Phoenix is entitled to an accounting of those gains.

43.    As a proximate result of the actual and threatened misappropriation of the Phoenix Trade Secrets by Jablon, Phoenix has been damaged in that Jablon has and will continue to receive the benefits of the Phoenix Trade Secrets, which have aided and continue to aid Jablon to compete unfairly against Phoenix, and Phoenix will suffer the loss of revenues from sale of its products and services. Phoenix is entitled to actual damages or royalties.

44.    Phoenix is informed and believes and on that basis alleges that in misappropriating the Phoenix Trade Secrets, and engaging in the willful and malicious conduct and omissions alleged herein, Jablon are guilty of oppression, fraud and malice. Phoenix is therefore entitled to exemplary or punitive damages and attorneys' fees.

**THIRD CLAIM FOR RELIEF**
**(Computer Fraud and Abuse Act)**
(18 U.S.C. § 1030)

45.    Phoenix realleges paragraphs 1-44 above as if fully set forth herein.

46.    Phoenix's computers are used in interstate and/or foreign commerce or communication.

47.    Phoenix is informed and believes and thereon alleges that Jablon, who primarily worked remotely from his home in Massachusetts, knowingly and with intent to defraud accessed Phoenix's protected computers without authorization and/or exceeded his authorized access and so furthered his intended fraud and obtained Phoenix's valuable confidential and proprietary information, all in violation of the Computer Fraud and Abuse Act ("FAA"), 18 U.S.C. §1030.

48.    Phoenix is informed and believes and thereon alleges that Jablon knowingly and intentionally accessed Phoenix's protected computers without authorization and purposely caused Phoenix damage by collecting and using confidential and proprietary information in violation of 18 U.S.C. § 1030.

49.    Jablon's damage and illegal misuse of Phoenix's protected computers caused Phoenix to suffer a loss greater than $5,000 in value during a one year period, in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**(Electronic Communications Privacy Act (Title II))**
(18 U.S.C. § 2701, *et seq.*)

50.   Phoenix realleges paragraphs 1-49 above as if fully set forth herein.

51.   Phoenix's confidential and proprietary electronic communications are not readily accessible to the general public and are transferred by a system that affects interstate or foreign commerce.

52.   Phoenix is informed and believes and thereon alleges that Jablon intentionally accessed, intercepted, disclosed and endeavored to disclose without authorization, or by intentionally exceeding an authorization to access, Phoenix's confidential and proprietary electronic communications, and thereby obtained unauthorized access to a wire or electronic communication while it was in electronic storage, all in violation of the Electronic Communications Privacy Act ("ECPA"),18 U.S.C. § 2701 *et seq.*

53.   Phoenix is informed and believes and thereon alleges that Jablon used or endeavored to use without authorization or by intentionally exceeding authorization Phoenix's confidential and proprietary electronic communications, while knowing or having reason to know that the information was obtained through interception of electronic communications in violation of the ECPA, 18 U.S.C. § 2511.

54.   Phoenix is entitled to an injunction restraining Jablon from engaging in further such acts in violation of the ECPA.

55.   Phoenix is further entitled to recover from Jablon the damages it has sustained and will sustain as a result of Jablon's wrongful acts as alleged above.  Phoenix is entitled to actual damages plus any profits made by Jablon as a result of the violation or statutory damages of $10,000.  Phoenix is further entitled to punitive damages under 18 U.S.C. § 2520(b) due to Jablon's oppressive, malicious and reckless conduct.

56.   Phoenix is entitled to attorneys' fees and litigation costs pursuant to 18 U.S.C. § 2520 (b)(3).

### FIFTH CLAIM FOR RELIEF
**(Unauthorized Access to Computers, Computer Systems and Computer Data)**
(California Penal Code §502)

57.   Phoenix realleges paragraphs 1-56 above as if fully set forth herein.

12
PHOENIX'S COMPLAINT

58.     Phoenix is informed and believes, and on that basis alleges, that by the acts alleged in the preceding paragraphs, Jablon knowingly accessed and without permission used data, computers, computer systems and/or a computer network in order to devise and/or execute a scheme or artifice to defraud, deceive or extort, and/or to wrongfully control or obtain money, property or data from Phoenix, in violation of California Penal Code § 502.

59.     Phoenix is informed and believes, and on that basis alleges, that by the acts alleged in the preceding paragraphs, Jablon knowingly accessed and without permission took, copied and/or made use of data from a computer, computer system and/or a computer network owned by Phoenix, in violation of California Penal Code § 502.

60.     Phoenix has suffered damage and loss as a result of Jablon's violations of Penal Code § 502.  Phoenix is entitled to recover from Jablon for the actual damages sustained by Phoenix as a result of Jablon's wrongful acts as described in this Complaint, in an amount to be proven at trial.

61.     Phoenix is entitled to injunctive relief under Penal Code § 502.

62.     Phoenix is informed and believes and on that basis alleges that Jablon acted with oppression, malice, and fraud.  Phoenix is therefore entitled to an award of punitive damages.

63.     Phoenix is entitled to an award of attorneys' fees under Penal Code § 502.

## SIXTH CAUSE OF ACTION
### (Statutory Unfair Competition)
(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

64.     Phoenix realleges paragraphs 1-63 above as if fully set forth herein.

65.     Phoenix is informed and believes, and on that basis alleges, that Jablon's wrongful conduct as set forth in the Complaint constitutes statutory unfair competition under California Business & Professions Code §§ 17200 *et seq.* ("Section 17200").

66.     These acts and practices, as described in the preceding paragraphs, are unlawful and unfair in violation of Section 17200.

67.     Phoenix is informed and believes, and on that basis alleges, that Jablon threatens and proposes to perform further acts of unfair competition and that, unless and until restrained by

1   appropriate injunctive relief, Phoenix will continue to suffer irreparable harm for which there is no

2   adequate remedy at law.

3        68.    As a direct and proximate cause of Jablon's unfair competition, Jablon has been

4   unjustly enriched as Phoenix's expense in an amount not yet ascertained.  Phoenix is entitled to an

5   accounting and restitution from Jablon in an amount to be determined at trial.

6
                           **SEVENTH CAUSE OF ACTION**
7                           **(Common Law Unfair Competition)**

8        69.    Phoenix realleges paragraphs 1-68 above as if fully set forth herein.

9        70.    Phoenix is informed and believes, and on that basis alleges, that Jablon's conduct

10  as set forth in this Complaint constitutes unfair competition under the common law of the state of

11  California.

12       71.    Unless Jablon is restrained by appropriate injunctive relief, Phoenix will suffer

13  immediate and irreparable harm for which there is no remedy at law.

14       72.    Phoenix is informed and believes, and on that basis alleges that Jablon has

15  wrongfully acquired gains resulting from the conduct described in this Complaint, and accepted

16  such gains with the knowledge that the gains came from such conduct.  Thus, Jablon holds the

17  wrongfully acquired gains in constructive trust for the benefit of Phoenix, and Phoenix is entitled

18  to an accounting of those gains

19       73.    As a proximate result of Jablon's conduct, Phoenix has been damaged in an amount

20  according to proof at trial.

21       74.    Phoenix is informed and believes and on that basis alleges that Jablon's unfair

22  competition was willful, oppressive and malicious conduct and that Jablon is guilty of oppression,

23  fraud and malice.  Phoenix is therefore entitled to exemplary or punitive damages

24                              **EIGHTH CAUSE OF ACTION**
25                          **(Breach of Duty of Loyalty)**

26       75.    Phoenix realleges paragraphs 1-74 above as if fully set forth herein.

27       76.    As an employee of Phoenix, Jablon at all times owed Phoenix a duty of loyalty,

28  pursuant to which Jablon was bound at all times to give preference to the business of Phoenix, not

1    to do anything which would cause Phoenix harm, to disclose to Phoenix all material information

2    concerning its business, and to perform his duties to and exclusively for the benefit of Phoenix.

3        77.    By engaging in the acts set forth in the Complaint, Jablon breached his duty of

4    loyalty.

5        78.    As a result of Jablon's breach of the duty of loyalty, Phoenix has been damaged in

6    an amount to be proven at trial.

7        79.    Phoenix is informed and believes and on that basis alleges that Jablon's breach of

8    the duty of loyalty was willful, malicious, oppressive and fraudulent, justifying an award of

9    punitive damages.

10

11                          **PRAYER FOR RELIEF**

12    Phoenix prays for judgment against Jablon as follows:

13        1.    That Jablon and his agents, servants, employees, and all other persons acting in

14    active concert or privately or in participation with him, and each of them, be preliminarily and

15    permanently enjoined from the wrongful acts and conduct set forth above.

16        2.    That Jablon and his agents, servants, employees, and all other persons acting in

17    active concert or privately or in participation with him, and each of them, be preliminarily and

18    permanently enjoined from:

19        (a)    accessing, using, copying, publishing, disclosing, using, attempting to use

20    or disclose, transferring, selling or otherwise distributing, directly or indirectly, any Phoenix Trade

21    Secrets and any product or technology developed with the use of, with reference to, derived from,

22    or incorporating all or any part of the Phoenix Trade Secrets;

23        (b)    accessing, using, copying, publishing, disclosing, using, attempting to use

24    or disclose, transferring, selling or otherwise distributing, directly or indirectly, any Phoenix Trade

25    Secrets and any product or technology developed with the use of, with reference to, derived from,

26    or incorporating all or any part of the Third Party Secrets; and

27        (c)    unfairly competing with Phoenix;

28    ///

---

15

PHOENIX'S COMPLAINT

3.   That Jablon be ordered to deliver to Phoenix:

   (a)   all Phoenix documents, computer files, source code files, or other tangible Phoenix things, including, but not limited to, those things which refer to, reflect, constitute, or in any way embody any of the Phoenix Trade Secrets or Third Party Secrets and all copies; and

   (b)   any and all things created, incorporating, referencing, based upon, or derived from the Phoenix Trade Secrets and Third-Party Secrets.

4.   That Phoenix receive such other injunctive relief as Phoenix may request and the Court may deem just and proper.

5.   That Jablon be required to account for all gains, profits, and advantages derived from his acts of misappropriation and other violations of law.

6.   That all gains, profits and advantages derived by Jablon from acts of misappropriation and other violations of law be deemed to be in constructive trust for the benefit of Phoenix.

7.   For an order requiring Jablon to disgorge profits earned from his unlawful conduct.

8.   For an award of restitution, unjust enrichment, actual damages, statutory damages and compensatory damages according to proof at trial;

9.   For reimbursement of all compensation paid to Jablon under the Severance Agreement, and all consequential damages flowing from his breach of contract;

10.  For punitive and exemplary damages according to proof at trial;

11.  For attorney fees, costs of suit and prejudgment and postjudgment interest, as provided under applicable law; and

/ / /

/ / /

/ / /

1    12.    For such other, further, and/or different relief, in law or equity, as the Court may

2    deem just and proper.

3

4                              **DEMAND FOR JURY TRIAL**

5          Plaintiff Phoenix Technologies Ltd. hereby demands a trial by jury on each of its claims

6    for relief that are triable before a jury.

7    Dated: February ___, 2008                    BERGESON, LLP

8

9                                                  By:_____

10                                                      Michael W. Stebbins
                                                        Attorneys for Plaintiff
                                                        PHOENIX TECHNOLOGIES LTD.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Michael Stebbins

| | |
|---|---|
| **From:** | O'Connor, Kevin J. [koconnor@WOLFBLOCK.com] |
| **Sent:** | Monday, March 03, 2008 3:26 PM |
| **To:** | Michael Stebbins |
| **Cc:** | Virginia Ross; Griffin, Christine M. |
| **Subject:** | RE: Phoenix.Jablon |

You are not entitled to attorney-client communications and I have no idea if I will be representing him in your new matter. Given that you have pending litigation against him -- and have filed this action only after he moved to compel Phoenix to produce source code -- you should not be attempting to have <u>any</u> form of interactive communication with him (e.g., phone, email). Obviously, there are ways you can notify him other than phone or email.

Kevin J. O'Connor
WolfBlock LLP
One Boston Place, 40th Floor
Boston, MA 02108
Direct:  (617) 226-4005
Fax:  (617) 226-4505
koconnor@wolfblock.com
www.wolfblock.com

---

**From:** Michael Stebbins [mailto:MStebbins@be-law.com]
**Sent:** Monday, March 03, 2008 5:23 PM
**To:** O'Connor, Kevin J.
**Cc:** Virginia Ross
**Subject:** RE: Phoenix.Jablon

Thanks for your e-mail, Kevin.

However, I am required by the Local Rules (L.R. 65-1) to provide notice of an application for TRO to either opposing counsel or the party. I am trying to do that. Because you say that you will not accept service (and, by implication, may not be representing him in the action, although I suspect that you will), I must contact Mr. Jablon directly.

As you know by now, since sending my last e-mail I left you a voice mail in which I indicated that I would *not* be calling him since I am certain you have already spoken to him (accordingly to your assistant, you were on the phone when I called you shortly after I sent my last e-mail). Nevertheless, I must ensure that he has been provided with a copy of the complaint. If you can provide me with that assurance and confirm that you have spoken with him (and, perhaps, already forwarded my e-mail), then I will not send a copy of the complaint via e-mail to his Jablon1363@yahoo.com account.

Otherwise, I will send the e-mail.

I understand that your first instinct is to make even these perfunctory procedural steps as difficult as possible, however, I respectfully submit that throwing up any such road blocks on this issue is really unwise and will make no difference in the end.

Thank you for your cooperation.

Michael W. Stebbins, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Telephone:  408 291-6200 Main
Telephone:  408 291-6207 Direct
Facsimile:  408 297-6000

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the
above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure
under law.  If you are not an intended recipient, do not forward this email.  Interception of this message may be a federal
crime.  Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly
prohibited.  If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete
the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal
tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot
be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or
recommending to another party any transaction or matter addressed herein.  2008 Bergeson, LLP [All Rights Reserved].

**From:** O'Connor, Kevin J. [mailto:koconnor@WOLFBLOCK.com]
**Sent:** Monday, March 03, 2008 2:13 PM
**To:** Michael Stebbins
**Cc:** Virginia Ross; Griffin, Christine M.
**Subject:** RE: Phoenix.Jablon

You should not be contacting my client directly by phone or email.  If you want to sue him,
go ahead and serve him and go through formal processes.  If he wants to have a lawyer
contact you, he will.

Kevin J. O'Connor
WolfBlock LLP
One Boston Place, 40th Floor
Boston, MA 02108
Direct:  (617) 226-4005
Fax:  (617) 226-4505
koconnor@wolfblock.com
www.wolfblock.com

**From:** Michael Stebbins [mailto:MStebbins@be-law.com]
**Sent:** Monday, March 03, 2008 5:04 PM
**To:** O'Connor, Kevin J.
**Cc:** Virginia Ross
**Subject:** RE: Phoenix.Jablon

I understand.  This is not service, however, but merely notice to you.  I will then call him and send him an e-mail.

Michael W. Stebbins, Esq.
Bergeson, LLP

3/4/2008

303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Telephone:  408 291-6200 Main
Telephone:  408 291-6207 Direct
Facsimile:  408 297-6000

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law.  If you are not an intended recipient, do not forward this email.  Interception of this message may be a federal crime.  Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited.  If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.  2008 Bergeson, LLP [All Rights Reserved].

**From:** O'Connor, Kevin J. [mailto:koconnor@WOLFBLOCK.com]
**Sent:** Monday, March 03, 2008 2:00 PM
**To:** Michael Stebbins
**Cc:** Virginia Ross
**Subject:** RE: Phoenix.Jablon

Mike,

Thanks for the copy.  I am not authorized to accept service for Mr. Jablon.

Kevin

Kevin J. O'Connor
WolfBlock LLP
One Boston Place, 40th Floor
Boston, MA 02108
Direct:  (617) 226-4005
Fax:  (617) 226-4505
koconnor@wolfblock.com
www.wolfblock.com

**From:** Michael Stebbins [mailto:MStebbins@be-law.com]
**Sent:** Monday, March 03, 2008 4:50 PM
**To:** O'Connor, Kevin J.
**Cc:** Virginia Ross
**Subject:** Phoenix.Jablon

Kevin:

As indicated in our telephone conversation a few minutes ago, attached is a copy of a complaint that will be filed tomorrow in the USDC, ND Cal., San Jose Division.  This complaint will be accompanied by an application for

3/4/2008

TRO, OSC re: preliminary injunction, and expedited discovery. We will e-mail you copies of the public/redacted version of the application papers after they have been filed. Hard copies of the documents will also be sent to you as well.

Michael W. Stebbins, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110
Telephone: 408 291-6200 Main
Telephone: 408 291-6207 Direct
Facsimile: 408 297-6000

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law. If you are not an intended recipient, do not forward this email. Interception of this message may be a federal crime. Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited. If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein. 2008 Bergeson, LLP [All Rights Reserved].

**Michael Stebbins**

| | |
|---|---|
| **From:** | D Jablon [jablon1363@yahoo.com] |
| **Sent:** | Monday, March 03, 2008 3:56 PM |
| **To:** | Michael Stebbins |
| **Subject:** | Yahoo! Auto Response |

Sorry, this email address is no longer in operation.

_____

Be a better friend, newshound, and
know-it-all with Yahoo! Mobile.  Try it now.  http://mobile.yahoo.com/;
_ylt=Ahu06i62sR8HDtDypao8Wcj9tAcJ