1   MICHAEL W. STEBBINS, Bar No. 138326
    mstebbins@be-law.com
2   MELINDA M. MORTON, Bar No. 209373
    mmorton@be-law.com
3   INA STANGENES, Bar No. 156559
    istangenes@be-law.com
4   BERGESON, LLP
    303 Almaden Boulevard, Suite 500
5   San Jose, CA 95110-2712
    Telephone: (408) 291-6200
6   Facsimile: (408) 297-6000

7   Attorneys for Plaintiff
    PHOENIX TECHNOLOGIES LTD.

8

ADR

E-FILING

Filed

MAR - 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12   PHOENIX TECHNOLOGIES LTD., a Delaware   Case No.  C08   01286 PVT
     Corporation,
13                                            EXHIBITS A-D TO THE DECLARATION
                    Plaintiff,                OF ROBIN ELLER IN SUPPORT OF
14                                            APPLICATION FOR TEMPORARY
                                              RESTRAINING ORDER, ORDER TO
15        vs.                                 SHOW CAUSE RE: PRELIMINARY
                                              INJUNCTION, AND AN ORDER
16   DAVID P. JABLON, an individual,          AUTHORIZING EXPEDITED DISCOVERY

17                  Defendant.                Complaint Filed:   March 4, 2008
                                              Trial Date:        None Set
18

19

20

21

22

23

24

25

26

27

28

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement"), dated February 26, 2001, is by and between David P. Jablon (the "Employee"), an individual currently residing at 7 Buckskin Drive, Westboro, Massachusetts 01581 and Phoenix Technologies Ltd. ("Company"), with its principal place of business at 411 East Plumeria Drive, San Jose, California 95134. This Agreement shall be effective upon the Closing of the Stock Purchase Agreement (the "Stock Purchase Agreement") dated as of February 16, 2001 among the Company, Integrity Sciences, Incorporated and Employee (the "Effective Date").

## R E C I T A L S

A.    The Company desires to employ Employee and Employee desires to provide employment services to the Company, on all of the terms and subject to all of the conditions set forth herein.

B.    The Company believes it to be in the best interest of the Company and its stockholders to provide the Employee with certain severance benefits should Employee's employment with the Company terminate under certain circumstances, and the parties wish to provide Employee with financial security and with sufficient incentive and encouragement for Employee to remain with the Company.

C.    Certain capitalized terms used in the Agreement are defined in Section 11 below. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Stock Purchase Agreement.

## A G R E E M E N T

In consideration of the mutual covenants herein contained, and in consideration of the continuing employment of Employee by the Company, the parties agree as follows:

1.    Duties and Scope of Employment. The Company has appointed Employee as Chief Technology Officer of the Company's Phoenixnet Division. Employee shall have such other or additional duties or assignments with the Company, its subsidiaries or affiliates generally consistent with such title as the Company shall determine from time to time. Employee shall comply with and be bound by the Company's operating policies, procedures and practices from time to time in effect during his employment. Employee shall devote his full time, skill and attention to his duties and responsibilities, and shall perform them faithfully, diligently and competently, and Employee will use his best efforts to further the business of the Company and its affiliated entities. In connection with his employment under this Agreement, Employee shall be based at the Company's Norwood, Massachusetts facilities or any successor office, provided such office is within a radius of fifty (50) miles from the Company's present office (the "Assigned Location"), but Employee understands and agrees that he may be required to perform services anywhere in the world, and will perform his employment at such location or locations as may be determined by the Company from time to time; provided however, that Employee's Assigned Location shall not be changed during the term of this Agreement except upon the mutual consent of Employee and the Company and provided further that Employee shall not be required to travel outside of the Assigned Location in connection with

his employment for more than twenty percent (20%) of any twelve month period beginning on (a) the date hereof or (b) the date that is twelve months after the date hereof.

2.   <u>Base Compensation</u>.   The Company will pay Employee a base annual salary at the rate of Two Hundred Thousand Dollars ($200,000) ("Base Compensation"). The Company will pay the Base Compensation in accordance with normal Company payroll practices. The Base Compensation shall be reviewed annually and may be increased from time to time in the sole discretion of the Company, in which case the "Base Compensation" will refer to the base salary earned by Employee at the time in question. Upon expiration of this Agreement or termination pursuant to Section 8, the Company shall have no obligation to pay Base Compensation, or any other compensation or benefits, to Employee, except as may be provided in Section 9, if at all.

3.   <u>Shares</u>.   In connection with the commencement of Employee's employment, a recommendation shall be made to the Board of Directors of Phoenix to grant to Employee an option to purchase 50,000 shares of Phoenix's Common Stock ("Shares") with an exercise price that shall be the fair market value of such Shares, as determined under the Company's 1999 Stock Plan (the "Plan"), on the date of the grant. Vesting of the option to purchase such Shares shall be over a four-year period with the first 25% vesting on the first anniversary date of the grant date and the balance in quarterly installments over the next three (3) years. The option will be an incentive stock option to the maximum extent allowed by the Internal Revenue Code of 1986, as amended, and will be subject to and governed exclusively under the terms of the Plan and the Stock Option Agreement between Employee and Phoenix. Subject to the discretion of Phoenix's Board of Directors, Employee may be eligible during his employment by Phoenix to receive additional grants of stock options from time to time, on such terms and subject to such conditions as the Board of Directors shall determine as of the date of any such grant. In the event that the Board of Directors of Phoenix does not, for any reason, grant to the Employee an option to purchase 50,000 Shares as contemplated above within two months following the execution of this Agreement, the parties shall in good faith negotiate an increase in the consideration provided under this Agreement to compensate the Employee for the loss of such option.

4.   <u>Bonus Eligibility and Payment</u>.

(a)    During the Employment Term, Employee will be eligible for an annual bonus in the target amount of Twenty-five Thousand Dollars ($25,000). Actual payments will be based on application of the terms of the Company's then-existing bonus plan applicable to Employee's position. Additionally, Employee will receive an Loyalty Payment of Five Hundred Thousand Dollars ($500,000) on the dates that are twelve (12) and twenty-four (24) months after the date hereof; <u>provided</u>, <u>however</u>, that Employee will not receive a Loyalty Payment if Employee has resigned or has been terminated for Misconduct prior to the date of the applicable Loyalty Payment.

(b)    On or before April 15 of the year following the year to which the Loyalty Payment is made, Company shall pay to Employee a corresponding Payment Adjustment Amount. The Payment Adjustment Amount shall equal the quotient of (i) (A) the amount of the Loyalty Payment multiplied by one minus the Preferred Loyalty Payment Rate (as defined below) minus (B) the amount of the Loyalty Payment multiplied by one minus the Ordinary Income Rate (as defined below) divided by (ii) one minus the Ordinary Income Rate in the year the Loyalty Payment Adjustment Amount is paid. For example, for a Loyalty Payment of $500,000 paid when the Ordinary Income Rate is 45.35% (39.6% federal plus 5.75% Massachusetts state tax (this rate would

PHX00905

be appropriately reduced if payment of Massachusetts tax produces a federal benefit) and the Preferred Loyalty Payment Rate is 20% (20% federal plus 0% state), the Payment Adjustment Amount would be $400,000 (the after-tax amount that Employee would have received using a 20% tax) minus $273,250 (the after-tax amount that Employee actually receives using a 45.35% rate) divided by 0.5465 (one minus a 45.35% tax rate), resulting in an Payment Adjustment Amount of $231,930. After Employee pays 45.35% tax on the $231,930 Payment Adjustment Amount, Employee will have $126,750 which combined with $273,250 equals $400,000, the after-tax amount Employee would have received if the $500,000 Loyalty Payment was taxed at long-term capital gains rates.

For purposes of this Agreement, the "Ordinary Rate" shall equal the combined rate of highest federal and Massachusetts income tax rates payable with respect to ordinary income and the "Preferred Loyalty Payment Rate" shall equal the combined rate of federal and Massachusetts income tax that would be payable on the sale or exchange of capital assets with a holding period for Massachusetts income tax purposes of more than six (6) years. For purposes of computing the Ordinary Rate, the Massachusetts income tax rate shall be computed by giving effect to any ability of Employee to reduce federal tax liability as a result of payment of Massachusetts tax.

5.    Benefits. Employee shall be eligible to participate in the employee benefit plans and compensation programs maintained by the Company applicable to other employees with the same or similar status as Employee, unless called out separately below, including (without limitation) retirement plans, savings or profit-sharing plans, stock option, incentive or other bonus plans, life, disability, health, medical and hospital, accident and other insurance programs, paid vacations, and similar plans or programs, subject in each case to the generally applicable terms and conditions of the applicable plan or program in question and subject to the approval of the Board or any committee administering such plan or program. While employed by the Company, Employee shall earn vacation at a rate of 15 days per year, provided that in no event shall Employee be entitled to accrue and carry forward more than 20 days of vacation from any calendar year to another, and if Employee has reached this total, no further vacation days shall accrue until the total of accrued but unused vacation days falls below such limit.

6.    Other Business Affiliations; Confidentiality. Employee agrees that, without the written approval of the Company, he shall not, during the term hereof, devote any time to any business affiliation which would materially interfere with or derogate from his obligations under this Agreement other than that with the Company and any of its subsidiaries, parents or affiliates. Concurrently with the execution and delivery of this Agreement, Employee agrees to execute the Invention and Confidentiality Agreement (the "Confidentiality Agreement") attached hereto as Exhibit A.

7.    Expenses. The Company shall reimburse Employee for all reasonable business expenses that are incurred in the performance of his duties hereunder on behalf of the Company, in accordance with the terms of the Company's then-existing reimbursement policy, upon submission of expense reports to the extent necessary to substantiate the Company's federal income tax deductions for such expenses under the Internal Revenue Code (as amended) and the Regulations there under and according to such expense report regulations as may be established by the Company.

PHX00906

8.    Term and Termination.

(a)    Term of Agreement. Unless otherwise terminated by the Company or the Employee in accordance with this Agreement, this Agreement and Employee's employment with the Company under this Agreement shall commence on the Effective Date and shall continue to and including the date which is 24 months thereafter (the "Employment Term"). Following the Employment Term and the termination or expiration of this Agreement, Employee shall deemed an "at will" employee of the Company.

(b)    Termination for Cause or Misconduct. The Company may terminate this Agreement and the employment of Employee hereunder, with immediate effect, including, without limitation, the termination of all compensation and benefits (except as may be expressly provided in this Agreement), for Cause or Misconduct, as defined hereunder. At the time of any termination for Cause or Misconduct, Employee shall be entitled to receive any salary and employment benefits which shall have accrued prior to the date of termination, but shall not be entitled to any severance payments, salary or employment benefits relating to periods subsequent to the date of termination, subject to Employee's rights to continue medical and dental coverage under the Company's group policy, at Employee's expense, as may be provided by law.

(c)    Termination Without Cause. The Company may terminate Employee's employment at any time for any reason or for no reason. If the Company terminates Employee's employment without Cause, the Employee shall be entitled to receive the severance benefits stated in Section 9(a) below. A termination without Cause, for purposes of this Agreement, means termination by the Company other than as provided for in Section 8(b) and shall include termination by reason of Employee's death or Disability.

(d)    Employee's Resignation. In the event Employee voluntarily resigns, Employee shall give the Company thirty (30) days written notice of resignation. Upon such notice, the Company, at its discretion, may terminate the relationship immediately, but in such event the Company's obligation to Employee shall be limited to compensation through the remainder of the thirty (30) days resignation notice period.

(e)    Return of Information. On termination of employment for any reason, Employee will return to the Company all originals and copies of all or any part of: lists and sources of customers and suppliers; lists of employees; proposals to clients or drafts of proposals; business plans and projections; reports; job notes; specifications; and drawings pertaining to the Company or its customers; or any and all other things, equipment and written materials obtained by Employee during the course of employment from the Company or from any client of the Company, unless Company provided in writing its waiver of the foregoing.

9.    Severance Benefits.

(a)    Termination Without Cause. Subject to the other provisions of this Section 9, if the Company terminates Employee's employment for any reason other than Cause or Misconduct, Employee shall be entitled to receive severance pay at the rate of Employee's then current Base Compensation until the date that is twenty-four (24) months after the date hereof. All severance pay shall be payable in equal consecutive monthly installments on the last day of each month following the effective date of Employee's termination until the date that is twenty-four (24) months after the

PHX00907

date hereof. Employee understands and agrees that such payments shall be his only entitlement as and for severance pay or severance compensation. Except for the severance payments stated herein and except for any Loyalty Payment or Payment Adjustment Amount due under Section 4 hereof, all rights accruing to Employee under the terms of this Agreement or otherwise shall cease, and Employee shall not be entitled to any further salary or employment benefits, except to the extent earned and accrued prior to such date, and subject to Employee's rights to continue medical and dental coverage under the Company's group policy, at Employee's expense, as may be provided by law.

(b)     Disability; Death. If the Company terminates the Employee's employment as a result of the Employee's Disability or if the Employee's employment terminates due to the death of the Employee, then the Employee (or his estate) shall be entitled to receive severance or other benefits pursuant to this Agreement, including without limitation any Loyalty Payment and Payment Adjustment Amount due under Section 4 hereof.

(c)     Insider Trading. While Employee receives severance payments, Employee agrees to be considered an "insider" within the meaning of Section 16(b) of the Securities Exchange Act of 1934 as amended, and comply with the Company's Insider Trading Policy, unless otherwise agreed to in writing by the Board of Directors for matters related to reduction of Employee's stock holding.

10.    Covenants Not to Compete and Not to Solicit.

(a)     During the term hereof, Employee agrees that he shall not, directly or indirectly, engage on his own behalf, or as owner, manager, advisor, principal, agent, partner, employee consultant, director, officer, stockholder or other proprietor owning more than a five percent (5%) interest, in any firm, corporation, partnership or other organization which is in the business of manufacturing, selling or distributing products in competition with the products of the Company. In case of any such ownership or participation, Employee shall furnish a detailed statement thereof to the Board of Directors of the Company, and, as from time to time requested by said Board, resubmit for approval a detailed statement thereof, which statement may be approved by said Board as not constituting such a violation or conflict, and in the event said Board determines that such violation or conflict exists, Employee shall immediately divest himself of such ownership or participation (or of representing or promoting others engaged in any such business). It is intended and agreed that during the term of this Agreement, Employee will not knowingly perform any act which may confer any competitive benefit or advantage upon any enterprise competing with the Company or any successor.

(b)     During the term of this Agreement, and upon the termination of the Employee's employment with the Company within the terms of Section 8(a) and for a period of two (2) years thereafter, Employee agrees that he shall not either directly solicit, induce, attempt to hire, recruit, encourage, take away, hire any employee of the Company or cause any employee of the Company to leave his or her employment either for Employee or for any other entity or person.

(c)     Employee represents that he (i) is familiar with the foregoing covenants not to compete and not to directly solicit, and (ii) is fully aware of his obligations hereunder, including, without limitation, the reasonableness of the length of time, scope and geographic coverage of these covenants. Employee agrees that the provisions of this Section 10 contain restrictions that are not greater than necessary to protect the interests of the Company. In the event of the breach or

PHX00908

threatened breach by Employee of this Section 10, the Company, in addition to all other remedies available to it at law or in equity, will be entitled to seek injunctive relief and/or specific performance to enforce this Section 10.

(d)     Company will respond within two weeks to any written request by Employee to exclude a particular company or business entity from the scope of this Section 10. Company will not unreasonably deny such a request. The parties agree that a passive financial investment of up to 5% by Employee in any corporation whose securities are regularly and publicly traded on a national or major stock exchange of any country or the Nasdaq National Market will not constitute competition within the scope of this Section 10.

11.     <u>Definition of Certain Terms</u>. The following terms referred to in this Agreement shall have the following meanings for the purposes of this Agreement only:

(a)     <u>Cause</u>. "Cause" shall mean (i) any act of embezzlement, theft, fraud or dishonesty; (ii) engaging in unfair competition with the Company or any subsidiary of the Company whether or not wholly-owned; (iii) conviction of any felony; (iv) any willful act by the Employee which constitutes gross misconduct and results in material injury to the Company, (v) the breach by Employee of the Non-Competition Agreement, or of the Confidentiality Agreement, each of which shall be supplemental hereto and incorporated by reference herein, or (vi) the violation by the Employee of his material obligations under this Agreement for any reason other than physical or mental illness or incapacity (it being understood that at Company's request the existence of a physical or mental illness or incapacity shall be determined by an examination by a physician or other appropriate specialist selected by the Company at its expense), including without limitation the habitual neglect of or failure to perform the usual and customary duties of his job or the policies of the Company, provided that, in the case of habitual neglect of or failure to perform the usual and customary duties of his job or the policies of the Company, there shall have first been delivered to the Employee a written demand for performance from the Company which describes the basis for the Company's belief that the Employee has failed to perform such material obligations under this Agreement.

(b)     <u>Disability</u>. "Disability" shall mean that Employee has been unable to perform his duties under this Agreement as the result of his incapacity due to physical or mental illness, and such inability, at least ninety (90) days after its commencement, is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to the Employee or the Employee's legal representative (such agreement as to acceptability not to be unreasonably withheld). Termination resulting from Disability may only be effected after at least 30 days' written notice by the Company of its intention to terminate the Employee's employment. In the event that the Employee resumes the performance of substantially all of his duties hereunder before the termination of his employment becomes effective, the notice of intent to terminate shall automatically be deemed to have been revoked.

(c)     <u>Misconduct</u>. "Misconduct" shall mean that Employee (i) commits an act of embezzlement, theft, or fraud that is against the Company or that involves personal profit in connection with the business of the Company; (ii) is convicted of a felony; (iii) commits any willful act that constitutes gross misconduct and could be reasonably foreseen to and actually does result in material injury to the Company; (iv) in any material respect breaches the Non-Competition Agreement, which shall be incorporated by reference herein; or (v) violates in any material respect

PHX00909

any of his obligations under this Agreement, <u>provided</u> that the Employee shall have first been given at least 30 days' written notice of the alleged violation and an opportunity to cure the same.

12.    <u>No Breach of Duty</u>. Employee represents that Employee's performance of this Agreement and as an employee of the Company does not and will not breach any agreement or duty to keep in confidence proprietary information acquired by Employee in confidence or in trust prior to employment with the Company. Employee has not and will not enter into any agreement either written or oral in conflict with this Agreement. Employee represents he is not presently restricted from being employed by the Company or entering into this Agreement.

13.    <u>Corporate Opportunities</u>.

(a)    In the event that Employee, during the Employment Term, shall become aware of any business opportunity which Employee reasonably believes is related in any material way to the then current business of the Company or its subsidiaries or affiliates, Employee shall immediately notify the Chief Executive Officer or General Counsel of the Company of such opportunity. Employee shall not appropriate for himself (or for any other person or entity in or with whom Employee has an economic, familial or other interest or relationship) any opportunity unless, as to any particular opportunity, the Board in its sole discretion waives the Company's rights to such opportunity. Employee's duty to notify the Company and to refrain from appropriating all such opportunities shall neither be limited by, nor shall such duty limit, the application of the general law of California relating to the fiduciary duties of an agent or employee.

(b)    In the event that Employee fails to comply with Section 13(a), Employee shall be deemed to have violated the provisions of this Section 13 notwithstanding the following: (i) the capacity in which Employee shall have acquired such opportunity; (ii) the inability for any reason of the Company to utilize the opportunity; or (iii) the probable success in the Company's hands of such opportunity. This Section 13 shall be deemed to be a material provision of this Agreement.

14.    <u>Successors</u>.

(a)    <u>Company's Successors</u>. Any successor to the Company (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and assets which executes and delivers the assumption agreement described in this Section or which becomes bound by the terms of this Agreement by operation of law.

(b)    <u>Employee's Successors</u>. The terms of this Agreement, and all rights of the Employee hereunder, shall inure to the benefit of, and be enforceable by, the Employee's personal or legal representatives, executors, administrators, successors, heirs, devisees and legatees.

15.    <u>Notice</u>.

(a)    <u>General</u>. Notices and all other communications contemplated by this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered or when

PHX00910

mailed by U.S. registered or certified mail, return receipt requested and postage prepaid. In the case of the Employee, mailed notices shall be addressed to the Employee at the home address that he most recently communicated to the Company in writing with a copy to Andrew Branz, Esq., Gaffin & Krattenmaker, P.C., 2400 Prudential Tower, Boston, MA 02199. In the case of the Company, mailed notices shall be addressed to the Company at: 411 East Plumeria Drive, San Jose, California 95134, and all notices shall be directed to the attention of the General Counsel.

(b)   Notice of Termination. Any termination by the Company for Cause or Misconduct pursuant to Section 8(b) hereof shall be communicated by a notice of termination to the Employee given in accordance with Section 15(a) of this Agreement. Such notice shall indicate the specific termination provision in this Agreement relied upon, shall set forth the basis for termination under the provision so indicated, and shall specify the termination date.

16.   Arbitration.

(a)   The Company and Employee agree that any dispute or controversy arising out of, relating to, or in connection with this Agreement, the interpretation, validity, construction, performance, breach, or termination hereof, or any of the matters herein released, excepting claims under applicable workers' compensation law and unemployment insurance claims, shall be finally determined by arbitration pursuant to the then-current Employment Dispute Resolution Rules (or successor rules) of the American Arbitration Association before a single arbitrator in an arbitration to be held in Boston, Massachusetts. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction. Employee and the Company hereby waive any rights each may have to a jury trial. This provision confers complete and total jurisdiction for final, binding arbitration with full and complete relief for any and all covered disputes, including all contract, tort, and statutory claims, and any other causes of action unless otherwise prohibited by law. This arbitration provision will survive after the termination of this Agreement.

(b)   The arbitrator(s) shall apply the law of the Commonwealth of Massachusetts to the merits of any dispute or claim, without reference to conflicts of law rules.

(c)   **EMPLOYEE HAS READ AND UNDERSTANDS THIS SECTION, WHICH DISCUSSES ARBITRATION. EMPLOYEE UNDERSTANDS THAT BY SIGNING THIS AGREEMENT, EMPLOYEE AGREES TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF, OR ANY OF THE MATTERS HEREIN TO BINDING ARBITRATION, AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THIS SEVERANCE AGREEMENT AND RELEASE OF ALL CLAIMS.**

(d)   In the event that litigation, arbitration, or other legal proceedings has commenced between the parties to this agreement or their representatives, successors, heirs or assigns concerning, interpreting or arising from any provision of this Agreement, the party most nearly

PHX00911

prevailing in such litigation, arbitration or other legal proceeding shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for attorney's fees and costs incurred, which amount shall be determined by the court, arbitrator or person presiding over such proceeding or in a separate action brought for that purpose.

17.    Miscellaneous Provisions.

(a)    Waiver. No provision of this Agreement shall be modified, waived or discharged unless the modification, waiver or discharge is agreed to in writing and signed by the Employee and by an authorized officer of the Company (other than the Employee). No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

(b)    Whole Agreement. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes in its entirety any and all prior undertakings and agreements of the Company and Employee with respect to the subject matter hereof.

(c)    Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws of the Commonwealth of Massachusetts applicable to contracts executed and fully performed within the Commonwealth of Massachusetts.

(d)    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon a determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible

(e)    No Assignment of Benefits. The rights of any person to payments or benefits under this Agreement shall not be made subject to option or assignment, either by voluntary or involuntary assignment or by operation of law, including (without limitation) bankruptcy, garnishment, attachment or other creditor's process, and any action in violation of this Section 16(e) shall be void.

(f)    Employment Taxes. All payments made pursuant to this Agreement will be subject to withholding of applicable income and employment taxes.

(g)    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

PHX00912

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

PHOENIX TECHNOLOGIES LTD.       EMPLOYEE

By: _____

Name: _Linda V. Moore_       _____
                                  David P. Jablon

Title _Vice President and General Counsel_

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

PHOENIX TECHNOLOGIES LTD.

EMPLOYEE

By: _____

Name: _____

Title _____

David P. Jablon



September 30, 2004


David Jablon
(Hand Delivered)


                    RE:    _Separation Agreement_

Dear David:

        This letter, upon your signature, will constitute the agreement between you and Phoenix Technologies Ltd. ("PHOENIX") on the terms of your separation from employment with PHOENIX (the "Agreement").

        1.    Your employment with PHOENIX will terminate effective September 27, 2004.

        2.    On September 27, 2004, you will be paid your earned but unpaid salary and accrued vacation pay.   You will receive by separate cover information regarding your rights to health insurance continuation and your retirement benefits.   Upon your separation, you are eligible to continue your current level of health coverage (medical, dental and vision) through COBRA for yourself or any dependants who are currently enrolled.

        3.    Although it is not obligated to do so, as consideration for execution of this agreement and release, PHOENIX has agreed to provide you with the following severance compensation:

        a.    One month of severance pay at your current base salary level (less any applicable Federal or State withholdings).

        b.    Three months paid benefit continuation through COBRA; and

        c.    Outplacement consulting through Lee Hecht Harrison.

David Jablon
September 30, 2004
Page 2

4.   As consideration for this Agreement, you waive and release and promise never to assert any and all claims that you have or might have against PHOENIX and its predecessors, subsidiaries, related entities, officers, directors, shareholders, agents, attorneys, employees, successors, or assigns, arising from or related to your employment with PHOENIX and/or your separation from employment with PHOENIX. These claims include, but are not limited to, claims arising under federal, state and local statutory or common law, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act of 1974, the California Fair Employment and Housing Act, the California Worker's Compensation Act and the law of contract and tort. Phoenix waives and releases and promises never to assert any and all claims that it has or might have against you and your successors arising from or related to your employment with Phoenix and/or your separation from employment with Phoenix. Notwithstanding the foregoing, the terms herein releasing the parties shall exclude any claims arising from or related to the Stock Purchase Agreement dated as of February 16, 2001 by and among the parties and Integrity Sciences, Incorporated.

You also waive and release and promise never to assert any such claims against PHOENIX, even if you do not currently believe and/or are not currently aware that you have such claims. You therefore waive your rights under § 1542 of the Civil Code of California which states:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known to him must have materially affected his settlement with the debtor.

5.   You will not, unless required or otherwise permitted by law, disclose to others any information regarding the following:

a.   Any information regarding PHOENIX's practices, procedures, trade secrets, customer lists, or product marketing; and/or

b.   The terms of this Separation Agreement, the benefit being paid under it or the fact of its payment, except that you may disclose this information to your attorney, accountant or other professional advisor to whom you must make the disclosure in order for them to render professional services to you. You will instruct them, however, to maintain the confidentiality of this information just as you must.

6.   We wish to remind you of your obligations under the EMPLOYEE INVENTION ASSIGNMENT and PROPIETARY INFORMATION AGREEMENT which you signed upon your date of hire.

7.   You agree that you will not knowingly make any disparaging comments about PHOENIX, its employees or affiliated entities at any time. PHOENIX's officers and directors will not make disparaging comments about you. In addition, you agree not to voluntarily attempt to assist any other PHOENIX employees or ex-employees with any claims they may feel they have against PHOENIX.

David Jablon
September 30, 2004
Page 3

8.    YOU ACKNOWLEDGES THAT YOU HAVE BEEN GIVEN A PERIOD OF AT LEAST TWENTY-ONE (21) DAYS WITHIN WHICH TO CONSIDER THIS AGREEMENT BEFORE SIGNING IT. THE PARTIES AGREE THAT YOU SHALL HAVE THE RIGHT TO REVOKE THIS AGREEMENT BY WRITTEN NOTICE TO PHOENIX WITHIN THE SEVEN-DAY PERIOD FOLLOWING ITS EXECUTION, AND THAT THIS AGREEMENT SHALL NOT BECOME EFFECTIVE AND BINDING UNTIL SUCH PERIOD HAS EXPIRED.  IN THE EVENT THIS AGREEMENT IS REVOKED BY YOU, YOU SHALL RETURN ALL CONSIDERATION AND BENEFITS PROVIDED TO YOU PURSUANT TO THIS AGREEMENT.

9.    In the event that you breach any of your obligations under this Separation Agreement or as otherwise imposed by law, PHOENIX will be entitled to recover the benefit paid under the Agreement and to obtain all other relief provided by law or equity.

10. This Agreement is governed by the laws of the State of California without reference to its laws regarding conflict of laws.  You and PHOENIX will submit any disputes relating to this Agreement (other than those relating to intellectual property) to binding arbitration conducted by the American Arbitration Association in Santa Clara County, California.  The prevailing party will recover from the losing party all costs and attorneys' fees incurred in any such arbitration or other legal proceeding.

11. If a court of competent jurisdiction invalidates any part of this Agreement, the remaining portions will remain in force.

To accept the Agreement, please sign and date this letter and return it to me by October 18, 2004.

David, I am pleased that we are able to part ways on these amicable terms.  PHOENIX and I wish you every success in your future endeavors.

Sincerely,

*Scott Taylor*

Scott Taylor
Vice President and General Counsel

Name: _____    Date: __10/9/2004_____

# EMPLOYEE INVENTION ASSIGNMENT AND CONFIDENTIALITY AGREEMENT

I, David P. Jablon, in consideration of my employment by Phoenix Technologies Ltd. ("Phoenix"), hereby represent and agree as follows:

1.     I understand that Phoenix is engaged in a continuous program of research, development, production and marketing in connection with its business and that, as an essential part of my work with Phoenix, I am expected to make new contributions to and create inventions of value for Phoenix.

2.     I agree to promptly disclose in writing in confidence to Phoenix all inventions, improvements, and other innovations of any kind, whether or not patentable or copyrightable or protectable as trade secrets or mask works, that are made or conceived or first reduced to practice or created by me, either alone or jointly with others, during the period of my employment, whether or not such conception, first reduction to practice or creation occurs in the course of such employment ("Innovations"). Examples of Innovations include but are not limited to original works of authorship, computer programs, formulas, processes, databases, trade secrets, mechanical and electronic hardware, computer languages, user interfaces, documentation, marketing and new product plans, production processes, packaging and marketing techniques, and improvements to anything.

3.     I agree that all Innovations that (a) are not developed entirely on my own time, (b) are developed using equipment, supplies, facilities or trade secrets of Phoenix, (c) result from work performed by me for Phoenix, or (d) relate at the time of conception or reduction to practice to the business or the actual or demonstrably anticipated research or development of Phoenix, will be the sole and exclusive property of Phoenix, and I hereby assign to Phoenix any and all rights that I may have in any such Innovations and in any associated patents, patent applications, copyrights, trade secret rights, mask work rights, rights of priority and other intellectual property rights. In addition, I understand I may request a written waiver from my manager which will serve to formally acknowledge that Phoenix has no right, title or interest in those of my Innovations that (a) are developed entirely on my own time, (b) are developed using equipment, supplies, facilities or trade secrets not belonging to Phoenix, (c) result from work not performed by my for Phoenix, or (d) relate at the time of conception or reduction to practice to no business or actual or demonstrably anticipated research or development of Phoenix. Such written waiver must be signed by my manager and Phoenix's General Counsel and will be placed in my personnel file with an original copy retained by me.

4.     I agree to assist Phoenix's efforts to obtain for Phoenix and enforce patents, copyrights, mask work rights and other legal protections for Innovations belonging to Phoenix in any and all countries. I also agree to execute any documents that Phoenix may reasonably request for its use in obtaining or enforcing such patents, copyrights, mask work rights and other legal protections. I acknowledge and agree that my obligations under this Section will continue beyond the termination of my employment with Phoenix, I understand that Phoenix will reimburse me for all reasonable out-of-pocket expenses I incur in cooperating with and assisting Phoenix under this Section 4.

PHX00915

5.    I hereby irrevocably transfer and assign to Phoenix, and forever waive and agree never to assert, any and all "Moral Rights" (as defined below) that I may have in or with respect to any Innovation. "Moral Rights" mean any right to claim authorship or be identified as the author of any Innovation, to object to any modification of, or other action in relation to, any Innovation, or any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

6.    I understand that my employment with Phoenix creates a relationship of confidence and trust with respect to any information of a confidential or proprietary nature that may be disclosed to my by Phoenix or that I may learn in the course of my employment by Phoenix and that relates to the business, products, research or development of Phoenix, its suppliers and customers and their respective products ("Proprietary Information"). Such Proprietary Information includes but is not limited to Innovations, marketing plans, product plans, business strategies, financial information, forecasts, personnel information, customer lists and any other nonpublic technical or business information on that I knows or have reason to know Phoenix would desire to treat as confidential for any purpose, such as maintaining a competitive advantage or avoiding undesirable publicity.

7.    At all times, both during and after my employment, I will keep all such Proprietary Information in confidence and trust, and will not use or disclose any of such Proprietary Information without the prior written consent of Phoenix, except as may be necessary to perform my duties as an employee of Phoenix and for Phoenix's benefit. Upon termination of my employment with Phoenix, I will promptly deliver to Phoenix all documents and materials of any nature pertaining to my work with Phoenix, and I will not take with me any documents or materials or copies thereof containing any Proprietary Information.

8.    I hereby warrant and represent to Phoenix that my performance of this Agreement and of my duties as an employee of Phoenix will not breach any invention assignment or proprietary information or similar agreement with any former employer or other party. I further warrant and represent that I will not bring with me to Phoenix or use in the performance of my duties for Phoenix any documents, materials or information of a former employer that are not generally available to the public.

9.    During, and for a period of one (1) year after termination of, my employment with Phoenix, I will not directly or indirectly attempt to call on, solicit or take away suppliers, customers, employees or consultants of Phoenix for my own benefit or for the benefit of anyone else.

10.    I hereby authorize Phoenix to notify others, including but not limited to customers of Phoenix and my future employers, of the terms of this Agreement and my responsibilities hereunder.

11.    In the event of any violation of this Agreement by me, and in addition to any relief or remedies to which Phoenix may otherwise be entitled, I agree that Phoenix shall have the right to an immediate injunction, and shall have the right to recover the reasonable attorneys' fees and court costs expended in connection with any litigation instituted to enforce this Agreement. I will be entitled to recover my reasonable attorney's fees and court costs from Phoenix in the event I prevail in any litigation brought by Phoenix for an alleged breach of this Agreement. No waiver of any

condition or covenant in this Agreement or failure to exercise a right or remedy shall be considered to imply or constitute a further waiver of the same or any other covenant, condition, right, or remedy.

12.    If any provision of this Agreement is declared invalid by any tribunal, such provision shall be deemed automatically adjusted to conform to the requirements for validity as declared at such time and, as so adjusted, shall be deemed a provision of this Agreement as though originally included herein.  If the provision invalidated is of such a nature that it cannot be so adjusted, the provision shall be deleted from this Agreement as though it had never been included herein.  In either case, the other provisions of this Agreement shall remain in effect.

13.    I understand that this Agreement will be governed by the laws of the State of California.

14.    I understand and agree that this Agreement does not constitute a contract of employment or obligate Phoenix to employ employee for any stated period of time.

15.    I understand that this Agreement shall be effective from and after the effective date of the employment agreement to which it is attached.


_____
David P. Jablon


Acknowledged and Accepted

Phoenix Technologies Ltd.



By: _____

Name: _____

Title: _____

PHX00917

condition or covenant in this Agreement or failure to exercise a right or remedy shall be considered to imply or constitute a further waiver of the same or any other covenant, condition, right, or remedy.

12.     If any provision of this Agreement is declared invalid by any tribunal, such provision shall be deemed automatically adjusted to conform to the requirements for validity as declared at such time and, as so adjusted, shall be deemed a provision of this Agreement as though originally included herein.  If the provision invalidated is of such a nature that it cannot be so adjusted, the provision shall be deleted from this Agreement as though it had never been included herein.  In either case, the other provisions of this Agreement shall remain in effect.

13.     I understand that this Agreement will be governed by the laws of the State of California.

14.     I understand and agree that this Agreement does not constitute a contract of employment or obligate Phoenix to employ employee for any stated period of time.

15.     I understand that this Agreement shall be effective from and after the effective date of the employment agreement to which it is attached.


_____

        David P. Jablon


Acknowledged and Accepted

Phoenix Technologies Ltd.


By: _____

Name: _Linda V. Moore_____

Title: _Vice President and General Counsel_

PHX00918

```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>d10k.txt
<DESCRIPTION>FORM 10-K
<TEXT>
<PAGE>
```

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

----------------------

FORM 10-K

(Mark One)

[X] Annual Report Pursuant to Section 13 or 15(d) of the Securities
    Exchange Act of 1934

For the fiscal year ended September 30, 2001

OR

[_] Transition Report Pursuant to Section 13 or 15(d) of the Securities
    Exchange Act of 1934

For the transition period from          to

Commission file number 0-17111

----------------------

PHOENIX TECHNOLOGIES LTD.
(Exact name of registrant as specified in its charter)

Delaware                                04-2685985
(State or other jurisdiction of         (I.R.S. Employer
incorporation or organization)          Identification No.)

411 East Plumeria Drive, San Jose, California 95134
(Address of principal executive offices, including zip code)

(408) 570-1000
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

None

Securities registered pursuant to Section 12(g) of the Act:

Common Stock, par value $.001
Preferred Stock Purchase Rights
(Title of each Class)

--------------------

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [_]

The aggregate market value of the voting stock held by non-affiliates of the registrant as of November 30, 2001, was $271,764,134 based upon the last reported sales price of the Common Stock in the Nasdaq National Market, as reported by the Nasdaq Stock Market.

The number of shares of the registrant's Common Stock outstanding as of November 30, 2001 was 25,210,031.

Documents Incorporated by Reference

Portions of the registrant's definitive proxy statement to be filed pursuant to Regulation 14A in connection with the 2002 annual meeting of its stockholders are incorporated by reference into Part III of this Form 10-K.

-------------------------------------------------------------------------
-------------------------------------------------------------------------

<PAGE>

PART I

ITEM 1. BUSINESS

FORWARD-LOOKING STATEMENTS

This report on Form 10-K, including without limitation the Business section and Management's Discussion and Analysis of Financial Condition and Results of Operations, contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements include, but are not limited to, statements concerning expected price erosion, plans to make acquisitions, dispositions or strategic investments, expectation of sales volume to original equipment manufacturers (or "OEM"), and plans to improve and enhance existing products and develop new products.

The forward-looking statements of the Company are subject to risks and uncertainties. Some of the factors that could cause future results to materially differ from the recent results or those projected in the forward-looking statements include, but are not limited to, significant increases or decreases in demand for Phoenix's products, increased competition, lower prices and margins, failure to successfully develop and market new products and technologies, competitor introductions of superior products, continued industry consolidation, instability and currency fluctuations in international markets, product defects, failure to secure intellectual property rights, results of litigation, failure to retain and recruit key employees, acts of war or global terrorism, power shortage, and unexpected natural

disasters. For a more detailed discussion of certain risks associated with the Company's business, see the "Business Risks" section of this Form 10-K. The Company undertakes no obligation to update forward-looking statements to reflect events or circumstances occurring after the date of this Form 10-K.

GENERAL DEVELOPMENT OF THE BUSINESS

Phoenix Technologies Ltd. ("Phoenix" or the "Company") is the global leader in device-enabling and management software solutions for Personal Computers (PCs) and connected digital devices. Phoenix provides its products primarily to platform and peripheral manufacturers (collectively, "OEMs") that range from large PC and information appliance manufacturers to small system integrators and value-added resellers. Phoenix also provides training, consulting, maintenance, and engineering services to its customers. The Company markets and licenses its products and services through a direct sales force as well as through regional distributors and sales representatives.

The global computer industry, driven by the expansion of the Internet, has evolved into a rich "connected device ecosystem" embracing entirely new categories of functionality and is characterized by rapid technology changes that include increased processor speeds, hardware miniaturization, portability, and new and improved ways to connect devices. Traditional PC platforms have evolved into "endpoints" of the Internet. In addition, a wide array of other new technological innovations have emerged such as TV-centric "internet Televisions" (iTVs), "internet Video Players" (iVPs), tablet PCs which recognize pen-based input in Windows-based applications, wireless handheld appliances, interactive game stations, home networks, and rack-mounted single board server systems (known as "server blades") for enterprise applications.

The Company believes that its products and services enable customers who specify, develop, and manufacture PCs, information appliances, and semiconductors to bring leading-edge products to market more quickly while reducing their costs, providing high value-added features to their customers and, hence, increasing their competitiveness.

The Company was incorporated in the Commonwealth of Massachusetts in September 1979, and was reincorporated in the State of Delaware in December 1986.

2

<PAGE>

In the second quarter of fiscal 2001, the Company acquired assets of Ravisent Technologies, Inc. and launched the Information Appliance Division worldwide to extend its global system software to a new generation of information appliances, mobile devices, and smart peripherals including internet Television (iTV), and internet Video Player (iVP) applications. As part of its commitment to deliver compact, high-quality, value-added code to the information appliance marketplace, the Company enhanced the Ravisent microbrowser technology and incorporated it into Phoenix's products.

Also, in the second quarter of fiscal 2001, the Company opened a sales office in Beijing, China as part of its continuing long-term commitment to service and support its Asian-based customers.

DESCRIPTION OF BUSINESS

The Company's four operating segments were Platform Enabling Division, inSilicon, Information Appliance Division, and PhoenixNet/TM/ Division.

Information regarding revenues, gross margin and operating profit by segments, and revenues from unaffiliated customers by geographic regions, can be referenced under Note 11 "Segment Reporting" in the Company's Consolidated Financial Statements.

Platform Enabling Division

The Platform Enabling Division of Phoenix has been instrumental in the advancement of PC architecture. This division's system enabling software, referred to as Basic Input Output System ("BIOS") products, continues to play an essential role in the design of PCs and other devices by providing the critical link between hardware platforms and operating systems. In 2001, the division introduced a new class of software, FirstWare applications, that is typically loaded from a protected area of a PC's hard disk. This software can be used before the operating system is started or in conjunction with an operating system to provide diagnostic, repair and other services.

PC systems and other electronic devices consist of hardware, BIOS software, operating system software, and applications software. BIOS is the software that is initially executed when the system is turned on and is typically stored on a Read Only Memory ("ROM") chip that resides on the device's motherboard. BIOS tests and initializes the hardware. It also starts some software components including FirstWare applications, initiates the operating system, and then provides certain advanced interface functions.

The Company believes that the introduction of new hardware architectures, microprocessors, peripheral equipment, and operating systems both within the PC industry and through other channels, has increased the range of possible computing options, and has increased the need for system BIOS. In addition, the Company believes that its customers will require their products to feature increased reliability, a capability offered by the FirstWare applications.

Products. The Platform Enabling Division is currently offering or developing the following BIOS products:

Desktop/Server

. PhoenixBIOS(TM) 4.0. The Company provides various versions of PhoenixBIOS 4.0 as its core system firmware for desktop and server systems. The Company believes that the success of this product is attributable to its reliability and advanced features, including its fourth generation modular architecture and advanced development tools and methodology.

. AwardBIOS(TM). The Platform Enabling Division also includes the products of Award Software, acquired in September 1998. The Company believes that the Award BIOS products and engineering services enable customers to rapidly develop new motherboard designs for state-of-the-art computer systems.

3

<PAGE>

Notebook/Portable Computers

. NoteBIOS(TM) 4.0 for Portable Systems. The Company offers its NoteBIOS system software for use with portable or notebook computers. The product adds extensive power management capabilities, such as Save-to-Disk and smart batteries, to the modular architecture of PhoenixBIOS 4.0.

In addition, the Company offers and continues to enhance firstware applications products, primarily for computer problem analysis and repair, for use by system owners.

Customers and Sales. The Company generates a significant portion of its Platform Enabling Division revenues from customers outside of the United States. See discussion under "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations--Results of Operations." The Company has licensed its BIOS technology to over 600 global technology leaders, including:

| PC Systems | | PC Motherboards | Embedded Systems |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Acer | Samsung | Asustek | Force Computers |
| Dell | Compaq | Gigabyte | Japan Victor Company |
| Fujitsu | Hewlett-Packard | GVC | Motorola |
| Sony | Toshiba | First International Company | NCR |
| Hitachi | Fujitsu Siemens | | NEC |
| EMC | IBM | | Radisys |

The Company licenses its BIOS products and provides professional services to major OEMs of PCs, motherboards, and other computing devices. In general, license fees are generated on a per unit basis for each system shipped, and professional service fees are generated based upon efforts expended. The Platform Enabling Division utilizes a global direct sales force in North America, Asia and Europe, and resellers and distributors on a limited basis to certain regions.

Some product modifications are generally required in order for the customer to deploy Phoenix's Platform Enabling Division products on specific hardware platforms. To support its worldwide customer base, the Platform Enabling Division employed over 125 deployment engineers in Germany, Japan, Korea, Taiwan, China, California, Oregon, and Massachusetts. The Company also provides support services by telephone, via the Internet, and on-site.

Two customers accounted for 15% and 11% of revenues generated by Platform Enabling Division in fiscal 2001. Also, one customer accounted for 19% and 11%, of revenues generated by Platform Enabling Division in fiscal 2000 and 1999, respectively. No other customer accounted for more than 10% of revenues of the Platform Enabling Division in fiscal 2001, 2000, and 1999.

Competition. The Platform Enabling Division competes for BIOS sales primarily with in-house research and development departments of PC manufacturers that may have significantly greater financial and technical resources than those of the Company. These companies include Acer Incorporated, Compaq Computer Corporation, Dell Computer Corporation, IBM Corporation. The Company also competes for system software business with other independent suppliers, ranging from small, privately-held companies to Acer Softech, Inc., a division of Acer Laboratories, Inc., a major Taiwan chip and motherboard supplier. The Company believes that OEM customers often license the Company's system software products rather than develop these products internally in order to: (1) enhance compatibility with the latest industry standards, (2) improve time to market, (3) reduce product development risks, (4) reduce product development and support costs, and/or (5) to differentiate their system offerings with advanced features. In the FirstWare software area, the Company competes with individual component software suppliers such as StorageSoft,

Inc., Symantec Corporation, and other companies that develop diagnostic and repair software, as well as in-house solutions.

4

<PAGE>

inSilicon

   inSilicon Corporation ("inSilicon") is a leading provider of communications technology that is used by semiconductor and systems companies to design complex semiconductors called systems-on-a-chip. The Systems-on-a-chip are critical components of wired and wireless products. inSilicon's customers use its communications technology in hundreds of different digital devices ranging from network routers to handheld computers and cellular phones. inSilicon's modular approach emphasizes customer-proven reusable semiconductor intellectual property that focuses on communications and connectivity, and is compatible with a wide range of microprocessor designs. Semiconductor and systems companies integrate inSilicon's communications technology into their overall semiconductor designs to save time and money, allowing them to focus on their core competencies that differentiate their products. By integrating inSilicon's communications technology into their complex designs, inSilicon's customers are better able to solve the widening "design gap" caused by the difficulty of designing complex systems-on-a-chip in the time necessary to get to the market with their products.

   inSilicon targets high growth markets requiring high performance, quick time to market, design flexibility, and compliance with industry standards. The primary market segments are telecommunications and data communications, consumer electronics, computers, and office automation.

   Products. inSilicon's communications technology includes semiconductor intellectual property and related software. Its semiconductor intellectual property includes a wide variety of both standards-based and proprietary communications technology. inSilicon's semiconductor intellectual property platforms vertically combine many of these technologies into functional blocks tailored for ease of use and faster integration by its customers.

   inSilicon supplies its technology as Verilog, a source code, and GDS II database, which are the primary design representations in use today. Semiconductor and systems companies then integrate inSilicon's communications technology into their overall semiconductor designs using electronic design automation tools, such as those provided by Synopsys, Inc., Mentor Graphics Corporation, and Cadence Design Systems, Inc. It uses a modular approach that emphasizes silicon-proven reusable, licensable technologies and software that are compatible with a wide range of processor designs.

   inSilicon's technologies are outlined in the following chart. Each family consists of its technologies that relate to a specific industry standard.

5

<PAGE>

<TABLE>
<CAPTION>

| Communications Standards | Technology Families | Technology Applications |
| --- | --- | --- |

| <S> | <C> | <C> |
|---|---|---|
| Ethernet | 10/100 and 10/100/1000 Ethernet Media Access Controller and Ethernet Simulation Model | Ethernet is a widely used local area net communications standard, used in device: modems, cable modems, home networking, routers, and switches. |
| IEEE 1394 | 1394 Device Controller Link, 1394 A/V Link, 1394 Cable Phy and 1394 Simulation Model | IEEE 1394 is a high-speed digital interf standard used in digital cameras, audio- drives, and scanners. |
| IrDA | VFIR and VFIR Simulation Model, IrDA and IrDA Simulation Model | IrDA is a wireless standard that enables communication between appliances across distances. It is used in mobile phones, and laptop computers, and electronic gam |
| Java(TM) Technology | JVX(TM) and JVXtreme(TM) Java Accelerators | JVX is a proprietary hardware and softwa solution that accelerates applications v Java programming language. JVX is primar targeted for wireless Internet applicati |
| PCI | PCI Suite and PCI Simulation Model | Peripheral Component Interconnect is an communications standard that connects va elements of computer systems to each oth used in many computers as well as in emk systems. |
| PCI-X | PCI-X and PCI-X Simulation Model | PCI-X is the latest revision of the PCI is used in many high performance computi applications, including multiprocessor s communications switches and routers, anc area networks. |
| USB | USB 2.0 PHY, USB 1.1 and 2.0 OHCI Host Controller, USB 1.1 Hub, USB 1.1 and 2.0 Device Controller | Universal Serial Bus is a standard desic simplify connections between personal cc and peripheral devices, such as printers cameras, and scanners. |
| UTOPIA | DMA UTOPIA Controller and Simulation Model | UTOPIA is a broadband interface widely t Asynchronous Transfer Mode (ATM) communications, network processors, and chipsets. |
| AMBA | ARM Prime Cells, and Micro Pack | Advanced ARM Micro Bus Architecture is v used in embedded systems. The Arm Prime and the Micro Pack offer most of the bui blocks needed to build a system around a ARMAmba processor bus which is supportec both the ARM and MIPS embedded processor family. This includes memory controllers and peripheral interface |
| JPEG | JPEG Encoder, Decoder, Codec, and JPEG2000 Encoder | JPEG and JPEG2000 are worldwide standarc still image compression and decompressic are widely used in digital camera, secur monitoring, printer, scanner, and medica |

</TABLE>

<PAGE>

Customers and Sales. inSilicon focuses its sales efforts in the following areas: direct sales, indirect sales through application specific integrated circuit (or "ASIC") manufacturers and authorized design centers, and internet distribution.

Direct Sales. inSilicon maintains a direct worldwide sales network consisting of its own employees and a limited number of sales representatives and field applications engineers. The sales force is distributed in key geographic areas around the world with employees in the following locations: Texas, Maryland, Massachusetts, California, Switzerland, England, Germany, Canada, Taiwan, and Japan. In addition, it has a distribution agreement with Phoenix covering Hong Kong, Japan, Korea, Singapore, and Taiwan.

Indirect Sales. In addition to the direct sales force, inSilicon also uses indirect sales channels such as ASIC manufacturers and authorized design centers.

Internet Distribution. inSilicon also allows semiconductor designers to download and test, via the Internet, encrypted versions of its technology before committing to any economic arrangement.

inSilicon has developed a strong customer base among semiconductor and systems companies that use its communications technology to design complex semiconductors. No customer accounted for more than 10% of revenues individually in fiscal 2001, 2000, or 1999.

Competition. inSilicon is one of the top five pure merchant IP companies based on world-wide revenues for fiscal 2000, according to a May 2001 report by Gartner, Inc. The other top vendors include ARM Holdings plc, MIPS Technologies, Rambus, Inc., and Mentor Graphics Corporation. The industry is very competitive and is characterized by constant technological change, rapid rates of product obsolescence, and frequently emerging new suppliers. inSilicon's existing competitors include other merchant semiconductor intellectual property (or "SIP") suppliers, such as the Inventra Division of Mentor Graphics Corporation, Synopsys Inc., Enthink, Inc., Gain Technology Corporation, and the VAutomation subsidiary of ARC Cores, Inc.; and suppliers of ASICs, such as LSI Logic Corporation, the ASIC divisions of IBM Corporation, Lucent Technologies, Inc., Toshiba Corporation, and NEC Corporation. inSilicon also competes with the internal development groups of large, vertically integrated semiconductor and systems companies, such as Intel Corporation, Motorola Inc., Cisco Systems, Inc., and Hewlett-Packard Company. In these companies, SIP developed for an individual project sometimes is subject to efforts by the company to be reused in multiple projects. Companies whose principal business is providing design services as work-for-hire, such as Intrinsix Corporation, Sci-worx Corporation, Parthus Technologies plc, and the Tality subsidiary of Cadence Design Systems, Inc., also provide competition. These companies generally build a portfolio of internally developed SIP over time and then re-use that SIP as applicable in new service projects in order to gain productivity leverage. For firmware, its primary competitors are in-house research and development departments of systems companies and small privately-held companies. As inSilicon introduces new SIP technologies, it will face competition from both existing SIP suppliers and new SIP suppliers that it anticipates will enter the market. inSilicon also may face competition from new suppliers of technologies based on new or emerging standards.

Information Appliance Division

The Information Appliance Division of Phoenix is a new division launched in

March 2001. It plays a leading role in establishing new information appliance categories and it also provides solutions for those existing information appliance categories. As a leader in the development of device enabling and management software solutions, Phoenix is leveraging more than 20 years of expertise to develop this new breed of instant-on information appliances.

Unlike PCs, information appliances are designed to offer internet connectivity to a new class of users. These new users demand devices that are easy to use, reliable, inexpensive, and that provide appliance-like capabilities, such as "Instant-on" and "Instant-off". The Company offers and continues to enhance its information appliance

<div align="center">7</div>

<PAGE>

software products to enable device OEMs to deliver this new breed of information appliances that will bring a new generation of users to the Internet. The Company believes that with its expertise in the development of software solutions it is well positioned to take advantage of the anticipated growth of the information appliance marketplace.

Products. The Information Appliance Division is currently offering the following BIOS products:

. Industrial BIOS. The Company developed the industrial BIOS for configuration and control of information appliances, also referred to as embedded platforms. The industrial BIOS as well as other informational appliance products are designed using small form factors in order to meet the requirements of embedded platforms.

. FirstView Connect. The Company offers its FirstView Connect family of products to device OEMs as its core system to enable solutions to provide the best possible user experience on non-PC devices. It was designed and developed to enable a new class of low cost, flexible device that can bypass the complex and tedious start-up and set-up procedures faced by PC users who seek internet access. The product adds extensive advanced interactive web technologies like Java and Macromedia Flash(TM) capabilities, allowing OEMs to deliver rich, multi-media based internet content to TV as well as stand-alone network appliances.

Customers and Sales. The Company generates most of its Information Appliance revenues from North America and Japan. The Company has licensed its FirstView Connect browser and Industrial BIOS technology to a number of global technology leaders, including:

| PC Motherboards | Embedded Systems |
| --- | --- |
| First International Company | TeleCruz |
| VIA | eHomeTV |

The Company licenses its software products and provides professional services. In general, license fees are generated on a per unit basis for each system shipped, and professional service fees are generated based upon efforts expended. The Information Appliance Division utilizes a global direct sales force in North America, Asia and Europe, and resellers and distributors on a limited basis for certain regions.

Some product modifications are generally required in order for the customer to deploy the Company's Information Appliance Division products on specific

hardware platforms. The Company provides support services by telephone, via the Internet, and on-site.

One customer accounted for 28% of Information Appliance Division's revenues in fiscal 2001. There were no other customers accounted for more than 10% of Information Appliance revenues in fiscal 2001. Fiscal 2001 was the first year the Information Appliance Division generated revenues.

Competition. The Information Appliance Division competes primarily with research and development departments of software developers that may have significantly greater financial and technical resources than those of the Company. These companies include OpenTV Corporation, Wind River Systems, Inc., Liberate Technologies, and Microsoft Corporation. The Company also competes for software business with other independent suppliers, ranging from small, privately-held companies to in-house research and development departments of major OEMs. The Company believes that OEM customers in the information appliance space often license the Company's software products rather than develop these products internally in order to: (1) improve time to market, (2) reduce product development risks, and/or (3) reduce product development support costs.

8

<PAGE>

PhoenixNet(TM) Division

The Company's PhoenixNet(TM) division delivers products and services, including the introduction of its Internet security infrastructure product in fiscal 2001, to new and existing users of personal computers, internet appliances, and mobile devices for leading providers worldwide.

PhoenixNet(TM) provides technology infrastructure that enables security products and services designed to deliver a higher level of trust to both devices and device-aware e-business applications through device authentication. Applications using this infrastructure for virtual private networks (VPNs) and the Internet are supported by a global network of Regional Device Authorities.

Products. PhoenixNet(TM) is currently offering the following products:

DeviceConnect(TM). Phoenix's DeviceConnect is a software and firmware based product, currently available for Check Point VPN-1 implementations, that turns a PC into an authentication token. Users need nothing more than their PCs running a Phoenix-customized VPN Client to securely access their network.

Technologies. The PhoenixNet(TM) division offers its products using primarily StrongROM and StrongClient technologies.

StrongROM. StrongROM is a ROM chip that contains an industry-leading cryptographic engine (RSA algorithms) and three security keys. Every PC, notebook, internet appliance, and other connected device that includes a StrongROM chip on the motherboard comes equipped with built-in strong security features. The device itself can become a tool for instant, and transparent device authentication.

With Phoenix Security firmware on board, the computer or notebook itself effectively becomes a "virtual smart card" for network access or internet transaction authentication, while all existing security steps and infrastructures (like username/password logons and VPNs) remain in place. By using two authentication methods--username/password for the individual and

StrongROM for the device--the customer benefits from two-factor or "strong" authentication.

StrongCLIENT. StrongCLIENT is the software version of the StrongROM security technology. It is a Windows based implementation of the cryptographic engine leveraging security keys that are in Phoenix's firmware solution, StrongROM. It provides the functionalities of the ROM-based version and is easily installed on new or existing computers.

Customers and Sales. The activities of PhoenixNet(TM) are focused on delivering internet configuration services to PhoenixNet(TM) enabled motherboards. When these motherboards are built into a PC that connects to the Internet, the free configuration services are performed from the PhoenixNet(TM) data center. The Company has expanded its offerings with an internet security infrastructure product. This key strategic offering allows a reseller to offer a trusted platform. The product uses digital signatures and an online enrollment process to establish device authentication for applications, such as access control, transaction integrity, and content security.

Two customers accounted for 35% and 34% of revenues generated by PhoenixNet(TM) in fiscal 2001. In fiscal 2000, four customers each accounted for more than 10% of revenues in fiscal 2000.

Competition. In the securities business, there are many distribution vehicles for the Company's customers to reach PC end users, including PC OEM companies, PC and hardware registration companies, and Internet web sites. Many have greater resources than the Company.

9

<PAGE>

PRODUCT DEVELOPMENT

The company's research and development expenditures in fiscal years 2001, 2000, and 1999 were $45.5, $39.1 million, and $39.9 million, respectively. At November 30, 2001, its research and development group included 367 full-time equivalent persons. The Company's research and development expenditures demonstrate its continuous commitment to maintain and enhance its current product lines, develop new products, maintain technological competitiveness and meet continually changing customer and market requirements.

INTELLECTUAL PROPERTY AND OTHER PROPRIETARY RIGHTS

The Company relies primarily on U.S. and foreign patents, trade secrets, trademarks, copyrights, and contractual agreements to establish and maintain proprietary rights in its technology. The Company has an active program to file applications for and obtain patents in the U.S. and in selected foreign countries where a potential market for its products exists. As of September 30, 2001, the Company had been issued twenty-nine patents in the U.S. and had sixty-five patent applications in process in the United States Patent and Trademark Office. There can be no assurance that any of these patents would be upheld as valid if challenged.

The Company's general policy has been to seek patent protection for those inventions and improvements likely to be incorporated in its products or otherwise expected to be of long-term value. The Company protects the source code of its products as trade secrets and as unpublished copyrighted works. It also initiates litigation where appropriate to protect its rights in that intellectual property. The Company licenses the source code for its products to

its customers for limited uses. Wide dissemination of its software products makes protection of its proprietary rights difficult, particularly outside the United States. Although it is possible for competitors or users to make illegal copies of its products, the Company believes the rate of technology change and the continual addition of new product features lessen the impact of illegal copying.

In recent years, there has been a marked increase in the number of patents applied for and issued with respect to software products. Although the Company believes that its products do not infringe on any copyright or other proprietary rights of third parties, the Company has no assurance that third parties will not obtain, or do not have, intellectual property rights covering features of its products, in which event the Company or its customers might be required to obtain licenses to use such features. If an intellectual property rights holder refuses to grant a license on reasonable terms or at all, the Company may be required to alter certain products or stop marketing them.

EMPLOYEES

As of November 30, 2001, Phoenix employed 515 full-time equivalent persons worldwide, of whom 302 were in research and development and customer engineering, 84 were in sales and marketing, and 129 were in general and administration. Of the 515 total full-time equivalent persons, 8 were contractors. Phoenix's employees are not represented by a labor organization, and the Company has never experienced a work stoppage. The Company considers its employee relations to be satisfactory.

As of November 30, 2001, inSilicon employed 124 full-time equivalent persons worldwide, of whom 65 were in research and development and customer engineering, 42 were in sales and marketing, and 17 were in general and administration. Of the 124 total full-time equivalent persons, 5 were contractors. inSilicon's employees are not represented by a labor organization, and inSilicon has never experienced a work stoppage. inSilicon considers its employee relations to be satisfactory.

COMPLIANCE WITH ENVIRONMENTAL REGULATIONS

To the Company's present knowledge, compliance with federal, state and local provisions enacted or adopted for protection of the environment has had no material effect upon its operations.

10

<PAGE>

ITEM 2. PROPERTIES

The Company's corporate headquarters are located in a facility in San Jose, California, which the Company leases pursuant to a lease agreement expiring in November 2003. This facility also includes its Platform Enabling Division, inSilicon, Information Appliance Division, and PhoenixNet(TM) Division. In fiscal 1997, the Company entered into a five-year lease agreement for a facility in Irvine, California. The Irvine lease was renewed in August 2001 for an additional seven years effective February 2002. The Company also leases smaller office facilities in other locations including: Norwood, Massachusetts; Beaverton, Oregon; Houston and Austin, Texas; Taipei, Taiwan; Hong Kong, Beijing, and Nanjing, China; Tokyo and Osaka, Japan; Seoul, Korea; Budapest, Hungary; and Munich, Germany. These offices generally provide engineering, sales, and technical support to its customers. In November 2000, inSilicon relocated its sales and marketing function to a small office facility in San

Jose, California under a two-year lease that expires in June 2002.

The Company's facilities are near capacity and are fully utilized. The Company considers its leased properties to be in good condition, well maintained, and generally suitable for their present and foreseeable future needs. The Company believes its facilities are adequate for its current needs and that suitable additional or substitute space will be available as needed to accommodate any expansion of its operations.

ITEM 3. LEGAL PROCEEDINGS

The Company, from time to time, becomes involved in litigation claims and disputes in the ordinary course of business. There are currently no pending legal proceedings to which either the Company or any of its subsidiaries are a party.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

EXECUTIVE OFFICERS OF PHOENIX TECHNOLOGIES LTD.

The executive officers of the Company serve at the discretion of the Board of Directors of Phoenix. As of the filing date of this Form 10-K, executive officers of the Company are as follows:

```
<TABLE>
<CAPTION>
Name                       Age                        Position
----                       ---                        --------
<S>                        <C> <C>
Albert E. Sisto............ 52  Chairman, President, and Chief Executive Officer

David A. Everett.......... 58  Senior Vice President

W. Curtis Francis......... 52  Senior Vice President & General Manager, Corporate Engir
                               Planning Division

David L. Gibbs............ 44  Senior Vice President & General Manager, Global Sales ar
                               Division

John M. Greeley........... 54  Senior Vice President, Finance and Chief Financial Offic

Kendall S. Larsen......... 44  Senior Vice President and General Manager, Business Deve

Magda M. Madriz........... 49  Vice President, Human Resources

Alan L. McCann............ 38  Senior Vice President & General Manager, Corporate Marke
                               Products Division

Linda V. Moore............ 55  Vice President, General Counsel and Secretary
</TABLE>
```

11

<PAGE>

BIOGRAPHIES

Mr. Sisto joined the Company as President and Chief Executive Officer and

was appointed to the Board in June 1999. He was elected Chairman of the Board in January 2000. Mr. Sisto was formerly Chief Operating Officer of RSA Data Security, Inc. from 1997 to 1999. He served as President, Chairman, and CEO of DocuMagix from 1994 to 1997. From 1989 to 1994, Mr. Sisto served as the President and CEO of PixelCraft, Inc. Mr. Sisto has also served in executive management roles at MIPS Technologies, Relational Technologies (INGRES), Intel, Honeywell, and General Electric. Mr. Sisto serves as a director and Chairman of the Board of inSilicon, Corp. and is on the Boards of Directors of Hi/fn Inc., a semiconductor components company, and Tekgraf, a graphic arts distribution and service company. Mr. Sisto earned a Bachelor of Science in Engineering from Stevens Institute of Technology.

Mr. Everett has served as Senior Vice President since October 2001, with responsibility for special assignments for the CEO. From April 1999 to October 2001, Mr. Everett served as Senior Vice President and General Manager of the Platform Enabling Division in April 1999. From September 1997 to April 1999, he was CEO of 3D Labs, Inc. In September 1997, he became President and CEO of Dynamic Pictures, Inc. In January 1996, he joined the Company as Vice President, Worldwide Field Operations. Through December 1995, Mr. Everett worked for SyQuest Technology as Executive Vice President, Sales and Marketing. He also worked for Wyse Technology as Senior Vice President, Sales and Corporate Marketing. Mr. Everett earned a B.A. in Business from Michigan State University.

Mr. Francis joined the Company as Senior Vice President and General Manager of the Corporate Engineering and Planning Division in October 2001. He joined Phoenix from Quantum Corporation, where he served as Vice President of Corporate Development from May 1998 to April 2001. Before joining Quantum, Mr. Francis was Vice President of Corporate Development and Strategic Planning at Advanced Micro Devices from April 1995 to May 1998 and also served as Vice President of Corporate Development at Sun Microsystems from August 1993 to April 1995. Prior to joining Sun Microsystems, he served in a number of executive capacities in the areas of corporate strategy, strategic planning, and finance at Advanced Micro Devices, and previously had worked as a consultant for the Boston Consulting Group. Mr. Francis holds an MBA Degree from Harvard Business School, a M.S. degree in Electrical Engineering from Massachusetts Institute of Technology, and a B.S. degree in Engineering and Applied Science from Yale University.

Mr. Gibbs became the Senior Vice President and General Manager of the Global Sales and Support Division in October 2001. He joined the Company as Vice President of Business Development in March 2001 and was promoted to Senior Vice President and General Manager of the Information Appliance Division in May 2001. Prior to joining Phoenix, he served in several senior management roles at FlashPoint Technologies, an embedded appliance OS company, from 1998 to 2001. Prior to that, Mr. Gibbs was Vice President of Sales at DocuMagix/JetFax from 1997 to 1998, and held a number of executive sales and business development roles between November 1993 to March 1997 while at Insignia Solutions. Mr. Gibbs earned a B.A. degree in Economics from UCLA.

Mr. Greeley joined the Company as Senior Vice President of Finance and Chief Financial Officer in May 2000. From April 1999 to May 2000, he was Chief Operating and Financial Officer of Leasing Solutions, Inc. Mr. Greeley spent over sixteen years at GE Capital Corporation in various finance and general management positions. While at GE Capital, Mr. Greeley served as President of Telecom Financial Services, a wholly owned subsidiary of GE Capital specializing in the financing of telecom and data networks, from September 1996 to April 1999. From June 1994 to September 1996, he was President of NTFC Capital, acquired by GE Capital, which supported Northern Telecom and its distributors. He started his career in New York City with

PricewaterhouseCoopers LLP, and is a CPA. Mr. Greeley is a graduate of St. John's University with a B.S. degree in Accounting and an M.B.A. in Finance.

Mr. Larsen became Senior Vice President and General Manager, Business Development in October 2001. He joined the Company as Senior Vice President and General Manager of the PhoenixNet Division in October

12

<PAGE>

2000. Before joining Phoenix, he was with RSA Security, Inc. as the Senior Vice President of Worldwide Alliances and OEM Sales from May 1998 to October 2000. Prior to joining RSA, Mr. Larsen was Vice President of International Sales and Vice President of Worldwide Sales at Ramp Networks from September 1996 to April 1998. From January 1994 to August 1996, he was Managing Director of the Americas for General Magic. He has also served as Director of National Accounts, Director of OEM Sales, and Director of the western area for Novell, Inc., and he held various management sales positions at IBM and Xerox Corporation. Mr. Larsen holds a B.S. degree in Economics from the University of Utah.

Ms. Madriz came to Phoenix from Xicor, Inc. in October 2000. She joined Xicor, Inc. in 1984 as Director of Human Resources, and was promoted to Vice President in 1990. In addition to her responsibilities as the senior executive for Human Resources, she also assumed responsibility for Safety and Environmental Compliance. Prior to Xicor, Ms. Madriz served as Division Senior HR Manager for Atari, Inc. from 1980 to 1984. She has also worked for Dysan Corporation, and Federated Department Stores in various HR capacities. She has served as an appointed Commissioner for The City of San Jose since 1994, and is on the board of several non-profit organizations. Ms. Madriz earned a B.A. degree in Business Administration from the University of Pavia, Italy.

Mr. McCann became Senior Vice President and General Manager, Corporate Marketing and Products Division in October 2001. He joined the Company as Vice President of Marketing, Platform Enabling Division in May 2001 and was promoted to Vice President and General Manager, Platform Enabling Division in August 2001. Prior to that, he served as Vice President and General Manager, PC and Consumer Electronics Divisions, Ravisent Technologies Inc. from November 1999 to April 2001; and from May 1997 to October 1999 as Sr. Director of Product Marketing, ATI Technologies Inc. Prior to that, Mr. McCann held various management positions at Xerox, QMS, and IBM. Mr. McCann earned an MBA from York University, Canada and a B.A.Sc. in Electrical/Computer Engineering from the University of Waterloo, Canada.

Ms. Moore joined the Company in November 1999. Prior to joining the Company, she was Vice President and General Counsel of Appiant Technologies, Inc., a distributor of computer-telephony products based in Fremont, California from 1998 to 1999. From 1989 to 1998, she served as General Counsel and Secretary of Jabil Circuit, Inc., an electronics contract manufacturer headquartered in St. Petersburg, Florida. She has also served as a consultant to Internet start-ups, has 6 years of experience in equipment leasing, and began her career in private practice. Ms. Moore received a B.A. degree from the University of Michigan, an M.A. from Eastern Michigan University and a J.D. from Detroit College of Law at Michigan State University.

13

<PAGE>

PART II

ITEM 5. MARKET FOR REGISTRANT'S COMMON STOCK AND RELATED STOCKHOLDER MATTERS

The Company's common stock is traded on the NASDAQ National Market under the symbol PTEC. The following table presents the quarterly high and low bid quotations in the over-the-counter market, as quoted by the Nasdaq National Market. These quotations reflect the inter-dealer prices, without retail mark-up, mark-down or commission and may not necessarily represent actual transactions.

```
<TABLE>
<CAPTION>
                                                       High    Low
                                                      ------  ------
        <S>                                           <C>     <C>
        Year ended September 30, 2001:
           Fourth quarter.................................. $15.14  $ 9.88
           Third quarter................................... 14.60   8.69
           Second quarter.................................. 19.25   12.94
           First quarter................................... 18.63   12.19

        Year ended September 30, 2000:
           Fourth quarter.................................. $20.50  $14.44
           Third quarter................................... 21.50   12.38
           Second quarter.................................. 30.25   13.38
           First quarter................................... 18.13   8.63
</TABLE>
```

The Company had 239 shareholders of record as of November 30, 2001. To date, the Company has paid no cash dividends on its common stock. The Company currently intends to retain all earnings for use in its business and does not anticipate paying any dividends in the foreseeable future. See Note 13 to the Consolidated Financial Statements included herein for the terms of exercise of stock options.

The Company may have issued certain shares of its common stock under its 1999 Stock Plan and 1991 Employee Stock Purchase Plan prior to the filing of applicable Registration Statements on Form S-8, all of which have now been filed.

ITEM 6. SELECTED FINANCIAL DATA

The selected financial data below includes business combinations described in Note 7 to the Consolidated Financial Statements, included herein. The tables in Part II include selected unaudited quarterly consolidated data for fiscal 2001 and 2000. This information was derived from the Company's unaudited consolidated financial statements that, in the opinion of management, reflect all recurring adjustments necessary to fairly present this information, when read in conjunction with the Company's annual Consolidated Financial Statements. The results of operations for any period are not necessarily indicative of the results to be expected for any future period.

14

<PAGE>

Selected Annual Consolidated Data

(In thousands, except per share data)

```
<TABLE>
<CAPTION>
                                                           For the Years ended Septembe
                                            -----------------------------------------
                                             2001      2000      1999      1998
                                            --------  --------  --------  ------
<S>                                          <C>       <C>       <C>       <C>
Revenues:
  License fees.............................  $103,324  $125,817  $103,326  $100,3
    Services................................  18,113    18,568    22,500    22,5
                                            --------  --------  --------  ------
       Total revenues.......................  121,437   144,385   125,826   122,8
Gross margin................................  100,372   122,922    90,944    95,7
Impairment of long-lived assets.............    9,393       --        --
Restructuring cost..........................    1,525     1,270     7,892    11,6
Income (loss) from operations...............  (24,768)   26,825    (4,661)      (4
Net income (loss)...........................  (18,002)   20,902     1,804        7
Earnings (loss) per share:
    Basic...................................  $  (0.72) $   0.85  $   0.07  $   0.
    Diluted.................................  $  (0.72) $   0.77  $   0.07  $   0.
<CAPTION>
                                                           For the Years ended Septembe
                                            -----------------------------------------
                                             2001      2000      1999      1998
                                            --------  --------  --------  ------
<S>                                          <C>       <C>       <C>       <C>
Cash, cash equivalents, and short-term investments....  $ 65,034  $107,718  $ 55,592  $ 71,2
Working capital.............................   76,606   124,532    52,929    77,1
Total assets................................  160,611   194,895   141,998   156,4
Long-term obligations.......................      638     1,449     1,546     1,4
Stockholders' equity........................  119,696   148,300    98,922   125,3
Cash dividends declared per common share.....     --        --        --
</TABLE>
```

Selected Unaudited Quarterly Consolidated Data

(In thousands, except per share data)

```
<TABLE>
<CAPTION>
                                                           Fiscal 2001, Quarte
                                            --------------------------
                                            Dec. 31 Mar. 31  Jun. 3
                                            ------- -------  ------
<S>                                          <C>      <C>      <C>
Revenues....................................  $38,775  $25,761  $31,73
Gross margin................................   34,411   20,966   25,66
Impairment of long-lived assets.............      --       --
Restructuring cost..........................      --       --     1,52
Income (loss) from operations...............    7,225   (8,183)  (4,59
Net income (loss)...........................    5,511   (4,396)  (1,66
Earnings (loss) per share--basic............  $  0.22  $ (0.17) $ (0.0
Earnings (loss) per share--diluted..........  $  0.21  $ (0.17) $ (0.0
<CAPTION>
                                                           Fiscal 2000, Quarte
                                            --------------------------
                                            Dec. 31 Mar. 31  Jun. 3
```

| | | | |
|---|---|---|---|
| | ------- | ------- | ------ |
| <S> | <C> | <C> | <C> |
| Revenues......................................................... | $32,371 | $34,725 | $36,50 |
| Gross margin..................................................... | 26,557 | 29,475 | 30,30 |
| Restructuring cost............................................... | -- | -- | - |
| Income from operations.......................................... | 3,505 | 6,528 | 7,22 |
| Net income...................................................... | 2,749 | 5,007 | 5,85 |
| Earnings per share--basic....................................... | $  0.11 | $  0.20 | $  0.2 |
| Earnings per share--diluted..................................... | $  0.10 | $  0.17 | $  0.2 |

</TABLE>

15

<PAGE>

     In the first quarter of fiscal 2001, inSilicon completed the acquisitions of
Xentec, Inc. and HD Lab, K.K. In the third quarter, Phoenix completed the
acquisitions of Integrity Sciences, Inc. and Ravisent Technologies, Inc. All
four acquisitions were accounted for using the purchase method of accounting.
And accordingly, the results of operations for the companies acquired are
included only for the period subsequent to closing of the acquisitions.

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
        OF OPERATIONS

     Phoenix is a global leader of device-enabling and management software
solutions for PCs and connected digital devices. We provide our products
primarily to platform and peripheral manufacturers (collectively, "OEMs") that
range from large PC and information appliance manufacturers to small system
integrators and value-added resellers. We also provide training, consulting,
maintenance, and engineering services to our customers. We market and license
our products and services through a direct sales force, as well as through
regional distributors and sales representatives.

     The global computer industry, driven by the expansion of the Internet, has
evolved into a rich "connected device ecosystem" embracing entirely new
categories of functionality and is characterized by rapid technology changes
that include increased processor speeds, hardware miniaturization, portability,
and new and improved ways to connect devices. Traditional PC platforms have
evolved into "endpoints" of the Internet. In addition, a wide array of other
new technological innovations have emerged such as TV-centric "Internet
Televisions" (iTVs), "Internet Video Players" (iVPs), tablet PCs, wireless
handheld appliances, interactive game stations, home networks, and rack-mounted
single board server systems (known as "server blades") for enterprise
applications.

     We believe that our products and services enable customers who specify,
develop, and manufacture PCs, information appliances, and semiconductors to
bring leading-edge products to market more quickly while reducing their costs,
providing high value-added features to their customers and, hence, increasing
their competitiveness.

     Phoenix's operations include the following:

     Platform Enabling: Provides system-enabling software that is used in the
design, deployment and ongoing operation of industry standard desktop, notebook
and server PCs. The Platform Enabling's flagship software products provide
support for current technologies and industry standards, allowing systems and
device manufacturers to base new product designs on a range of microprocessors,
chipsets and operating systems combinations.

inSilicon: Provides communications technology that is used by semiconductor and systems companies to design complex semiconductors called systems-on-a-chip that are critical components of wired and wireless products. inSilicon provides cores, related silicon subsystems and firmware to customers that use its technologies in hundreds of different digital devices ranging from network routers to handheld computers.

Information Appliance: Provides technology to electronics OEMs to develop information appliance designs. Information Appliance software delivers an easy-to-implement, low cost/high value architecture that enables "instant-on" internet access and browsing capability for devices such as internet TV, interactive screen phones, and handheld appliances. This division was launched in March 2001.

PhoenixNet(TM): Provides technology infrastructure that enables security products and services designed to deliver a higher level of trust to both devices and device-aware e-business applications through device authentication. Applications using this infrastructure for virtual private networks (VPNs) and the Internet are supported by a global network of Regional Device Authorities.

16

<PAGE>

During fiscal 2001, we completed four business combinations. In February 2001, Phoenix acquired Integrity Sciences, Inc., a provider of core computer security products, which developed and marketed strong password technology. In March 2001, Phoenix acquired certain assets of Ravisent Technologies, Inc., a provider of digital audio and video software solutions and internet appliance technology. In December 2000, inSilicon acquired Xentec, Inc., a privately held IP developer that specialized in the design of high-speed mixed-signal analog and wireless technologies and HD Lab, K.K., a wireless design services group specialized in certain Bluetooth baseband technology.

These acquisitions were accounted for using the purchase method of accounting. Accordingly, the assets and liabilities of the acquired business are included in the Consolidated Balance Sheets as of September 30, 2001. The results of operations from the date of acquisitions through September 30, 2001 were included in the accompanying Consolidated Statement of Operations for the year ended September 30, 2001. There were no acquisitions or business combinations during fiscal 2000 or 1999.

The amounts allocated to goodwill and purchased intangible assets are being amortized on a straight-line basis. The estimated asset lives are determined based on projected future economic benefits and expected life cycles of the technologies. The amounts allocated to Purchased Technology are being amortized over periods of 3 to 6 years, the amounts allocated to Other Intangible Assets (comprised of customer lists and assembled work force costs) are being amortized over periods of 2 and 6 years, and the amounts allocated to Goodwill are being amortized over periods of 5 and 6 years.

The following is a summary of purchased transactions completed in fiscal 2001 (in millions):

<TABLE>
<CAPTION>

|  | Total purchase | Total tangible | Purchased | Other intangible | Stock-based |
|---|---|---|---|---|---|

| Acquired company | consideration | assets | technology | assets | compensation | Goo |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| By Phoenix: | | | | | | |
| Integrity Sciences, Inc.... | $ 3.9 | $ -- | $3.4 | $ -- | $ -- | $ |
| Ravisent Technologies, Inc. | $19.1 | $ -- | $8.1 | $ -- | $ -- | $1 |
| By inSilicon: | | | | | | |
| Xentec, Inc.............. | $11.7 | $0.2 | $0.2 | $0.6 | $0.4 | $1 |
| HD Lab, K.K.............. | $ 1.6 | $ -- | $1.3 | $0.3 | $ -- | $ |

</TABLE>

The following are details of the forms of consideration and their fair values for each acquisition:

<TABLE>
<CAPTION>

| Acquired company | Form of consideration | Fair va |
|---|---|---|
| <C> | <S> | <C> |
| Integrity Sciences, Inc. | $2.5 million in cash................................ | $ 2.5 mi |
| | 75,000 shares of Phoenix common stock.............. | 1.3 mi |
| | Transaction costs.................................. | 0.1 mi |
| | Total.............................................. | $ 3.9 mi |
| Ravisent Technologies, Inc. | $17.8 million in cash.............................. | $17.8 mi |
| | Transaction costs.................................. | 1.3 mi |
| | Total.............................................. | $19.1 mi |
| Xentec, Inc. | $3.0 million in cash............................... | $ 3.0 mi |
| | 15,678 and 618,378 shares of inSilicon common and exchangeable preferred stock, respectively........ | 7.2 mi |
| | Options to purchase 96,004 shares of inSilicon common stock................................... | 1.0 mi |
| | Transaction costs.................................. | 0.5 mi |
| | Total.............................................. | $11.7 mi |
| HD Lab, K.K. | $1.6 million in cash............................... | $ 1.6 mi |

</TABLE>

17

<PAGE>

As of September 30, 2001, $1.2 million of the $1.6 million payable specified in the HD Lab, K.K. acquisition agreement had been paid. The remaining balance of $0.4 million is scheduled to be paid in fiscal 2002.

The acquisition agreement with Integrity Sciences, Inc. includes an earn-out agreement over a five year period of up to 100,000 shares of Phoenix's common stock and cash payments of $1.5 million, if certain revenues and technology criteria are met. There is no minimum payment requirement in the earn-out agreement. No payments have been earned through September 30, 2001.

The acquisition agreement with Xentec requires that inSilicon Canada issue up to an additional 415,000 exchangeable preferred shares to the former Xentec stockholders over a two-year period, contingent upon the achievement of certain performance-based milestones. Additional goodwill will be recorded for the fair value of this consideration as the exchangeable preferred shares, if any, are issued. There is no minimum payment requirement in this contingent consideration and no payment was earned or paid for fiscal 2001. Also under the terms of the acquisition, in January 2002 inSilicon will issue common stock with a fair value of $0.5 million to former Xentec employees who continue their employment with inSilicon through December 18, 2001. The $0.5 million is being recognized as stock-based compensation expense over the one year period subsequent to the merger, and as of September 30, 2001, $0.4 million of this amount is included in payroll and related liabilities in the consolidated balance sheets.

If the performance milestones specified in the earn-out agreements are met, payments will be accrued and recorded as additional goodwill.

On March 27, 2000, Phoenix's majority-owned subsidiary, inSilicon, closed its initial public offering of 3.5 million shares. Proceeds, net of issuance costs, to inSilicon were approximately $37.0 million. The principal purpose of the offering was to increase inSilicon's equity capital, to create a public market for its common stock, to facilitate future access to public equity markets, to improve the effectiveness of its stock option plan in attracting and retaining key employees, to provide liquidity to Phoenix and to provide increased visibility of inSilicon in the marketplace. On September 30, 2001, Phoenix owned approximately 69.2% of inSilicon's common stock.

In September 1998, we acquired Sand in a purchase acquisition. The purchase price consisted of approximately $18.6 million in cash, 464,000 shares of our common stock, approximately 264,000 stock options issued in exchange for Sand stock options, and up to $3.7 million in performance incentives to be paid through fiscal 2002. Of the $3.7 million, approximately $1.6 million represents minimum anticipated payments. Performance incentives totaling of $2.6 million were earned per the agreement. Of the $2.6 million, $0.8 million was earned in fiscal 2000 and paid in fiscal 2001; $0.9 million was earned in fiscal 1999 and paid in fiscal 2000. The final payment of $0.9 million was earned in fiscal 2001 and is scheduled to be paid in fiscal 2002. The earn-out agreement ended in fiscal 2001.

18

<PAGE>

Results of Operations

The following table includes Consolidated Statement of Operations data for the years ended September 30, 2001, 2000, and 1999, as a percentage of total revenues:

<TABLE>
<CAPTION>

| | 2001 | 2000 | 1999 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Revenues: | | | |
| License fees.................................................. | 85 % | 87% | 82% |
| Services..................................................... | 15 | 13 | 18 |
| Total revenues............................................... | 100 | 100 | 100 |

| | | | |
|---|---:|---:|---:|
| Cost of revenues: | | | |
| License fees.................................................. | 3 | 2 | 6 |
| Services...................................................... | 12 | 12 | 15 |
| Amortization of purchased technology.......................... | 2 | 1 | 2 |
| Write-off of capitalized software............................. | -- | -- | 5 |
| | --- | --- | --- |
| Total cost of revenues.................................. | 17 | 15 | 28 |
| | --- | --- | --- |
| Gross margin.................................................. | 83 | 85 | 72 |
| Operating expenses: | | | |
| Research and development...................................... | 37 | 27 | 32 |
| Sales and marketing........................................... | 31 | 23 | 23 |
| General and administrative.................................... | 20 | 14 | 13 |
| Amortization of goodwill and acquired intangible assets........... | 4 | 2 | 2 |
| Stock-based compensation...................................... | 1 | -- | -- |
| Impairment of long-lived assets............................... | 8 | -- | -- |
| Restructuring cost............................................ | 2 | 1 | 6 |
| | --- | --- | --- |
| Total operating expenses................................ | 103 | 67 | 76 |
| | --- | --- | --- |
| Income (loss) from operations................................ | (20) | 18 | (4) |
| Interest and other income, net............................... | 2 | 3 | 3 |
| Gain (loss) on investment.................................... | (2) | -- | 3 |
| Minority interest............................................ | 4 | -- | -- |
| | --- | --- | --- |
| Income (loss) before income taxes............................ | (16) | 21 | 2 |
| Income tax expense (benefit)................................. | (1) | 7 | 1 |
| | --- | --- | --- |
| Net income (loss)............................................ | (15)% | 14% | 1% |
| | === | === | === |

</TABLE>

Revenues

   Our products are generally designed into personal computer systems,
information appliances, and semiconductors. License fee and service revenues by
segment for fiscal 2001, 2000, and 1999 were as follows (dollars in thousands):

<TABLE>
<CAPTION>

| | Amount of Revenues | | | % Change | | % of Revenues | | |
|---|---|---|---|---|---|---|---|---|
| | 2001 | 2000 | 1999 | 2001 | 2000 | 2001 | 2000 | 1999 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Platform Enabling........ | $ 96,668 | $118,604 | $106,872 | -18.5% | 11.0% | 79.6% | 82.1% | 84.9% |
| inSilicon................ | 19,079 | 24,676 | 18,954 | -22.7% | 30.2% | 15.7% | 17.1% | 15.1% |
| Information Appliance.... | 3,531 | -- | -- | n/a | n/a | 2.9% | -- | -- |
| PhoenixNet(TM)........... | 2,159 | 1,105 | -- | 95.4% | n/a | 1.8% | 0.8% | -- |
| Total revenues........... | $121,437 | $144,385 | $125,826 | -15.9% | 14.7% | 100.0% | 100.0% | 100.0% |

</TABLE>

   Total revenues in fiscal 2001 decreased by $22.9 million (or 15.9%) from
fiscal 2000. The decrease is primarily a result of the global economic slowdown
and softness in the PC market.

<PAGE>

Platform Enabling revenues in fiscal 2001 decreased by $21.9 million (or 18.5%) from fiscal 2000 due to softness in the PC market which had a significant impact on our core business in the North America and Taiwan regions. Platform Enabling revenues increased by $11.7 million (or 11.0%) in fiscal 2000, mainly due to higher volume royalty license fees from two OEM customers.

inSilicon revenues in fiscal 2001 decreased by $5.6 million (or 22.7%) from fiscal 2000 due primarily to the challenging economic environment, particularly in North America. Revenues in fiscal 2000 increased by $5.7 million (or 30.2%) from fiscal 1999 due to greater market acceptance of semiconductor intellectual property, increased acceptance of re-use licenses of semiconductor intellectual property to existing customers, and increased maintenance revenues from inSilicon's growing installed base of customers.

Information Appliance first generated revenues in the third quarter of fiscal 2001. North America and Japan were the two main regions contributing to these revenues.

PhoenixNet(TM) revenues in fiscal 2001 increased by $1.1 million (or 95.4%) from fiscal 2000, primarily due to its shift in business focus from homepage and search settings solutions to device authentication security products and services during fiscal 2001. PhoenixNet(TM) first generated revenues in the second quarter of fiscal 2000.

Revenues by geographic region based on country of sale for fiscal 2001, 2000, and 1999 were as follows (dollars in thousands):

<TABLE>
<CAPTION>

| | Amount of Revenues | | | % Change | | % of Revenues | | |
|---|---|---|---|---|---|---|---|---|
| | 2001 | 2000 | 1999 | 2001 | 2000 | 2001 | 2000 | 1999 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| North America........ | $ 34,613 | $ 41,121 | $ 40,907 | -15.8% | 1.0% | 28.5% | 28.5% | 32.5% |
| Japan................ | 46,878 | 48,994 | 36,596 | -4.3% | 33.9% | 38.6% | 33.9% | 29.1% |
| Taiwan............... | 21,705 | 41,409 | 33,828 | -47.6% | 22.4% | 17.9% | 28.7% | 26.9% |
| Other Asian Countries | 9,870 | 3,405 | 2,999 | 189.9% | 13.5% | 8.1% | 2.4% | 2.4% |
| Europe............... | 8,371 | 9,456 | 11,496 | -11.5% | -17.7% | 6.9% | 6.5% | 9.1% |
| Total Revenues....... | $121,437 | $144,385 | $125,826 | -15.9% | 14.7% | 100.0% | 100.0% | 100.0% |

</TABLE>

In fiscal 2001, North America, Japan, Taiwan, and Europe revenues decreased while Other Asian Countries revenues increased. The decrease in North America, Japan, Taiwan, and Europe was due primarily to the economic slowdown in the global economy which had a significant impact on the PC market. The increase in Other Asian Countries was attributed to improved sales development efforts in Korea and China. In fiscal 2000, revenues from Japan, Taiwan, and Other Asian Countries increased while North American revenues remained relatively flat and European revenues decreased. This fluctuation of revenues was due primarily to the outsourcing of system design and manufacturing to Asian PC and motherboard manufacturers, inSilicon's release of their USB 2.0 Controller, growth in Japan PC shipments in the Platform Enabling segment, and a shift in revenues from the European market to the Asian market. Taiwan, Japan, and Other Asian Countries revenues in fiscal 2000 increased despite lower average selling prices of our

BIOS products than in fiscal 1999, partly due to a shift in demand for personal computers from desktop to notebook computers.

One customer accounted for 12% of total revenues in fiscal 2001. Another customer accounted for 19% and 11% of revenues in fiscal 2000 and 1999, respectively. No other customer accounted for more than 10% of revenues in fiscal 2001, 2000, or 1999.

Gross Margin

Gross margin as a percentage of revenues was 83%, 85%, and 72% for fiscal 2001, 2000, and 1999, respectively. Included in the cost of revenues was $2.2 million, $1.3 million, and $2.1 million of amortization of

20

<PAGE>

purchased technologies from business combinations for fiscal 2001, 2000, and 1999, respectively. Also included in the costs of revenues in fiscal 2000 and 1999 was a reversal of $1.9 million of previous year's Year 2000 ("Y2K") support cost and $3.2 million of Y2K support cost. In addition, a $6.6 million write-off of capitalized software in fiscal 1999 was reclassified from restructuring cost to cost of revenues for presentation purposes.

For fiscal 2001, 2000, and 1999, gross margin as a percentage of revenues before the amortization of purchased technology and software development costs, Y2K support costs (reversal of Y2K support costs), and write-off of capitalized software was 84%, 85%, and 82%, respectively. The decrease in gross margin in fiscal 2001 from fiscal 2000 was due to lower margins on Information Appliance and inSilicon product sales. The increase in gross margin in fiscal 2000 from fiscal 1999 was due to an increase in license revenues from the Platform Enabling division and inSilicon, especially in Asia. License fee gross margin as a percentage of license fee revenues was 96%, 98% and 92% in fiscal 2001, 2000 and 1999, respectively. Service gross margin as a percentage of revenues was 16%, 8% and 19% in fiscal 2001, 2000 and 1999, respectively. Total amortization of capitalized purchased technologies and software development costs charged to costs of revenues in fiscal 2001, 2000 and 1999, was $2.2 million, $2.5 million and $4.8 million, respectively.

Research and Development Expenses

Research and development expenses were $45.5 million, $39.1 million, and $39.9 million in fiscal 2001, 2000, and 1999, respectively. As a percentage of revenues, these expenses represented 37%, 27%, and 32%, respectively. In fiscal 2001, research and development expenses increased by $6.4 million (or 16%) due to increased expenses relating to recent acquisitions, the launch of a new division, and establishment of a new development center in Asia. In fiscal 2000, research and development expenses decreased by $0.8 million (or 2%) due to the improvement of product and resource management resulting in lower headcount and the movement of research and development centers to Asia and Japan where costs were lower partially offset by an increase in variable compensation due to the attainment of increased revenues.

Approximately $1.4 million, $0.4 million, and $2.4 million of internal software development costs were capitalized in fiscal 2001, 2000, and 1999, respectively.

Sales and Marketing Expenses

Sales and marketing expenses were $37.2 million, $33.1 million, and $29.0 million in fiscal 2001, 2000, and 1999, respectively. As a percentage of revenues, these expenses represented 31%, 23% and 23% in fiscal 2001, 2000, and 1999, respectively. In fiscal 2001, sales and marketing expenses increased by $4.1 million (or 12%) due primarily to the increase in the size of our direct sales force and the expansion of our distribution channels to position ourselves for growth in the security and Information Appliance markets. In fiscal 2000, sales and marketing expenses increased by $4.1 million (or 14%) due primarily to an increase in variable compensation due to the attainment of increased revenues, and costs related to sales meetings.

General and Administrative Expenses

General and administrative expenses were $24.7 million, $19.7 million, and $16.3 million in fiscal 2001, 2000, and 1999, respectively. As a percentage of revenues, these expenses represented 20%, 14%, and 13% in fiscal 2001, 2000, and 1999, respectively. In fiscal 2001, the general and administrative expenses increased by $5.0 million (or 25%) due to investment in infrastructure, including launching the new Information Appliance Division and setting up new foreign offices. Also included in the fiscal 2001 general and administrative expenses was an increase in bad debt provision of $1.2 million from fiscal 2000 to reflect current market slowdown. The increase in fiscal 2000 was primarily due to increases in personnel, especially in the PhoenixNet(TM) segment and inSilicon, and variable compensation due to higher profitability.

21

<PAGE>

Amortization of goodwill and acquired intangibles

Amortization expenses were $5.0 million, $2.2 million, and $2.5 million in fiscal 2001, 2000, and 1999, respectively. In fiscal 2001, amortization expense increased by $2.8 million from fiscal 2000, primarily due to various purchase acquisitions completed in fiscal 2001 (see Note 7 to the Consolidated Financial Statements). The amortization expenses in fiscal 2000 and 1999 were related to the Sand acquisition, which was completed in fiscal 1998.

Stock-Based Compensation

The stock-based compensation expenses were $1.7 million, $0.8 million, and $nil in fiscal 2001, 2000, and 1999, respectively. Charges in fiscal 2001 were mostly due to the granting of options to purchase Phoenix and inSilicon stock at exercise prices less than the fair market value of the stock on the grant date.

Impairment of long-lived assets

Impairment of long-lived assets were $9.4 million in fiscal 2001 and $nil in fiscal 2000 and 1999. During the fourth quarter of fiscal 2001, pursuant to Statement of Financial Accounting Standards No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed of" ("SFAS 121"), inSilicon performed an assessment of the carrying value of its long-lived assets to be held and used, including goodwill and other intangible assets recorded in connection with its various acquisitions. The assessment was necessitated by various factors that indicated these assets may be impaired, including recent operating results that did not meet management's expectations, the global downturn in technology spending, and sustained decline in inSilicon's market capitalization.

The conclusion of inSilicon's assessment was that indicators of impairment were present and therefore a test was required. inSilicon performed an asset impairment test with the assistance of independent valuation experts. The test was performed by comparing the undiscounted expected cash flows for a five-year period (the estimated life of the assets), to the carrying amount of the goodwill and other intangible assets resulting from purchase business combinations. The assumptions supporting the estimated cash flows reflect management's best estimates.

Also with the assistance of independent valuation experts, inSilicon determined the fair value of the impaired long-lived assets. Fair value was determined using the cash flow method and the income approach using the same assumptions as those used in the initial test of impairment. Based on the results of the test, inSilicon determined that the goodwill associated with Xentec was impaired and a write-down of goodwill and intangible assets totaling $9.4 million was recorded during the fourth quarter of fiscal 2001, reflecting the amount by which the carrying amount of the assets exceed their respective fair values. The write-down was included in "Impairment of long-lived assets" in the Consolidated Statements of Operations. There were no impairment charges of long-lived assets in fiscal 2000 or 1999 for inSilicon.

Phoenix also conducted an assessment of the carrying value of its long-lived assets due to similar impairment indicators and determined that no impairment charges were required in fiscal 2001, 2000, or 1999.

Restructuring Costs

Restructuring charges for fiscal 2001, 2000, and 1999, were as follows:

| | Years ended September 30, | | |
| --- | --- | --- | --- |
| | 2001 | 2000 | 1999 |
| | (in thousands) | | |
| Severance and other exit costs................... | $1,525 | $1,270 | $7,108 |
| Asset write-offs............................... | -- | -- | 784 |
| | $1,525 | $1,270 | $7,892 |

22

<PAGE>

Write-off of capitalized software of $6.6 million that was previously categorized as restructuring charges in fiscal 1999 was reclassified to costs of revenues for presentation purposes.

2001 Charges

In April 2001, in efforts to optimize operational efficiency and change its business strategy to address changes in customer demands, we reduced our global workforce by approximately 70 employees across all business functions. The restructuring included refocusing research and development efforts, re-evaluating sales and marketing and general and administration resource requirement, and aligning overall cost structure with current revenue levels.

All terminations were completed as of September 30, 2001.

The restructuring program resulted in a charge of approximately $1.5 million for severance and related cost in the third quarter of fiscal 2001. As of September 30, 2001, approximately $1.3 million was paid and an additional $0.2 million was accrued and expected to be paid through the first quarter of fiscal 2002. As a result of the restructuring program, we expect pretax savings in operating expenses to be approximately $9.0 million on an annualized basis.

2000 Charges

In the fourth quarter of fiscal 2000, Phoenix recorded a restructuring charge of approximately $1.3 million for severance benefits associated with the elimination of three management positions. The charges were related to the streamlining of certain management functions in Taiwan and North America. All terminations were completed as of September 30, 2000.

1999 Charges

In fiscal 1999, we incurred $7.9 million of restructuring charges relating to the realignment of its business into three operating divisions, consolidation of certain facilities and operations, integration of Award and Sand, and discontinuation of the PICO and PC Enhancing Division. These charges included $5.5 million in severance costs associated with the elimination of 92 positions across all business functions from various product divisions and management, $0.8 million of fixed assets write-down for the Company's United Kingdom branch, $0.7 million in facilities abandonment, and $0.9 million of other business exit costs pursuant to the re-organization plan. All terminations were completed as of September 30, 2000.

Charges Subsequent to Fiscal 2001 Year End

In October 2001, due to continuing global economic downturn and industry trends, we announced a restructuring program that would reduce its global workforce by approximately 15%. This restructuring program will align our expense structure with current market conditions to return to profitability. This reduction will result in a one-time charge of approximately $4.0 million in the first quarter of fiscal 2002.

As part of the restructuring program, we also announced a reorganization plan that would align its corporate actions with corporate strategy to improve customer focus, unify product marketing, streamline engineering, and create a market driven development process. The Corporate Marketing and Products Division (or CMPD), will be customer-focused and responsible for product marketing functions and applications development activities. The Corporate Engineering and Planning Division (or CEPD), will be technology-focused and includes the core development resources and deployment-engineering group. The Global Sales and Support Division (or GSSD), will focus on growing customer base and revenues.

As a result of the restructuring program announced in October 2001, we expect a pre-tax saving of $10.0 million on an annualized basis starting from the second quarter of fiscal 2002.

23

<PAGE>

In December 2001, inSilicon announced a restructuring program to realign ongoing expense structure. This restructuring program will result in a one-time

charge of $3.5 million which includes a global workforce reduction by approximately 20% and a substantial non-cash write-down of previously capitalized software. The restructuring is expected to be completed by the first quarter of fiscal 2002. inSilicon anticipated an annualized cost saving of approximately $2.8 million from this restructuring program.

Interest and Other Income, Net

Net interest and other income was $2.9 million, $4.0 million, and $3.3 million in fiscal 2001, 2000, 1999, respectively. Net interest and other income consists mostly of interest income. Interest income is primarily derived from cash and short-term investments. The income generated each period is highly dependent on available cash and fluctuations in government interest rates. The average interest rate earned in fiscal 2001 was approximately 4.3%. All of the cash equivalents and short-term investments are in USD and are not subject to fluctuations in foreign currency exchange rates. Interest income was $3.5 million, $4.4 million, and $3.4 million in fiscal 2001, 2000, 1999, respectively, of which $1.6 million in fiscal 2001 was inSilicon's. Interest income decreased by $0.9 million and increased by $1.0 million in fiscal year 2001 and 2000, respectively. The decrease in interest income in fiscal 2001 was primarily due to the decrease in the average cash balance available for investment as a result of funding various acquisitions and stock repurchase programs during the year. The increase of $1.0 million interest income in fiscal 2000 was primarily due to higher cash balances as a result of proceeds inSilicon received from the initial public offering of inSilicon stock.

Gain/Loss on Investment

Gain (loss) on investment was ($2.8 million), $nil, and $4.0 million in fiscal 2001, 2000, and 1999, respectively. Equity investments in companies in which Phoenix does not have significant influence, which is usual when ownership is less than 20%, are included in other assets. These investments are accounted for using the cost method. These investments are assessed for impairment periodically through review of operations and indications of continued viability, such as subsequent rounds of financing. In the fourth quarter of fiscal 2001, as a result of the deterioration of financial markets and the corresponding effect on company valuations and financing prospects, Phoenix recorded $3.5 million in losses as a result of other than temporary declines in the value of investments in these companies. We do not participate in subsequent financings for any of the companies we invested in, and we are not obligated or committed in any way to participate in any future financings of these companies. Net loss on investment in fiscal 2001 was $2.8 million resulting from $3.5 million of write-down netted against $0.7 million of gain on sale of investments. The net gain on investment in fiscal 1999 was mainly related to a sale of Xionics common stock, which resulted in a $4.0 million gain.

Provision for Income Taxes

Phoenix recorded income tax benefit of $0.8 million and income tax provisions of $9.8 million and $0.9 million, reflecting effective tax rates of 4%, 32%, and 32% in fiscal 2001, 2000, and 1999, respectively. The effective tax rate in 2001 was lower than the statutory rate due to change of valuation allowance related to inSilicon's deferred tax assets and foreign withholding taxes. Phoenix's effective tax rate in fiscal 2000 and 1999 had been lower than the statutory rate due to various federal and state tax credits and lower tax rates imposed on foreign earnings in certain jurisdictions. inSilicon is not consolidated for federal income tax purposes in fiscal 2001, as Phoenix owns less than 80% of inSilicon's issued outstanding voting stock.

New Accounting Pronouncements

In July 2001, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards No. 141, "Business Combinations" ("SFAS 141") and Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"). SFAS 141 requires all business combinations to be accounted for using the purchase method of accounting and is effective for all business combinations

24

<PAGE>

completed after June 30, 2001. The adoption did not have a material effect on the Company's operating results or financial condition. SFAS 142 requires goodwill to be tested for impairment under certain circumstances, and written-off when impaired, rather than being amortized as previous standards required. Furthermore, SFAS 142 required purchased intangible assets to be amortized over their estimated useful lives unless these lives are determined to be indefinite. SFAS 142 is effective for fiscal years beginning after December 15, 2001. Early application is permitted for entities with fiscal years beginning after March 15, 2001 provided that the first interim period financial statements have not been previously issued. The Company is currently assessing the impact of SFAS 142 on its operating results and financial condition. The unamortized goodwill was $15.9 million as of September 30, 2001 and the amortization of goodwill was $4.1 million for fiscal 2001.

On October 3, 2001, the FASB issued Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS 144"), that is applicable to financial statements issued for fiscal years beginning after December 15, 2001. The FASB's new rules on asset impairment supersede SFAS 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," and portions of Accounting Principles Board Opinion 30, "Reporting the Results of Operations." This Standard provides a single accounting model for long-lived assets to be disposed of and significantly changes the criteria that would have to be met to classify an asset as held-for-sale. Classification as held-for-sale is an important distinction since such assets are not depreciated and are stated at the lower of fair value and carrying amount. This Standard also requires expected future operating losses from discontinued operations to be displayed in the period(s) in which the losses are incurred, rather than as of the measurement date as presently required. The Company is currently assessing the potential impact of SFAS 144 on its operating results and financial position.

Fluctuations in Operating Results

The tables in Part II, Item 6 of this Form 10-K include selected unaudited quarterly consolidated data for fiscal 2001 and 2000. This information was derived from our unaudited consolidated financial statements that, in the opinion of management, reflect all recurring adjustments necessary to fairly present this information, when read in conjunction with our annual Consolidated Financial Statements. The results of operations for any period are not necessarily indicative of the results to be expected for any future period.

Our future operating results may vary substantially from period to period. The timing and amount of our license fees are subject to a number of factors that make estimating revenues and operating results prior to the end of a quarter uncertain. While we receive recurring revenues on royalty-based license agreements and some agreements contain minimum quarterly royalty commitments, a significant amount of license fees in any quarter is dependent on signing

agreements and delivering the licensed software in that quarter. Generally, we experience a pattern of recording 50% or more of our quarterly revenues in the third month of the quarter. We have historically monitored our revenue bookings through regular, periodic worldwide forecast reviews within the quarter. These reviews keep management informed of areas where additional selling efforts may be needed in order to meet the internal plans and market expectations. There can be no assurances that this process will result in our meeting revenue expectations. Operating expenses for any year are normally based on the attainment of planned revenue levels for that year and are incurred ratably throughout the year. As a result, if revenues were less than planned in any period while expense levels remain relatively fixed, our operating results would be adversely affected for that period. In addition, unplanned expenses could adversely affect operating results for the period in which such expenses were incurred.

## Business Risks

   The additional following factors should be considered carefully when evaluating our business.

## Product Development

   Our long-term success will depend on our ability to enhance existing products and to introduce new products timely and cost-effectively that meet the needs of customers in present and emerging markets. There

<div align="center">25</div>

<PAGE>

can be no assurance that we will be successful in developing new products or in enhancing existing products or that new or enhanced products will meet market requirements. Delays in introducing new products can adversely impact acceptance and revenues generated from the sale of such products. We have, from time to time, experienced such delays. Our software products and their enhancements contain complex code that may contain undetected errors and/or bugs when first introduced. There can be no assurance that new products or enhancements will not contain errors or bugs that will adversely affect commercial acceptance of such new products or enhancements. The introduction of new products depends on acceptance of e-commerce and adoption of digital devices.

## Protection of Intellectual Property

   We rely on a combination of patent, trade secret, copyright, trademark, and contractual provisions to protect our proprietary rights in our software products. There can be no assurance that these protections will be adequate or that competitors will not independently develop technologies that are substantially equivalent or superior to our technology. In addition, copyright and trade secret protection for our products may be unavailable or unreliable in certain foreign countries. We have been issued twenty-nine patents with respect to our current product offerings and have sixty-five patent applications pending with respect to certain of the products we market. Phoenix maintains an active internal program designed to identify internally developed inventions worthy of being patented. There can be no assurance that any of the applications pending will be approved and patents issued or that our engineers will be able to develop technologies capable of being patented. Also, as the number of software patents increases, we believe that companies that develop software products may become increasingly subject to infringement claims.

There can be no assurance that a third party will not assert that our patents or other proprietary rights are violated by products offered by Phoenix. Any such claims, whether or not meritorious, may be time consuming and expensive to defend, can trigger indemnity obligations owed by us to third parties, and may have an adverse effect on our business, results of operations and financial condition. Infringement of valid patents or copyrights or misappropriation of valid trade secrets, whether alleged against us, or our customers, and regardless of whether such claims have merit, could also have an adverse effect on our business, results of operations and financial condition.

Importance of Microsoft and Intel

For a number of years, Phoenix has worked closely with leading software and semiconductor companies in developing standards for the PC industry. We remain optimistic regarding relationships with these industry leaders. However, there can be no assurance that leading software and semiconductor companies will not develop alternative product strategies that could conflict with our product plans and marketing strategies. Action by such companies may adversely impact our business and results of operations. Presently, there is little overlap or conflict in our product offerings, although these companies now incorporate some functionality that has traditionally resided in the BIOS. These leading software and semiconductor companies, in their endeavors to add value, incorporate features or functions provided by Phoenix either in the silicon or in the operating system. Therefore, we must continuously create new features and functions to sustain, as well as increase, our software's added value to OEMs. There can be no assurances that we will be successful in these efforts.

Attraction and Retention of Key Personnel

Our ability to achieve our revenue and operating performance objectives will depend in large part on our ability to attract and retain technically qualified engineering, sales, marketing, and finance personnel. In particular, approximately 50% to 60% of our employees are involved in engineering efforts. Semiconductors IP and Internet products are based on new and emerging technologies that are different from BIOS technologies. The available pool of engineering talent is limited for all four operating segments. Accordingly, failure to attract, retain and grow our research and development teams could adversely affect our business and operating results.

26

<PAGE>

All of our executive officers and key personnel are employees at-will. Phoenix might not be able to execute its business plan if we were to lose the services of any of our key personnel. Several of our executives and key employees joined Phoenix only recently and have had only a limited time to work together. Our management team might not be able to work effectively together or with the rest of our employees to develop our technology and manage our continuing operations.

Dependence on Key Customers; Concentration of Credit Risk

The loss of any key customer and our inability to replace revenues provided by a key customer may have a material adverse effect on our business and financial condition. Phoenix's customer base includes large OEMs in the PC, semiconductor and Internet markets, system integrator value-added reseller, and motherboard manufacturers. As a result, we maintain individually significant receivable balances due from some of them. If these customers fail to meet guaranteed minimum royalty payments and other payment obligations, our operating results could be adversely affected. As of September 30, 2001, our

largest receivable balance from any one customer represented approximately 20% of total accounts receivable. As of the filing date, this receivable had been collected.

Competition

The market for our BIOS products is very competitive, resulting in downward pricing pressure. In marketing our BIOS products, we compete primarily with in-house research and development departments of PC manufacturers that may have significantly greater financial and technical resources than ours. These companies include Acer Incorporated, Compaq Computer Corporation, Dell Computer Corporation, IBM Corporation, and Toshiba Corporation. We also compete for system software business with other independent suppliers, ranging from small, privately held companies to Acer Softech, a division of Acer Laboratories, Inc., a major Taiwan chip and motherboard supplier. There can be no assurance that we will continue to compete successfully with our current competitors or potential new competitors. There can be no assurance that intense competition in the industry and particular actions of our competitors will not have an adverse effect on our business, operating results and financial condition. Due to the competitive nature of the business and the overall price pressures within the PC market, we expect that prices on many of our products may decrease in the future and that such price decreases could have an adverse impact on our results of operations or financial condition.

The SIP industry is very competitive and is characterized by constant technological change, rapid rates of product obsolescence, and frequently emerging new suppliers. Our existing competitors include other merchant semiconductor intellectual property (or "SIP") suppliers, such as the Inventra Division of Mentor Graphics Corporation, Synopsys Inc., Enthink, Inc., Gain Technology Corporation, and the VAutomation subsidiary of ARC Cores, Inc.; and suppliers of ASICs, such as LSI Logic Corporation, the ASIC divisions of IBM Corporation, Lucent Technologies, Inc., Toshiba Corporation, and NEC Corporation. We also compete with the internal development groups of large, vertically integrated semiconductor and systems companies, such as Intel Corporation, Motorola Inc., Cisco Systems, Inc., and Hewlett-Packard Company. In these companies, SIP developed for an individual project sometimes is subject to efforts by the company to be reused in multiple projects. Companies whose principal business is providing design services as work-for-hire, such as Intrinsix Corporation, Sci-worx Corporation, Parthus Technologies plc, and the Tality subsidiary of Cadence Design Systems, Inc., also provide competition.

In the FirstWare software area, we compete with individual component software suppliers such as StorageSoft, Inc., Symantec Corporation, and other companies that develop diagnostic and repair software, as well as in-house solutions.

In the Internet and securities business, there are many distribution vehicles for our partners to reach PC end users, including PC OEM companies, PC and hardware registration companies and Internet web sites. Many have greater resources than Phoenix.

27

<PAGE>

The Information Appliance Division competes primarily with research and development departments of software developers that may have significantly greater financial and technical resources than Phoenix. These companies include OpenTV Corporation, Wind River Systems, Inc., Liberate Technologies, and Microsoft Corporation. We also compete for software business with other

independent suppliers, ranging from small, privately-held companies to in-house research and development departments of major OEMs.

International Sales and Activities

   Revenues derived from the international operations of our Platform Enabling Division comprises a majority of total revenues. There can be no assurances that we will not experience significant fluctuations in international revenues. While the major portion of our license fee or royalty contracts are U.S. dollar denominated, we are entering into a number of contracts denominated in local currencies. Phoenix has sales and engineering offices in Germany, Japan, Korea, Taiwan, and China. Our operations and financial results may be adversely affected by factors associated with international operations, such as changes in foreign currency exchange rates, uncertainties relative to regional economic circumstances, political instability in emerging markets, difficulties in attracting qualified employees, and language, cultural and other difficulties managing foreign operations.

Recent Terrorist Attacks

   On September 11, 2001, the United States was a target of terrorist attacks of unprecedented scope. These attacks have caused instability in the global financial markets, and have contributed to downward pressure on stock prices of United States publicly traded companies. This instability has resulted in a slowdown in the economy. These attacks may lead to armed hostilities or to further acts of terrorism and civil disturbances in the United States, or elsewhere, which may further contribute to economic instability in the United States and could have a material adverse effect on our business, financial condition and operating results.

Volatile Market for Phoenix Stock

   The market for our stock is highly volatile. The trading price of our common stock has been, and will continue to be, subject to fluctuations in response to operating and financial results, announcements of technological innovations, new products or customer contracts by us or our competitors, changes in our or our competitors' product mix or product direction, changes in our revenue mix and revenue growth rates, changes in expectations of growth for the PC industry, as well as other events or factors which we may not be able to influence or control. Statements or changes in opinions, ratings or earnings estimates made by brokerage firms and industry analysts relating to the market in which Phoenix does business, companies with which Phoenix competes or relating to it specifically could have an immediate and adverse effect on the market price of our stock. In addition, the stock market has from time to time experienced extreme price and volume fluctuations that have particularly affected the market price for many small capitalization, high-technology companies and have often included factors other than the operating performance of these companies.

Certain Anti-Takeover Effects

   Our Certificate of Incorporation, Bylaws and Stockholder Rights Plan and the Delaware General Corporation Law include provisions that may be deemed to have anti-takeover effects and may delay, defer or prevent a takeover attempt that stockholders might consider in their best interests. These include provisions under which members of the Board of Directors are divided into three classes and are elected to serve staggered three-year terms.

Rapid Change with the Internet

Critical issues concerning the commercial use of the Internet, including security, reliability, cost, ease of use, accessibility, quality of service, potential tax or other government regulation, may affect the use of the

28

<PAGE>

Internet as a medium to distribute or support our software products and the functionality of some of our products. If we are unsuccessful in timely assimilating changes in the Internet environment in our business operations and product development efforts, our future net revenues and operating results could be adversely affected.

Business Disruptions

While Phoenix has not been the target of software viruses specifically designed to impede the performance of its products, such viruses could be created and deployed against its products in the future. Similarly, experienced computer programmers or hackers may attempt to penetrate our network security or the security of our web sites from time to time. A hacker who penetrates our network or web sites could misappropriate proprietary information or cause interruptions of our services. We might be required to expend significant capital and resources to protect against, or to alleviate, problems caused by virus creators and/or hackers.

Financial Condition

Liquidity and Capital Resources

Our primary sources of liquidity include cash, cash equivalents, and short-term investments, totaling $65.0 million and $107.7 million at September 30, 2001 and 2000, respectively. Consolidated cash and cash equivalents were $62.1 million at September 30, 2001, of which $32.0 million was owned directly by inSilicon. Consolidated short-term investment totaled $2.9 million at September 30, 2001, and none was restricted. We believe that current cash and cash flow from operations will be sufficient to meet our operating and capital requirements on a short-term and long-term basis.

In February 2001, the Board of Directors authorized a program to repurchase up to $30 million of outstanding shares of common stock over a 12-month period. In fiscal 2001, we repurchased approximately 469,000 shares at a cost of approximately $5.1 million under the 2001 repurchase program.

In fiscal 2000, the Board of Directors authorized a program to repurchase outstanding shares of common stock over a 24-month period. Under this program, we repurchased approximately 836,000 shares during fiscal 2000 at a cost of $14.5 million. Also, in first quarter of fiscal 2001, we repurchased approximately 1,028,000 shares at a cost of approximately $15.9 million under the 2000 repurchase program and completed the program.

Changes in Financial Condition

We reported $62.1 million consolidated cash in fiscal 2001, of which $32.0 million was owned directly by inSilicon. Net cash generated from operating activities during fiscal 2001 was $5.1 million, consisting primarily of a decrease of $18.3 million in accounts receivable and a $1.7 million increase in income tax payable, partially offset by an outflow of $3.3 million of net loss adjusted for non-cash items, a $4.8 million increase in prepaid royalties, and other fluctuations in working capital. Net cash provided by investing

activities in fiscal 2001 was $18.6 million, consisting primarily of $51.0 million in net proceeds in disposal from short-term investments, offset by $3.8 million in purchases of property and equipment, $1.4 million in additions to computer software costs, and $27.2 million in business acquisitions. Net cash used in financing activities during fiscal 2001 was $15.1 million, consisting primarily of repurchase of the our common stock of $21.0 million, repurchase of the Intel warrant for $2.9 million, and net payment of borrowings of $0.8 million, partially offset by exercise of common stock options and issuance of stock under Phoenix and inSilicon's employee purchase plan of $9.6 million.

Net cash generated from operating activities during fiscal 2000 was $11.0 million, consisting primarily of $20.9 million of net income, adjusted for non-cash items, partially offset by increases in accounts receivable, other current assets and other assets and decreases in payroll, other accrued liabilities and income taxes payable.

29

<PAGE>

Net cash used in investing activities in fiscal 2000 was $18.5 million, consisting primarily of $13.3 million of net purchases of short-term and long-term investments, $4.8 million in purchases of property and equipment and $0.4 million in additions to computer software costs. Net cash provided by financing activities during fiscal 2000 was $36.6 million, consisting of approximately $37.0 million generated from the initial public offering of inSilicon common stock, $19.9 million generated from the exercise of common stock options and the issuance of stock under the Phoenix and inSilicon's employee stock purchase plans, partially offset by $20.3 million of cash used to repurchase Phoenix's common stock.

Net cash generated from operating activities during fiscal 1999 was $21.6 million, resulting primarily from cash provided by net income, adjusted for non-cash items. Net cash used in investing activities was $13.7 million, which consisted primarily of $6.2 million of net purchases of short-term and long-term investments and marketable securities, $5.0 million in purchases of property and equipment, and $2.4 million in addition to computer software costs. Cash used in financing activities during fiscal 1999 was $28.3 million, consisting primarily of $34.1 million to repurchase our common stock, partially offset by $5.8 million generated from the exercise of common stock options and the issuance of stock under our employee stock purchase plan.

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to the impact of interest rate changes, foreign currency fluctuations, and change in the market values of our investments.

Interest Rate Risk

Our exposure to market rate risk for changes in interest rates relates primarily to our investment portfolio. We do not use derivative financial instruments in our investment portfolio. Our investments are in debt instruments of the U.S. Government and its agencies, and in high-quality corporate issuers and, by policy, limit the amount of credit exposure to any one issuer. We protect and preserve our invested funds by limiting default, market and reinvestment risk. Investments in both fixed rate and floating rate interest earning instruments carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if there is a decline in interest rates. Due in part to these factors,

our future investment income may fall short of expectations, or we may suffer a loss in principal if it is forced to sell securities, which have declined in market value due to changes in interest rates.

Foreign Currency Risk

International revenues from our foreign subsidiaries were 71%, 71%, and 67% of total revenues in fiscal 2001, 2000, and 1999, respectively. International sales are primarily from our foreign sales subsidiaries in their respective countries and are often denominated in the local currency of each country. These subsidiaries incur most of their expenses in the local currency. Accordingly, all foreign subsidiaries use the local currency as their functional currency. Our international business is subject to risks typical of an international business, including, but not limited to differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions, and foreign exchange rate volatility. Accordingly, our future results could be materially adversely impacted by changes in these or other factors. Our exposure to foreign exchange rate fluctuations arises in part from intercompany accounts in which costs incurred in the United States are charged to our foreign sales subsidiaries. These intercompany accounts are typically denominated in the functional currency of the foreign subsidiary in order to centralize foreign exchange risk with the parent company in the United States. We are also exposed to foreign exchange rate fluctuations as the financial results of foreign subsidiaries are translated into U.S. dollars in consolidation. As exchange rates vary, these results, when translated, may vary from expectations and adversely impact overall expected profitability. The impact from a hypothetical 10 percent appreciation/depreciation of the U.S. Dollar from September 30, 2001 market rates would be immaterial on our net income.

30

<PAGE>

Investment Risk

We invest in equity instruments of information technology companies for business and strategic purposes. These investments are included in other long-term assets and are accounted for under the cost method when ownership is less than 20%. For these non-quoted investments, our policy is to regularly review the assumptions underlying the operating performance and cash flow forecasts in assessing the carrying values. We identify and record impairment losses on these assets when events and circumstances indicate that such assets might be impaired. In fiscal 2001, after re-valuating our investments, we recorded impairment charges of $3.5 million on these investments. Equity security price fluctuations would have an immaterial negative impact on the value of our securities in fiscal 2001 due to our low net equity investment balance at September 30, 2001.

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See Item 14(a) for an index to the consolidated financial statements and supplementary financial information attached hereto.

ITEM 9. CHANGES IN, AND DISAGREEMENTS WITH, ACCOUNTANTS ON ACCOUNTING AND
         FINANCIAL DISCLOSURE

None.

PART III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

   The information required by this Item with respect to its Company's
directors will be contained in its definitive proxy statement to be filed
pursuant to Regulation 14A in connection with the 2001 annual meeting of its
stockholders (the "Proxy Statement") and is incorporated herein by this
reference. The information required by this item with respect to its executive
officers is contained in Part I in the section captioned, "Election of
Directors" in the Proxy Statement.

ITEM 11. EXECUTIVE COMPENSATION

   The information required by this section is incorporated by reference from
the information contained in the section captioned, "Executive Compensation" in
the Proxy Statement.

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

   The information required by this section is incorporated by reference from
the information contained in the section captioned, "Security Ownership of
Certain Beneficial Owners and Management" in the Proxy Statement.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

   The information required by this section is incorporated by reference from
the information contained in the section captioned, "Certain Transactions" in
the Proxy Statement.

                                       31

<PAGE>

                                    PART IV

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

   (a) 1. Index to Consolidated Financial Statements

   The following Consolidated Financial Statements of the Company and its
subsidiaries are filed as part of this report on Form 10-K:

<TABLE>
<CAPTION>

| | Page |
|---|---|
| <S> | <C> |
| Report of Ernst & Young LLP, Independent Auditors................................... | 36 |
| Consolidated Balance Sheets as of September 30, 2001 and 2000...................... | 37 |
| Consolidated Statements of Operations for the years ended September 30, 2001, 2000, and 1999................................................................. | 38 |
| Consolidated Statements of Stockholders' Equity for the years ended September 30, 2001, 2000, and 1999 | 39 |
| Consolidated Statements of Cash Flows for the years ended September 30, 2001, 2000, and 1999................................................................. | 40 |
| Notes to Consolidated Financial Statements....................................... | 41 |

</TABLE>

   2. Consolidated Financial Statement Schedules

Schedule II--Valuation and Qualifying Accounts

All other schedules are omitted because they are not required, are not applicable or the information is included in the consolidated financial statements or notes thereto. The consolidated financial statements and financial statement schedules follow the signature page hereto.

   3. See Item 14(c)

   (b) Reports on Form 8-K

   The Company filed no reports on Form 8-K during the quarter ended September 30, 2001.

   (c) Exhibits

<TABLE>
<CAPTION>
Exhibit
Number  Description
------  -----------
<C>     <S>
  2.1   Agreement and Plan of Reorganization dated April 15, 1998, among Phoenix, Portland
        Corporation and Award (incorporated herein by this reference to Exhibit 2.1 to the
        Statement on Form S-4 filed with the SEC on May 26, 1998).

  2.2   Agreement of Merger between Award and Portland Acquisition Corporation (incorporat
        this reference to Exhibit 2.2 to the Registration Statement on Form S-4 filed with
        May 26, 1998).

  2.3   Asset Acquisition Agreement among Phoenix, Ravisent I.P., Inc., Ravisent Operating
        Ravisent Technologies Internet Appliance Group, Inc., and Ravisent Technologies, I
        March 21, 2001.

  3.1   Amended and Restated Certificate of Incorporation of Phoenix dated June 29, 1998
        herein by this reference to Exhibit 3.1 to the Registration Statement on Form S-4
        on May 26, 1998).

  3.2   By-laws of Phoenix as amended through February 6, 1995 (incorporated herein by ref
        Exhibit 4.2 to Phoenix's Registration Statement on Form S-8, Registration No. 333-

  4.2   Phoenix Preferred Share Purchase Rights Plan dated October 28, 1999 (incorporated
        reference to Exhibit 1 of Form 8-A as filed on October 28, 1999).

</TABLE>

                                      32

<PAGE>

<TABLE>
<CAPTION>
Exhibit
Number  Description
------  -----------
<C>     <S>
 10.15  1994 Equity Incentive Plan, as amended through February 28, 1996 (incorporated her
        to Exhibit 10.17 to Phoenix's Report on Form 10-K for the fiscal year ended Septem
        "1995 10-K")).

10.21    Amended and Restated Lease Agreement dated March 15, 1995 between The Prudential ]
         Company of America and Phoenix with respect to certain facilities located at 846 [
         Norwood, MA (incorporated herein by reference to Exhibit 10.23 to the 1995 10-K).

10.22+   Agreement dated December 18, 1995 between Intel Corporation and Phoenix (incorpora
         reference to Exhibit 10.24 to Phoenix's Report on Form 10-Q for the quarter ended
         1995, as amended by a Form 10-Q/A-1 (the "December 1995 10-Q")).

10.26    Standard Industrial Lease--Full Net between The Equitable Life Assurance Society o
         States as Landlord and Phoenix as Tenant dated as of May 15, 1996 for that certain
         at 411 E. Plumeria Drive, San Jose, California (incorporated herein by reference t
         Phoenix's Report on Form 10-Q for the quarter ended June 30, 1996).

10.28    Industrial Lease (Single Tenant; Net) dated October 1, 1996 by and between The Irv
         and Phoenix for that certain property located at 135 Technology Drive, Irvine, Cal
         (incorporated herein by reference to Exhibit 10.28 to Phoenix's Report on Form 10-
         year ended September 30, 1996).

10.29    1996 Equity Incentive Plan, as amended through December 12, 1996 (incorporated her
         reference to Exhibit 4.2 to Phoenix's Registration Statement on Form S-8 filed on
         (Registration No. 333-20447)).

10.30    1997 Non-statutory Stock Option Plan (incorporated herein by reference to Exhibit
         Registration Statement on Form S-8, filed on October 2, 1997, Registration No. 333

10.32    1998 Stock Plan (incorporated herein by reference to Exhibit 99.1 to Phoenix's Reg
         Statement on Form S-8, filed on June 5, 1998, Registration No. 333-56103).

10.33    Amended and Restated 1991 Employee Stock Purchase Plan, as amended June 4, 1998 (i
         herein by reference to Exhibit 99.2 to Phoenix's Registration statement on Form S-
         1998, Registration No. 333-56103) .

10.53    Letter Agreement dated March 1, 1998 between Pierre A. Narath and Phoenix (incorpo
         by reference to Exhibit 10.36 of the 10-K of Award for the year ended December 31,

10.54+   Master Original Equipment Manufacturer (OEM) Software License Agreement, dated Sep
         1997, between Phoenix and Intel Corporation (incorporated herein by reference to E
         the 10-K of Award for the year ended December 31, 1997).

10.59    Employment Agreement dated June 8, 1999 between Phoenix and Albert E. Sisto (incor
         herein by reference to Exhibit 10.59 to the 1999 Form 10-K).

10.61    Amended and Restated Initial Public Offering Agreement, dated March 15, 2000, betw
         and inSilicon (incorporated herein by reference to Exhibit 10.61 to the Form 10-Q
         ended March 31, 2000).

10.62    Contribution Agreement, dated November 30, 1999, between Phoenix and inSilicon (in
         herein by reference to Exhibit 10.62 to the Form 10-Q for the quarter ended March

10.63    Employee Matters Agreement, dated November 30,1999, between Phoenix and inSilicon
         (incorporated herein by reference to Exhibit 10.63 to the Form 10-Q for the quarte
         2000).

</TABLE>

33

<PAGE>

<TABLE>

```
<CAPTION>
Exhibit
Number   Description
------   -----------
<C>      <S>
10.64    Registration Rights Agreement dated as of November 30, 1999 by and between Phoeni>
         inSilicon Corporation (incorporated herein by reference to Exhibit 10.8 to inSilic
         Registration Statement on Form S-1, Registration No. 333-94573).

10.65    1999 Stock Plan (incorporated herein by reference to Exhibit 4.1 to Phoenix's Regi
         on Form S-8 filed on December 5, 2001, Registration No. 333-74532).

10.66    1999 Director Option Plan (incorporated herein by reference to Exhibit 4.2 to Phoe
         Statement on Form S-8 filed on December 5, 2001, Registration No. 333-74532).

10.67    Employment Agreement, dated February 19, 1999, between Phoenix and David A. Everet

10.68    Employment Agreement, dated January 4, 2001, between Phoenix and John M. Greeley.

10.69    Employment Agreement, dated January 4, 2001, between Phoenix and Linda V. Moore.

21.1     Subsidiaries of the Registrant.

23.1     Consent of Ernst & Young LLP, Independent Auditors.

24       Power of Attorney. See signature page.
</TABLE>
---------------------
+  The Securities and Exchange Commission has granted confidential treatment
   for portions of this document.

   (d)  See Item 14(a)2
```

                                    34

```
<PAGE>
```

                              SIGNATURES

     Pursuant to the requirements of Section 13 or 15(d) of the Securities
Exchange Act of 1934, the registrant has duly caused this report to be signed
on its behalf by the undersigned, thereunto duly authorized.

                         PHOENIX TECHNOLOGIES LTD.

                              /s/ ALBERT E. SISTO
                         By: _____
                         Albert E. Sisto
                         Chairman, President and Chief
                           Executive Officer
                         Date: December 5, 2001

                           POWER OF ATTORNEY

     KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears
below constitutes and appoints Linda V. Moore, Albert E. Sisto and John M.
Greeley jointly and severally, his attorneys-in-fact and agents, each with the
power of substitution and resubstitution, for him and in his name, place or
stead, in any and all capacities, to sign any amendments to this Registration
Statement on Form 10-K, and to file such amendments, together with exhibits and

other documents in connection therewith, with the Securities and Exchange
Commission, granting to each attorney-in-fact and agent, full power and
authority to do and perform each and every act and thing requisite and
necessary to be done in and about the premises, as fully as he might or could
do in person, and ratifying and confirming all that the attorney-in-facts and
agents, or his or her substitute or substitutes, may do or cause to be done by
virtue hereof.

    Pursuant to the requirements of the Securities Exchange Act of 1934, this
report has been signed below by the following persons on behalf of the
registrant and in the capacities and on the dates indicated.

<TABLE>
<C>                                          <S>
/s/ ALBERT E. SISTO                          /s/ JOHN M. GREELEY
_____          _____
Albert E. Sisto                              John M. Greeley
Chairman, President and Chief Executive      Principal Financial and Accounting
  Officer                                      Officer

Date: December 5, 2001                       Date: December 5, 2001


/s/ TAHER ELGAMAL                            /s/ GEORGE C. HUANG
_____          _____
Taher Elgamal                                George C. Huang
Director                                     Director

Date: December 5, 2001                       Date: December 5, 2001


                                             /s/ ANTHONY SUN
_____          _____
Edmund P. Jensen                             Anthony Sun
Director                                     Director

Date: December   , 2001                      Date: December 5, 2001


/s/ ANTHONY P. MORRIS
_____
Anthony P. Morris
Director

Date: December 5, 2001
</TABLE>

                                  35

<PAGE>

                REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

The Board of Directors and Stockholders
Phoenix Technologies Ltd.

    We have audited the accompanying consolidated balance sheets of Phoenix
Technologies Ltd. as of September 30, 2001 and 2000, and the related
consolidated statements of operations, stockholders' equity and cash flows for
each of the three years in the period ended September 30, 2001. Our audits also

included the financial statement schedule listed in Part IV, Item 14(a). These consolidated financial statements and schedule are the responsibility of the management of Phoenix Technologies Ltd. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, based on our audits, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Phoenix Technologies Ltd. at September 30, 2001 and 2000, and the consolidated results of its operations and its cash flows for each of the three years in the period ended September 30, 2001, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

/s/ Ernst & Young LLP

San Jose, California
October 17, 2001

36

&lt;PAGE&gt;

PHOENIX TECHNOLOGIES LTD.

CONSOLIDATED BALANCE SHEETS

(in thousands, except par value)

&lt;TABLE&gt;
&lt;CAPTION&gt;

|  | Sept |
| --- | --- |
|  | 2001 |
| &lt;S&gt;                          Assets | &lt;C&gt; |
| Current assets: |  |
| Cash and cash equivalents....................................................... | $ 62,08 |
| Short-term investments.......................................................... | 2,95 |
| Accounts receivable, net of allowances of $2,374 and $2,283 at September 30, 2001 and 2000............................................................. | 21,52 |
| Prepaid royalties and maintenance............................................... | 5,62 |
| Deferred income taxes........................................................... | 5,18 |
| Other current assets............................................................ | 6,57 |
| Total current assets....................................................... | 103,94 |
| Property and equipment, net..................................................... | 10,79 |

```
Computer software costs, net.....................................    17,6(
Goodwill and intangible assets, net..............................    17,1(
Deferred income taxes............................................     8,74
Other assets.....................................................     2,42
                                                                   -------
     Total assets................................................  $160,61
                                                                   =======
```

## Liabilities and stockholders' equity

```
Current liabilities:
  Accounts payable...............................................  $  2,94
  Accrued compensation and related liabilities...................     9,91
  Deferred revenue...............................................     5,08
  Treasury stock payable.........................................        1(
  Accrued acquisition costs......................................     1,8(
  Income taxes payable...........................................     3,2(
  Other accrued liabilities......................................     4,27
                                                                   -------
     Total current liabilities...................................    27,33
Long-term obligations............................................        63
                                                                   -------
     Total liabilities...........................................    27,97
                                                                   -------
Minority interest................................................    12,94
                                                                   -------

Stockholders' equity:
  Preferred stock, $.10 par value, 500 shares authorized,none issued..............       -
  Common stock, $.001 par value, 60,000 shares authorized, 30,114 and 28,985 shares
    issued, 25,239 and 25,608 shares outstanding at September 30, 2001 and 2000....       3
  Additional paid-in capital.....................................   165,39
  Retained earnings..............................................    35,88
  Accumulated other comprehensive income (loss).................    (1,87
  Less: Cost of treasury stock (4,875 and 3,377 shares at September 30, 2001
    and 2000)....................................................   (79,74
                                                                   -------
     Total stockholders' equity..................................   119,69
                                                                   -------
     Total liabilities and stockholders' equity..................  $160,61
                                                                   =======
```

</TABLE>

See notes to consolidated financial statements

37

<PAGE>

PHOENIX TECHNOLOGIES LTD.

CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except per share amounts)

<TABLE>
<CAPTION>

|  | Years ended September 30, | | |
|  | 2001 | 2000 | 1999 |
| <S> | <C> | <C> | <C> |
| Revenues: | | | |

| | | | |
|---|---:|---:|---:|
| License fees............................................. | $103,324 | $125,817 | $103,326 |
| Services................................................. | 18,113 | 18,568 | 22,500 |
| Total revenues..................................... | 121,437 | 144,385 | 125,826 |
| Cost of revenues: | | | |
| License fees............................................. | 3,712 | 3,133 | 7,844 |
| Services................................................. | 15,138 | 17,074 | 18,344 |
| Amortization of purchased technology...................... | 2,215 | 1,256 | 2,132 |
| Write-off of capitalized software......................... | -- | -- | 6,562 |
| Total cost of revenues............................. | 21,065 | 21,463 | 34,882 |
| Gross Margin.............................................. | 100,372 | 122,922 | 90,944 |
| Operating expenses: | | | |
| Research and development.................................. | 45,526 | 39,055 | 39,910 |
| Sales and marketing...................................... | 37,213 | 33,050 | 29,020 |
| General and administrative................................ | 24,743 | 19,713 | 16,287 |
| Amortization of goodwill and acquired intangible assets... | 5,027 | 2,220 | 2,496 |
| Stock-based compensation.................................. | 1,713 | 789 | -- |
| Impairment of long-lived assets........................... | 9,393 | -- | -- |
| Restructuring cost........................................ | 1,525 | 1,270 | 7,892 |
| Total operating expenses........................... | 125,140 | 96,097 | 95,605 |
| Income (loss) from operations............................ | (24,768) | 26,825 | (4,661) |
| Interest and other income, net........................... | 2,866 | 3,997 | 3,346 |
| Gain (loss) on investments............................... | (2,824) | -- | 3,969 |
| Minority interest........................................ | 5,891 | (81) | -- |
| Income (loss) before income taxes........................ | (18,835) | 30,741 | 2,654 |
| Income tax expense (credit).............................. | (833) | 9,839 | 850 |
| Net income (loss)........................................ | $(18,002) | $ 20,902 | $ 1,804 |
| Earnings (loss) per share: | | | |
| Basic.................................................... | $ (0.72) | $ 0.85 | $ 0.07 |
| Diluted.................................................. | $ (0.72) | $ 0.77 | $ 0.07 |
| Shares used in earnings (loss) per share calculation: | | | |
| Basic.................................................... | 25,141 | 24,720 | 25,966 |
| Diluted.................................................. | 25,141 | 27,120 | 27,250 |

</TABLE>

See notes to consolidated financial statements

38

<PAGE>

PHOENIX TECHNOLOGIES LTD.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(in thousands)

```
<TABLE>
<CAPTION>
```

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Tr S |
| | Shares | Amount | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C` |
| BALANCE, SEPTEMBER 30, 1998.......... | 26,286 | $26 | $102,629 | $ 31,150 | $   101 | $ |
| Stock purchases under option and | | | | | | |
| purchase plans....................... | 1,028 | 1 | 5,335 | -- | -- | |
| Stock warrants exercised.............. | 49 | -- | 40 | -- | -- | |
| Repurchase of common stock........... | (3,327) | -- | -- | -- | -- | |
| Stock-based compensation............. | -- | -- | 1,101 | -- | -- | |
| Tax benefit on exercise of stock | | | | | | |
| options............................. | -- | -- | 186 | -- | -- | |
| Purchase of minority interest in | | | | | | |
| Award Japan...................... | -- | -- | 158 | 37 | -- | |
| Comprehensive income: | | | | | | |
| Net income........................ | -- | -- | -- | 1,804 | -- | |
| Change in unrealized gain on | | | | | | |
| investments, net of a tax benefit | | | | | | |
| of $963........................... | -- | -- | -- | -- | (2,046) | |
| Translation adjustment, net of tax | | | | | | |
| of $506........................... | -- | -- | -- | -- | 1,076 | |
| Comprehensive income............. | | | | | | |
| | ------ | --- | -------- | -------- | ------- | -- |
| BALANCE, SEPTEMBER 30, 1999.......... | 24,036 | 27 | 109,449 | 32,988 | (869) | ( |
| Stock purchases under option and | | | | | | |
| purchase plans....................... | 2,481 | 2 | 19,473 | -- | -- | |
| Stock warrants exercised.............. | 102 | -- | -- | -- | -- | |
| Net proceeds under inSilicon IPO..... | -- | 4 | 36,972 | -- | -- | |
| Changes in APIC resulting from | | | | | | |
| issuances of inSilicon stock........ | -- | (4) | (13,588) | -- | -- | |
| Repurchase of common stock........... | (1,011) | -- | -- | -- | -- | ( |
| Tax benefit on exercise of | | | | | | |
| stock options....................... | | | 455 | -- | -- | |
| Stock-based compensation............. | -- | -- | 770 | -- | -- | |
| Comprehensive income: | | | | | | |
| Net income........................ | -- | -- | -- | 20,902 | -- | |
| Translation adjustment, net of tax | | | | | | |
| of $230........................... | -- | -- | -- | -- | 489 | |
| Comprehensive income............. | | | | | | |
| | ------ | --- | -------- | -------- | ------- | -- |
| BALANCE, SEPTEMBER 30, 2000.......... | 25,608 | 29 | 153,531 | 53,890 | (380) | ( |
| Purchases under stock option and | | | | | | |
| purchase plans....................... | 1,052 | 1 | 8,677 | -- | -- | |
| Changes in APIC resulting from | | | | | | |
| issuances of inSilicon stock........ | -- | -- | 4,051 | -- | -- | |
| Issuance of stock and options for | | | | | | |
| ISI acquisition..................... | 75 | -- | 1,303 | -- | -- | |
| Repurchase of common stock........... | (1,497) | -- | -- | -- | -- | ( |
| Repurchase of Intel Warrant.......... | -- | -- | (2,900) | -- | -- | |
| Stock-based compensation............. | 1 | -- | 697 | -- | -- | |
| Amortization of deferred stock-based | | | | | | |
| compensation....................... | -- | -- | 37 | -- | -- | |

```
Comprehensive income:
  Net income (loss)..................        --      --         --     (18,002)         --
  Translation adjustment, net of tax
    of $705..........................        --      --         --         --       (1,498)

  Comprehensive loss...............

BALANCE, SEPTEMBER 30, 2001.........    25,239    $30   $165,396   $ 35,888     $(1,878)   $
                                        ======    ===   ========   ========     =======    ==
```

</TABLE>

See notes to consolidated financial statements

39

<PAGE>

PHOENIX TECHNOLOGIES LTD.

CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)

<TABLE>
<CAPTION>

```
                                                                                         Ye
                                                                                        ----
                                                                                         2(
                                                                                        ----
<S>                                                                                     <C>
CASH FLOWS FROM OPERATING ACTIVITIES:
  Net income (loss)...................................................................... $(18
  Reconciliation to net cash provided by operating activities:
    Depreciation and amortization.......................................................   1
    Write-offs related to merger and restructuring activities...........................
    Write-off of capitalized software..................................................
    Impairment of long-lived assets....................................................     9
    Stock-based compensation...........................................................     1
    Minority interest..................................................................    (5
    Gain (loss) on investment..........................................................     2
    Deferred income tax................................................................    (6
    Change in operating assets and liabilities:
      Accounts receivable..............................................................   18
      Other assets.....................................................................
      Prepaid royalties and maintenance................................................    (4
      Accounts payable.................................................................
      Accrued compensation and related liabilities.....................................
      Other accrued liabilities........................................................    (1
      Deferred Revenue.................................................................
      Income taxes.....................................................................    (1
                                                                                        ----
        Net cash provided by operating activities.......................................    5
                                                                                        ----
CASH FLOWS FROM INVESTING ACTIVITIES:
  Proceeds from sale of investments.....................................................   61
  Purchases of investments.............................................................  (1(
  Purchases of property and equipment...................................................   (3
  Additions to computer software.......................................................   (1
  Acquisition of businesses, net of cash acquired......................................  (27
                                                                                        ----
        Net cash provided by (used in) investing activities............................   18
```

CASH FLOWS FROM FINANCING ACTIVITIES:
    Proceeds from stock purchases under stock option and stock purchase plans..........     $
    Proceeds from initial public offering of inSilicon common stock....................
    Repurchase of common stock....................................................... (2(
    Repurchase of warrant............................................................ (2
    Repayment of long term-obligations............................................... (1
    Proceeds from borrowings.........................................................
    Other financing activities.......................................................
                                ----

       Net cash provided by (used in) financing activities.......................... (15

Effect of exchange rate changes on cash and cash equivalents....................... (1

Net increase in cash and cash equivalents.......................................... 7
Cash and cash equivalents at beginning of period................................... 55

Cash and cash equivalents at end of period......................................... $ 62
                                 ====

Supplemental disclosure of cash flow information:
  Income taxes paid during the year, net of refunds.................................. $ 7
Supplemental schedule of non-cash investing and financing activities:
  Issuance of Phoenix common shares and stock options related to the ISI acquisition. $ 1
&lt;/TABLE&gt;

See notes to consolidated financial statements

40

&lt;PAGE&gt;

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Note 1. Description of Business

  Phoenix Technologies Ltd. ("Phoenix" or the "Company") is the global leader
in device-enabling and management software solutions for PCs and other
user-driven connected digital devices. Phoenix provides these products
primarily to platform and peripheral manufacturers (collectively, "OEMs") which
range from large PC and Information Appliance manufacturers to small system
integrators and value-added resellers. Phoenix also provides training,
consulting, maintenance and engineering services to its customers. The Company
markets and licenses its products and services through a direct sales force as
well as through regional distributors and sales representatives. The Company
had four business units (one of which, inSilicon Corporation ("inSilicon"), is
a majority-owned subsidiary), each of which delivers leading products and
professional services that enable connected computing. See Note 11 - "Segment
Reporting".

Note 2. Summary of Significant Accounting Policies

  Financial Statement Presentation. The consolidated financial statements of
the Company include the financial statements of the Company and subsidiaries,
including inSilicon. All significant intercompany accounts and transactions
have been eliminated.

  Reclassification. Certain amounts in the prior years' financial statements

have been reclassified to conform to the current year presentation.

Foreign Currency Translation. The Company has determined that the functional currency of its foreign operations is the local currency. Therefore, assets and liabilities are translated at year-end exchange rates and income statement transactions are translated at average exchange rates prevailing during each period.

Use of Estimates. The presentation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

Revenue Recognition. The Company licenses software under non-cancelable license agreements and provides services including non-recurring engineering efforts, maintenance consisting of product support services and rights to upgrades on a when-and-if available basis, and training.

Revenues from software license agreements is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collectibility is probable. The Company uses the residual method to recognize revenue when an agreement includes one or more elements to be delivered at a future date and vendor specific objective evidence of the fair value of all the undelivered elements exists. Under the residual method, the fair value of the undelivered elements is deferred and the remaining portion of the arrangement fee is recognized as revenues. If evidence of fair value of one or more undelivered elements does not exist, revenues are deferred and recognized when delivery of those elements occurs or when fair value can be established. When the Company provides the customer with significant customization of the software products, revenues are recognized in accordance with AICPA Statement of Position 81-1 ("Accounting for Performance of Construction-Type and Certain Production-Type Contracts") which requires revenues to be recognized using the percentage-of-completion method based on time and materials or when services are complete. Revenues from arrangements with distributors or resellers are recognized on a sell-through basis.

Royalty revenues from OEMs are generally recorded in each period based on estimates of shipments by the OEMs of products containing the Company's software during the period. Revenues from OEMs for fully paid up, non-refundable royalties is recorded when the revenue recognition criteria has been met.

<div align="center">41</div>

&lt;PAGE&gt;

<div align="center">PHOENIX TECHNOLOGIES LTD.</div>

<div align="center">NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)</div>

Non-recurring engineering service revenues are recognized on a time and materials basis or when contractual milestones are met. Contractual milestones involve the use of estimates and approximate the percentage-of-completion method. Software maintenance revenues are recognized ratably over the maintenance period which is typically one year. Training and other service revenues are recognized as the services are performed. Amounts paid in advance for licenses and services that are in excess of revenues recognized are recorded as deferred revenues.

Provisions are made for doubtful accounts, estimated returns, and customer credits.

Cash Equivalents. The Company considers all highly liquid securities purchased with an original or remaining maturity of less than three months at the date of purchase to be cash equivalents.

Investments. Short-term investments represent marketable securities acquired with original maturities ranging from three months to one year. As of September 30, 2001, the Company had short-term investments of $2.9 million, which consisted only of auction instruments. All marketable securities acquired with excess cash were classified as cash equivalents as they mature within three months. At September 30, 2000, the short-term investments were classified as held-to-maturity and consisted of U.S. government agency obligations, commercial paper, and corporate debt securities. The fair value of such short-term investments approximated amortized cost and gross unrealized holding gains and losses were not material. The cost of securities sold and the fair value of securities are based on the specific identification method. Realized gains or losses and declines in value deemed to be other than temporary, if any, are reported in gain (loss) on investments in the consolidated statements of operations.

Other investments primarily consist of equity investments of less than 20% equity interest in publicly held and private companies. The Company does not have the ability to exercise significant influence over any of these companies and therefore account for the investments as available-for-sale securities under Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("SFAS 115"). Investments in publicly held companies are recorded at fair value as measured by quoted market prices and investments in privately held companies, which are recorded at cost, are accounted for under the cost method of accounting. Realized gains and losses are recorded in gain (loss) on investment when the related investments are sold and temporary fluctuations in values are recorded in other comprehensive income. In fiscal 2001, the Company sold its investment in certain marketable securities and recorded a realized gain of $0.7 million.

The Company performs periodic reviews of its investments for impairment. The Company's investments in publicly held companies are generally considered impaired when a decline in the fair value of an investment as measured by quoted market prices is less than its carrying value and such decline is other than temporary. The impairment charge is included in the gain (loss) on investment in the consolidated statements of operations. The Company's investments in privately held companies are considered impaired when a review of operations and other indicators of impairment show that the carrying value of the investment is not likely to be recoverable. Such indicators include operating losses, significant cash outflows, prices of subsequent issuances of equity securities, and limited liquidity. Impaired investments in privately held companies are written down to estimated fair value, which is the amount the Company believes is recoverable from its investments. Impairment write-downs when deemed other than temporary create a new carrying value for both publicly and privately held investments and the Company does not realize gains from subsequent increases in fair value in excess of the new carrying value until disposition. In fiscal 2001, the Company recorded a write-down of $3.5 million for impairments of its equity investments.

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Fair Value of Financial Instruments. The carrying values of the Company's financial instruments, including accounts receivable, accounts payable, and accrued liabilities, approximate their fair values due to their short maturities. The estimated fair values may not be representative of actual values of the financial instruments that could be realized as of the period end or that will be realized in the future.

Credit Risk. Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash investments and trade receivables. The Company places its cash investments with high credit qualified financial institutions. The Company extends credit on open accounts to its customers and does not require collateral. The Company performs ongoing credit evaluations of all customers and establishes an allowance for doubtful accounts based upon factors surrounding the credit risk of specific customers, historical trends, and other information. One customer accounted for 20% and 18% of accounts receivable as of September 30, 2001 and 2000, respectively.

Property and Equipment. Property and equipment are carried at cost and depreciated using the straight-line method over the estimated useful life of the assets, which are typically three to five years. Leasehold improvements are recorded at cost and amortized over the lesser of the useful life of the assets or the remaining term of the related lease.

Computer Software Costs. Computer software costs consist of internally developed and purchased software capitalized under the provisions of Statement of Financial Accounting Standards No. 86, "Computer Software to be Sold, Leased or Otherwise Marketed" ("SFAS 86"). Costs incurred in the research and development of new software products and enhancements to existing products are expensed as incurred until technological feasibility (beta test version) has been established, at which time, such costs are capitalized. Capitalized computer software costs are amortized over the economic life of the product, generally three to six years, using the straight-line method.

Goodwill and other intangible assets. Goodwill is amortized using the straight-line method over the estimated life of the assets, which is typically from five to six years. Goodwill was $15.9 million and $6.3 million, net, as of September 30, 2001 and 2000, respectively. Accumulated amortization amounted to $7.9 million and $5.2 million on September 30, 2001 and 2000, respectively.

Other intangible assets were amortized using the straight-line method over the estimated life of the assets, which is typically from two to six years. Other intangible assets were $1.2 million and $1.6 million, net, as of September 30, 2001 and 2000, respectively. Accumulated amortization amounted to $1.8 million and $1.2 million on September 30, 2001 and 2000, respectively.

The Company evaluates the net realizable value and amortization periods of computer software costs, goodwill, and other intangible assets on an ongoing basis and records charges to reduce carrying value to net realizable value, as necessary. In assessing net realizable value, the Company relies on a number of factors including operating results, business plans, budgets and economic projections. In addition, the Company's evaluation considers non-financial data such as market trends, customer relationships, buying patterns, and product development cycles.

Impairment of goodwill and other long-lived assets. Long-lived assets are

reviewed for impairment whenever events or changes in circumstances indicate
that the carrying amount of such assets may not be recoverable. These
indicators may be a significant industry downturn, a significant decline in the
market value of the Company, or significant reductions in projected future cash
flows of operating segments. Pursuant to Statement of Financial Accounting
Standards No. 121, "Accounting for the Impairment of Long-Lived Assets and

                                      43

<PAGE>

                          PHOENIX TECHNOLOGIES LTD.

              NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

for Long-Lived Assets to be Disposed of" ("SFAS 121"), recoverability of
long-lived assets is based on an estimate of future undiscounted cash flows to
initially determine whether impairment should be measured. Measurement of
impairment charges for long-lived assets is based on the fair value of the
assets. If quoted market prices for the assets are not available, the fair
value is calculated using the present value of estimated expected future cash
flows. The cash flow calculations are based on management's best estimates,
using appropriate assumptions and projections. When impairments are assessed,
the Company records charges to reduce goodwill or other long-lived assets based
on the amount by which the carrying amounts of these assets exceed their fair
values.

   Income Taxes. Income taxes are accounted for in accordance with Statement of
Financial Accounting Standards No. 109 "Accounting for Income Taxes" ("SFAS
109"). Under the asset and liability method of SFAS 109, deferred tax assets
and liabilities are recognized for future tax consequences attributable to
differences between the financial statement carrying amounts of existing assets
and liabilities, and their respective tax bases. Deferred tax assets and
liabilities are measured using enacted tax rates expected to apply to taxable
income in the years in which those temporary differences are expected to be
recovered or settled. The effect on deferred tax assets and liabilities of a
change in tax rates is recognized in income in the period of enactment.

   Stock-Based Compensation. The Company accounts for its stock option plans
and employee stock purchase plan in accordance with provisions of the
Accounting Principles Board's Opinion No. 25, "Accounting for Stock Issued to
Employees" ("APB 25"). The Company has adopted the disclosure only criteria,
described in Statement of Financial Accounting Standards No. 123, "Accounting
for Stock-Based Compensation" ("SFAS 123"). See Note 13 for more details.

   Computation of Earnings (loss) per Share. Basic earnings (loss) per share is
computed using the weighted-average number of common shares outstanding during
the period. Diluted net income per share is computed using the weighted-average
number of common and dilutive potential common shares outstanding during the
period. Diluted net loss per share is computed using the weighted-average
number of common shares and excludes dilutive potential common shares
outstanding, as their effect is anti-dilutive. Dilutive potential common shares
primarily consist of employee stock options and warrants.

   New Accounting Pronouncements. In July 2001, the Financial Accounting
Standards Board (FASB) issued Statement of Financial Accounting Standards No.
141, "Business Combinations" ("SFAS 141") and Statement of Financial Accounting
Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"). SFAS
141 requires all business combinations to be accounted for using the purchase
method of accounting and is effective for all business combinations completed

after June 30, 2001. The adoption did not have a material effect on the Company's operating results or financial condition. SFAS 142 requires goodwill to be tested for impairment under certain circumstances, and written-off when impaired, rather than being amortized as previous standards required. Furthermore, SFAS 142 required purchased intangible assets to be amortized over their estimated useful lives unless these lives are determined to be indefinite. SFAS 142 is effective for fiscal years beginning after December 15, 2001. Early application is permitted for entities with fiscal years beginning after March 15, 2001 provided that the first interim period financial statements have not been previously issued. The Company is currently assessing the impact of SFAS 142 on its operating results and financial condition. The unamortized goodwill was $15.9 million as of September 30, 2001 and the amortization of goodwill was $4.1 million for fiscal 2001.

On October 3, 2001, the FASB issued Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS 144"), that is applicable to financial statements issued for fiscal years beginning after December 15, 2001. The FASB's new rules on asset impairment supersede

44

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

SFAS 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," and portions of Accounting Principles Board Opinion 30, "Reporting the Results of Operations." This Standard provides a single accounting model for long-lived assets to be disposed of and significantly changes the criteria that would have to be met to classify an asset as held-for-sale. Classification as held-for-sale is an important distinction since such assets are not depreciated and are stated at the lower of fair value and carrying amount. This Standard also requires expected future operating losses from discontinued operations to be displayed in the period(s) in which the losses are incurred, rather than as of the measurement date as presently required. The Company is currently assessing the potential impact of SFAS 144 on its operating results and financial position.

Note 3. Sale of Interest in inSilicon Corporation

The initial public offering of 3.5 million shares of common stock of the Company's subsidiary, inSilicon, closed on March 27, 2000. Proceeds, net of issuance costs, to inSilicon were approximately $37.0 million. The Company owned 69.2% of inSilicon's outstanding common stock as of September 30, 2001. The accompanying consolidated financial statements include the financial position and results of operations of inSilicon on a fully consolidated basis. During fiscal 2000, as part of the separation of the inSilicon business to a separate subsidiary, the Company contributed certain assets to inSilicon including technology, licenses, personal property and other assets with inSilicon assuming the related liabilities. The Company entered into certain agreements with inSilicon, including a service and cost sharing agreement, employee matters agreement, and a tax sharing agreement that govern the ongoing relationship of the parties

Note 4. Property and Equipment

Property and equipment consist of the following:

```
<TABLE>
<CAPTION>
                                                        September 30,
                                                   -------------------
                                                     2001       2000
                                                   --------   --------
                                                      (in thousands)
              <S>                                  <C>        <C>
              Equipment................................... $ 25,464  $ 19,486
              Leasehold improvements......................    4,690     7,843
              Furniture and fixtures......................    3,283     3,003
                                                   --------   --------
                                                     33,437    30,332
      Less accumulated depreciation and amortization  (22,644)  (17,060)
                                                   --------   --------
          Property and equipment, net...............  $ 10,793  $ 13,272
                                                   ========   ========
</TABLE>
```

Depreciation expense related to property and equipment totaled $6.0 million, $5.1 million, and $5.1 million for fiscal 2001, 2000, and 1999, respectively.

Note 5. Computer Software Costs

Additional costs associated with purchased and internally developed computer software of $1.4 million, $0.4 million, and $2.4 million were capitalized in fiscal 2001, 2000, and 1999, respectively. During fiscal 2001, Phoenix capitalized $3.4 million and $8.1 million of software costs in conjunction with its acquisitions of Integrity Sciences, Inc. and Ravisent Technologies, Inc., respectively. inSilicon also capitalized $1.3 million and $0.2 million of software costs in conjunction with its acquisition of HD Lab, K.K. and Xentec, Inc., respectively. Amortization charged to costs of revenues was $2.2 million, $2.5 million and $4.8 million, during fiscal 2001, 2000, and 1999, respectively. Accumulated amortization of capitalized computer software costs was $5.7 million and $3.5 million at September 30, 2001 and 2000, respectively.

45

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Note 6. Earnings Per Share

The following table presents the calculation of basic and diluted earnings per share required under Statement of Financial Accounting Standards No. 128 ("SFAS 128"):

```
<TABLE>
<CAPTION>
                                                   Years ended September
                                                   -------------------------
                                                     2001       2000      1
                                                   --------   -------   --
                                                   (in thousands, except per
                                                             amounts)
<S>                                                <C>        <C>       <C>
```

| | | | |
|---|---|---|---|
| Net income (loss)........................................... | $(18,002) | $20,902 | $ ] |
| | ======== | ======= | == |
| Weighted average common shares outstanding.................... | 25,141 | 24,720 | 25 |
| Effect of dilutive securities (using the treasury stock method): | | | |
| Stock options.............................................. | -- | 2,125 | 1 |
| Warrants................................................... | -- | 275 | |
| Total dilutive securities................................. | -------- | 2,400 | 1 |
| | -------- | ------- | -- |
| Weighted average diluted common and equivalent shares | | | |
| outstanding............................................... | 25,141 | 27,120 | 27 |
| | ======== | ======= | == |
| Earnings (loss) per share: | | | |
| Basic...................................................... | $ (0.72) | $ 0.85 | $ |
| Diluted.................................................... | $ (0.72) | $ 0.77 | $ |
| | ======== | ======= | == |

</TABLE>

   The dilutive potential common shares that were anti-dilutive for fiscal 2001
amounted to 1,114,000 shares.

Note 7. Business Combinations

   During fiscal 2001, the Company completed four business combinations. In
February 2001, Phoenix acquired Integrity Sciences, Inc., a provider of core
computer security products, which developed and marketed strong password
technology. In March 2001, Phoenix acquired certain assets of Ravisent
Technologies, Inc., a provider of digital audio and video software solutions
and internet appliance technology. In December 2000, inSilicon acquired Xentec,
Inc., a privately held IP developer that specialized in the design of
high-speed mixed-signal analog and wireless technologies and HD Lab, K.K., a
wireless design services group specialized in certain Bluetooth baseband
technology.

   These acquisitions were accounted for using the purchase method of
accounting. Accordingly, the assets and liabilities of the acquired business
are included in the Consolidated Balance Sheets as of September 30, 2001. The
results of operations from the date of acquisition through September 30, 2001
were included in the accompanying Consolidated Statement of Operations for the
year ended September 30, 2001. There were no acquisitions or business
combinations during fiscal 2000 or 1999.

   The amounts allocated to goodwill and purchased intangible assets are being
amortized on a straight-line basis. The estimated asset lives are determined
based on projected future economic benefits and expected life cycles of the
technologies. The amounts allocated to Purchased Technology are being amortized
over periods of 3 to 6 years, the amounts allocated to Other Intangible Assets
(comprised of customer lists and assembled work force costs) are being
amortized over periods of 2 and 6 years, and the amounts allocated to Goodwill
are being amortized over periods of 5 and 6 years.

                                      46

<PAGE>

                          PHOENIX TECHNOLOGIES LTD.

                NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

The following is a summary of purchased transactions completed in fiscal
2001 (in millions):

<TABLE>
<CAPTION>

| Acquired company | Total purchase consideration | Total tangible assets | Purchased technology | Other intangible assets | Stock-based Compensation | Goo |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| By Phoenix: | | | | | | |
| Integrity Sciences, Inc.... | $ 3.9 | $ -- | $3.4 | $ -- | $ -- | $ |
| Ravisent Technologies, Inc. | $19.1 | $ -- | $8.1 | $ -- | $ -- | $1 |
| By inSilicon: | | | | | | |
| Xentec, Inc.............. | $11.7 | $0.2 | $0.2 | $0.6 | $0.4 | $1 |
| HD Lab, K.K.............. | $ 1.6 | $ -- | $1.3 | $0.3 | $ -- | $ |

</TABLE>

The following are details of the forms of consideration and their fair
values for each acquisition:

<TABLE>
<CAPTION>

| Acquired company | Form of consideration | Fair |
|---|---|---|
| <C> | <S> | <C> |
| Integrity Sciences, Inc. | $2.5 million in cash.................................. | $ 2.5 |
| | 75,000 shares of Phoenix common stock................. | 1.3 |
| | Transaction costs.................................... | 0.1 |
| | | ------ |
| | Total............................................. | $ 3.9 |
| Ravisent Technologies, Inc. | $17.8 million in cash................................ | $17.8 |
| | Transaction costs.................................... | 1.3 |
| | | ------ |
| | Total............................................. | $19.1 |
| Xentec, Inc. | $3.0 million in cash................................. | $ 3.0 |
| | 15,678 and 618,378 shares of inSilicon common and exchangeable preferred stock, respectively.......... | 7.2 |
| | Options to purchase 96,004 shares of inSilicon common stock................................................ | 1.0 |
| | Transaction costs.................................... | 0.5 |
| | | ------ |
| | Total............................................. | $11.7 |
| HD Lab, K.K. | $1.6 million in cash................................. | $ 1.6 |

</TABLE>

As of September 30, 2001, $1.2 million of the $1.6 million specified in the
HD Lab, K.K. acquisition agreement had been paid. The remaining balance of $0.4
million will be paid in fiscal 2002.

The acquisition of Integrity Sciences, Inc. includes an earn-out agreement
over a five year period of up to 100,000 shares of Phoenix's common stock and
cash payments of $1.5 million, if certain revenues and technology criteria are
met. There is no minimum payment requirement in the earn-out agreement. No

payments have been earned through September 30, 2001.

The acquisition agreement with Xentec requires that inSilicon Canada issue up to an additional 415,000 exchangeable preferred shares to the former Xentec stockholders over a two-year period, contingent upon the achievement of certain performance-based milestones. Additional goodwill will be recorded for the fair value of this consideration as the exchangeable preferred shares, if any, are issued. There is no minimum payment requirement in this contingent consideration and no payment was earned or paid for fiscal 2001. Also under the terms of the acquisition, in January 2002 inSilicon will issue common stock with a fair value of $0.5 million to former Xentec employees who continue their employment with inSilicon through December 18,

<div align="center">47</div>

<PAGE>

<div align="center">PHOENIX TECHNOLOGIES LTD.</div>

<div align="center">NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)</div>

2001. The $0.5 million is being recognized as stock-based compensation expense over the one year period subsequent to the merger, and as of September 30, 2001, $0.4 million of this amount is included in payroll and related liabilities in the consolidated balance sheets.

If the performance milestones specified in the earn-out agreements are met, payments will be accrued and recorded as additional goodwill.

The following unaudited, pro forma information shows the results of operations of the Company for the years ended September 30, 2001 and 2000, as if the business combinations had occurred at the beginning of each period. This data is not indicative of the results of operations that would have arisen if the business combinations had occurred at the beginning of the respective periods. Moreover, this data is not intended to be indicative of future results of operations.

<TABLE>
<CAPTION>

| | Pro Forma Years ended September 30, | |
| --- | --- | --- |
| | 2001 | 2000 |
| | (unaudited) | |
| <S> | <C> | <C> |
| Revenues.................................. | $121,553 | $145,571 |
| Net income (loss)......................... | $(21,074) | $ 14,813 |
| Earnings (loss) per share: | | |
| Basic................................. | $ (0.84) | $ 0.60 |
| Diluted............................... | $ (0.84) | $ 0.55 |

</TABLE>

In September 1998, the Company acquired Sand in a purchase acquisition. The purchase price consisted of approximately $18.6 million in cash, 464,000 shares of the Company's common stock, approximately 264,000 stock options issued in exchange for Sand stock options, and up to $3.7 million in performance incentives to be paid through fiscal 2002. Of the $3.7 million, approximately $1.6 million represents minimum anticipated payments. Performance incentives totaling $2.6 million were earned per the agreement. Of the $2.6 million, $0.8

million was earned in fiscal 2000 and paid in fiscal 2001, $0.9 million was earned in fiscal 1999 and paid in fiscal 2000. The final payment of $0.9 million was earned in fiscal 2001 and is scheduled to be paid in fiscal 2002. The earn-out agreement ended in fiscal 2001.

Note 8. Restructuring Charges

Restructuring charges during fiscal 2001, 2000, and 1999, were as follow:

|  | Years ended September 30, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (in thousands) | | |
| Severance and other exit costs......... | $1,525 | $1,270 | $7,108 |
| Asset write-offs...................... | -- | -- | 784 |
|  | $1,525 | $1,270 | $7,892 |

Write-off of capitalized software of $6.6 million that was previously categorized as restructuring charges in fiscal 1999 was reclassified to costs of revenues for presentation purposes.

48

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

2001 Charges

In April 2001, in efforts to optimize operational efficiency and change its business strategy to address changes in customer demands, the Company reduced its global workforce by approximately 70 employees across all business functions. The restructuring included refocusing research and development efforts, re-evaluating sales and marketing and general and administration resource requirement, and aligning overall cost structure with current revenue levels. All terminations were completed as of September 30, 2001.

The restructuring program resulted in a charge of approximately $1.5 million for severance and related cost in the third quarter of fiscal 2001. As of September 30, 2001, approximately $1.3 million was paid and an additional $0.2 million was accrued and expected to be paid through the first quarter of fiscal 2002.

2000 Charges

In the fourth quarter of fiscal 2000, the Company recorded a restructuring charge of approximately $1.3 million for severance benefits associated with the elimination of three management positions. The charges were related to the streamlining of certain management functions in Taiwan and North America. All terminations were completed as of September 30, 2000.

1999 Charges

In fiscal 1999, the Company recorded $7.9 million restructuring charges relating to the realignment of its business into three operating divisions, consolidation of certain facilities and operations, integration of Award and Sand, and discontinuation of the PICO and PC Enhancing Division. These charges included $5.5 million in severance costs associated with the elimination of 92 positions across all business functions from various product divisions and management, $0.8 million of fixed assets write-down for the Company's United Kingdom branch, $0.7 million in facilities abandonment, and $0.9 million of other business exit costs pursuant to the re-organization plan. All terminations were completed as of September 30, 2000.

Note 9. Impairment of Goodwill and Other Long-lived Assets

During the fourth quarter of fiscal 2001, pursuant to SFAS 121, inSilicon performed an assessment of the carrying value of its long-lived assets to be held and used, including goodwill and other intangible assets recorded in connection with its various acquisitions. The assessment was necessitated by various factors that indicated these assets may be impaired, including recent operating results that did not meet management's expectations, the global downturn in technology spending, and sustained decline in inSilicon's market capitalization.

The conclusion of inSilicon's assessment was that indicators of impairment were present and therefore a test was required. inSilicon performed the asset impairment test with the assistance of independent valuation experts. The test was performed by comparing the undiscounted expected cash flows for a five-year period (the estimated life of the assets), to the carrying amount of the goodwill and other intangible assets resulting from the business combinations. The assumptions supporting the estimated cash flows reflect management's best estimates. Based on the results of the test, inSilicon determined that the goodwill associated with Xentec was impaired and the write-down was included in "Impairment of long-lived assets" in the Consolidated Statements of Operations.

With the assistance of independent valuation experts, inSilicon determined the fair value of the impaired long-lived assets. Fair value was determined based on the cash flow method and the income approach using the same assumptions as those used in the initial test of impairment. A write-down of goodwill and intangible assets

49

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

totaling $9.4 million was recorded during the fourth quarter of fiscal 2001, reflecting the amount by which the carrying amounts of the assets exceed their respective fair values. There were no impairment charges of long-lived assets in fiscal 2000 or 1999 for inSilicon.

Phoenix also conducted an assessment of the carrying value of its long-lived assets based on the same factors noted above and determined that no impairment charges were required in fiscal 2001, 2000, or 1999.

Note 10. Income Taxes

The components of income tax expense (credit) from continuing operations are as follows:

| | Years ended September 30, | | |
|---|---|---|---|
| | 2001 | 2000 | 1999 |
| | (in thousands) | | |
| Current: | | | |
| Federal............................................... | $ (800) | $ 882 | $ 470 |
| State................................................. | 34 | 802 | 1,356 |
| Foreign.............................................. | 6,637 | 8,809 | 7,594 |
| Total current................................... | 5,871 | 10,493 | 9,420 |
| Deferred: | | | |
| Federal............................................... | (5,100) | (1,224) | (7,161) |
| State................................................. | (1,428) | 570 | (1,409) |
| Foreign.............................................. | (176) | -- | -- |
| Total deferred.................................. | (6,704) | (654) | (8,570) |
| Income tax expense (credit)............................. | $ (833) | $ 9,839 | $ 850 |

The reconciliation of the United States Federal statutory rate to the Company's income tax expense (credit) recorded is as follows:

| | Years ended September 30, | | |
|---|---|---|---|
| | 2001 | 2000 | 1999 |
| | (in thousands) | | |
| Tax at U.S. federal statutory rate...................... | $(8,654) | $10,759 | $ 928 |
| State taxes, net of federal tax benefit................. | (1,754) | 1,000 | (34) |
| Research and development tax credits.................... | (990) | (892) | (471) |
| Nondeductible merger and acquisition costs.............. | 813 | 562 | 562 |
| Effect of foreign earnings taxed at less than U.S. rate.... | -- | (295) | (251) |
| Effect of extraterritorial income exclusion/foreign sales corporation........................................... | (399) | (1,438) | -- |
| Foreign taxes.......................................... | 3,618 | -- | -- |
| Valuation allowance.................................... | 6,094 | -- | -- |
| Other.................................................. | 439 | 143 | 116 |
| Income tax expense (credit)............................. | $ (833) | $ 9,839 | $ 850 |

50

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

The components of net deferred tax assets and liabilities are as follow:

| | September 30, | |
| --- | --- | --- |
| | 2001 | 2000 |
| | (in thousands) | |
| Deferred tax assets: | | |
| Foreign tax credits............................ | $ 5,704 | $ 6,459 |
| Research and development tax credits........... | 4,813 | 2,809 |
| Minimum tax carryforward....................... | 1,216 | 1,104 |
| Reserves and accruals.......................... | 6,493 | 5,066 |
| Depreciation................................... | 1,122 | 751 |
| Intangible assets.............................. | 3,993 | -- |
| Net operating loss carryforwards............... | 1,952 | -- |
| Other.......................................... | 68 | -- |
| Total....................................... | 25,361 | 16,189 |
| Less valuation allowance....................... | 8,908 | 2,814 |
| Net deferred tax assets..................... | 16,453 | 13,375 |
| Deferred tax liabilities: | | |
| Capitalized software and other intangibles, net | 2,374 | 2,613 |
| Other.......................................... | 150 | 414 |
| Total deferred tax liabilities.............. | 2,524 | 3,027 |
| Net deferred tax assets........................ | $13,929 | $10,348 |

    Due to the uncertainty surrounding the timing of the realization of the
benefit of certain tax attributes in future tax returns, the Company has
recorded a valuation allowance against otherwise recognizable net deferred tax
assets. Realization of the Company's net deferred tax assets is dependent upon
its generating sufficient taxable income in future years in appropriate tax
jurisdictions to obtain benefit from the reversal of temporary differences and
from tax credit carryforwards. The amount of deferred tax assets considered
realizable is subject to adjustment in future periods if estimates of future
taxable income are reduced. The increase in valuation allowance by
approximately $6.1 million in fiscal 2001 reflects the uncertainty regarding
the realizability of inSilicon's deferred tax assets.

    Net undistributed earnings of certain foreign subsidiaries amounted to
approximately $15.0 million as of September 30, 2001. These earnings are
considered to be indefinitely reinvested, and accordingly, no provision for
U.S. Federal and state income taxes has been provided thereon. Upon
distribution of these earnings in the form of dividends or otherwise, the
Company would be subject to U.S. income taxes (subject to an adjustment for
foreign tax credits) of approximately $1.5 million.

    As of September 30, 2001, the Company had available for U.S. Federal income
tax purposes foreign tax credits of $2.4 million, which expire in the years
2003 through 2005, if not utilized. The Company's federal and state research

and development tax credit carryforwards for income tax purposes are approximately $3.9 million and $0.9 million, respectively. If not utilized, the federal tax credit carryforwards will begin to expire in fiscal 2003.

51

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Note 11. Segment Reporting

   Segment information is presented in accordance with Statement of Financial Accounting Standards No. 131, "Disclosures about Segments of an Enterprise and Related Information" ("SFAS 131"). This standard requires segmentation based upon the Company's internal reporting to the Chief Executive Officer and disclosure of revenues and operating income based upon internal accounting methods. The Company had four reportable segments: Platform Enabling, inSilicon, Information Appliance, and PhoenixNet(TM).

   Platform Enabling: Provides system-enabling software that is used in the design, deployment and ongoing operation of industry.standard desktop, notebook and server PCs. The Platform Enabling's flagship software products provide support for current technologies and industry standards, allowing systems and device manufacturers to base new product designs on a range of microprocessors, chipsets, and operating systems combinations.

   inSilicon: Provides communications technology that is used by semiconductor and systems companies to design complex semiconductors called systems-on-a-chip that are critical components of wired and wireless products. inSilicon provides cores, related silicon subsystems and firmware to customers that use its technologies in hundreds of different digital devices ranging from network routers to handheld computers.

   Information Appliance: Provides technology to electronics OEMs to develop information appliance designs. Information Appliance software delivers an easy-to-implement, low cost/high value architecture that enables "instant-on" Internet access and browsing capability for devices such as Internet TV, interactive screen phones, and handheld appliances. This division was launched in March 2001.

   PhoenixNet(TM): Provides technology infrastructure that enables security products and services designed to deliver a higher level of trust to both devices and device-aware e-business applications through device authentication. Applications using this infrastructure for virtual private networks (VPNs) and the Internet are supported by a global network of Regional Device Authorities.

   The Company evaluates operating segment performance based on revenues, gross margin, and income or loss from operations. It has not historically allocated assets to its individual operating segments.

52

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

<TABLE>
<CAPTION>

|  | Years ended September 30, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (in thousands) | | |
| <S> | <C> | <C> | <C> |
| **Revenues:** | | | |
| Platform Enabling................................ | $ 96,668 | $118,604 | $106,872 |
| inSilicon....................................... | 19,079 | 24,676 | 18,954 |
| Information Appliance............................ | 3,531 | -- | -- |
| PhoenixNet/TM/................................... | 2,159 | 1,105 | -- |
| Total.................................... | $121,437 | $144,385 | $125,826 |
| **Gross margin:** | | | |
| Platform Enabling................................ | $ 79,974 | $100,269 | $ 80,896 |
| inSilicon....................................... | 16,052 | 21,558 | 10,048 |
| Information Appliance............................ | 2,206 | -- | -- |
| PhoenixNet/TM/................................... | 2,140 | 1,095 | -- |
| Total.................................... | $100,372 | $122,922 | $ 90,944 |
| **Income (loss) from operations:** | | | |
| Platform Enabling................................ | $ 16,241 | $ 37,485 | $ 13,146 |
| inSilicon....................................... | (21,573) | (1,903) | (12,082) |
| Information Appliance............................ | (4,451) | -- | -- |
| PhoenixNet/TM/................................... | (14,985) | (8,757) | (5,725) |
| Total.................................... | $(24,768) | $ 26,825 | $ (4,661) |

</TABLE>

During fiscal 2001, inSilicon recorded a $9.4 million impairment charge related to goodwill arising from the acquisition of Xentec, which was reflected in the $21.6 million inSilicon operating loss.

The Company also records geographic information based on country of sale, which is categorized into five major regions: North America, Japan, Taiwan, Other Asian Countries, and Europe:

<TABLE>
<CAPTION>

|  | Years ended September 30, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (in thousands) | | |
| <S> | <C> | <C> | <C> |
| **Revenues:** | | | |
| North America................................... | $ 34,613 | $ 41,121 | $ 40,907 |
| Japan........................................... | 46,878 | 48,994 | 36,596 |
| Taiwan.......................................... | 21,705 | 41,409 | 33,828 |
| Other Asian Countries........................... | 9,870 | 3,405 | 2,999 |
| Europe.......................................... | 8,371 | 9,456 | 11,496 |

```
Total...................................... $121,437 $144,385 $125,826
                                            ======== ======== ========
```

</TABLE>

Net income (loss) from foreign operations was approximately ($1.4 million), $1.8 million, and ($2.5 million) for fiscal 2001, 2000, and 1999, respectively.

One customer accounted for 12% of total revenues in fiscal 2001. Another customer accounted for 19% and 11% of revenues in fiscal 2000 and 1999, respectively. No other customer accounted for more than 10% of revenues in fiscal 2001, 2000, or 1999.

<div align="center">53</div>

<PAGE>

<div align="center">PHOENIX TECHNOLOGIES LTD.</div>

<div align="center">NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)</div>

Note 12. Commitments

The Company has commitments related to office facilities under operating leases. Total rent expense was $5.4 million, $4.7 million, and $4.5 million in fiscal 2001, 2000, and 1999, respectively.

On September 30, 2001, future minimum operating lease payments are required as follows (in thousands):

<TABLE>
<CAPTION>

| Years ending September 30, | |
| --- | --- |
| <S> | <C> |
| 2002.................................... | $ 5,120 |
| 2003.................................... | 2,895 |
| 2004.................................... | 1,182 |
| 2005.................................... | 886 |
| 2006.................................... | 877 |
| 2007 and thereafter.................... | 844 |
| Total minimum lease payments.......... | $11,804 |

</TABLE>

Note 13. Stockholders' Equity

Sales of Common Stock and Issuance of Warrants. In February 2001, the Company repurchased from Intel Corporation the outstanding warrant to purchase approximately 1,074,000 shares of Phoenix Technologies common stock for approximately $2.9 million in cash. The repurchase was to eliminate potential dilution to the Company's existing shareholders. Under the original agreement entered in February 1996, the Company sold approximately 895,000 newly issued, unregistered shares of its common stock and a warrant to purchase approximately 1,074,000 additional shares of its common stock to Intel Corporation for $10.4 million. The purchase rights under the warrant vested over a four-year period, beginning in December 1996. The warrant was to expire in April 2001.

Stock Repurchase Program. In February 2001, the Board of Directors authorized a program to repurchase up to $30 million of outstanding shares of common stock over a 12-month period. In fiscal 2001, the Company repurchased approximately 469,000 shares of its common stock at a cost of $5.1 million under the fiscal 2001 program. In fiscal 2001, the Company repurchased approximately 1,498,000 shares of its common stock at a cost of $21.0 million under the fiscal 2001 and 2000 repurchase programs.

In fiscal 2000, the Board of Directors authorized a program to repurchase $30 million of outstanding shares of common stock over a 24-month period. In fiscal 2000, the Company repurchased approximately 836,000 shares at a cost of $14.5 million under the fiscal 2000 program. Also, during the first quarter of fiscal 2001, the Company repurchased approximately 1,028,000 shares of common stock at a cost of $15.9 million under the fiscal 2000 repurchase program. As of December 31, 2000, the fiscal 2000 repurchase program was completed and terminated. In fiscal 2000, the company repurchased approximately 1,011,000 shares at a cost of $16.6 million under the fiscal 2000 and 1999 repurchase programs.

In fiscal 1999, the Board of Directors authorized two programs to repurchase outstanding shares of common stock. Under these programs, the Company repurchased approximately 3,300,000 shares during fiscal 1999 at a total aggregate cost of $34.1 million.

Employee Stock Purchase Plan. The Phoenix Technologies Ltd. 1991 Employee Stock Purchase Plan ("1991 ESPP") allows eligible employees to purchase shares at six month intervals, through payroll deductions,

54

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

at 85% of the fair market value of the Company's common stock at the beginning or end of the six-month period, whichever is lower. The maximum amount each employee may contribute during an offering period is 10% of gross base pay. As of September 30, 2001, approximately 1,065,000 shares had been issued under the Purchase Plan and approximately 169,000 shares remained reserved for future issuance.

Stock Option Plans. The Company has various incentive stock option plans for employees, officers, directors, consultants, and independent contractors. Incentive stock options may not be granted at a price less than 100% (110% in certain cases) of the fair market value of the shares on the date of grant. Nonqualified options may not be granted at a price less than 85% of the fair value of the shares on the date of grant unless it is performance based. To date, all grants of incentive stock options, except for performance-based options, have been made at fair market value or greater. Options vest evenly over a period determined by the Company's Board of Directors, generally four years, and have a term not exceeding ten years.

The following table sets forth the option activity under the Company's option plans all periods presented (in thousands, except per-share amounts):

<TABLE>
<CAPTION>

                                                        Options Outstanding

|  | Shares | Weighted Average Exercise Price |
|---|---|---|
| <S> | <C> | <C> |
| Balance as of September 30, 1998....... | 6,626 | $ 8.52 |
| Options granted...................... | 3,279 | 9.07 |
| Options exercised.................... | (674) | 4.80 |
| Options canceled..................... | (1,476) | 9.46 |
| Balance as of September 30, 1999....... | 7,755 | 8.90 |
| Options granted...................... | 2,259 | 16.15 |
| Options exercised.................... | (2,254) | 7.10 |
| Options canceled..................... | (1,861) | 10.41 |
| Balance as of September 30, 2000....... | 5,899 | 11.92 |
| Options granted...................... | 2,915 | 13.31 |
| Options exercised.................... | (911) | 7.80 |
| Options canceled..................... | (1,180) | 14.72 |
| Balance as of September 30, 2001....... | 6,723 | $12.66 |

</TABLE>

On September 30, 2001, the number of shares exercisable under the stock option plans was approximately 2,818,000.

55

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

The following table summarizes information about stock options outstanding as of September 30, 2001 (in thousands, except per-share amounts):

<TABLE>
<CAPTION>

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number of Shares | Weighted Average Remaining Contractual Life (years) | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
| <S> | <C> | <C> | <C> | <C> | <C> |
| $ 0.01 - $ 7.55... | 639 | 5.76 | $ 4.68 | 571 | $ 4.49 |
| $ 7.69 - $ 9.70... | 1,084 | 7.75 | 9.02 | 459 | 8.53 |
| $10.03 - $11.13... | 956 | 7.88 | 10.93 | 478 | 10.95 |
| $11.19 - $13.75... | 1,390 | 8.27 | 12.80 | 468 | 12.40 |
| $13.81 - $16.75... | 1,429 | 8.59 | 14.80 | 462 | 15.32 |
| $16.88 - $28.56... | 1,225 | 8.59 | 18.76 | 380 | 18.98 |
| $ 0.01 - $28.56... | 6,723 | 8.02 | $12.66 | 2,818 | $11.29 |

</TABLE>

   Amortization of deferred stock-based compensation. The Company amortizes deferred stock-based compensation for options that were granted below market value at the date of grant over the respective vesting period of the options granted. For fiscal 2001, amortization of deferred stock-based compensation was $37,000 and the unamortized deferred stock-based compensation as of September 30, 2001 was $701,000. There were no unamortized deferred stock-based compensation for fiscal 2000 and 1999.

   Disclosures of Stock-Based Compensation Plans. The Company accounts for its stock-based compensation plans in accordance with the provisions of APB 25. If compensation cost for the Company's stock-based compensation plan had been determined based on the fair value method at the grant date, as prescribed in SFAS 123, the Company's net income (loss) and net income (loss) per share would have been as follows:

<TABLE>
<CAPTION>

| | Years ended September 30, | | |
| --- | --- | --- | --- |
| | 2001 | 2000 | 1999 |
| | (in thousands, except per share amounts) | | |
| <S> | <C> | <C> | <C> |
| Net income (loss): | | | |
| As reported.................................... | $(18,002) | $20,902 | $1,804 |
| Pro forma..................................... | $(24,810) | 19,290 | (370) |
| | | | |
| Basic earnings (loss) per share: | | | |
| As reported.................................... | $ (0.72) | $ 0.85 | $ 0.07 |
| Pro forma..................................... | (0.99) | 0.78 | (0.01) |
| | | | |
| Diluted earnings (loss) per share: | | | |
| As reported.................................... | $ (0.72) | $ 0.77 | $ 0.07 |
| Pro forma..................................... | (0.99) | 0.71 | (0.01) |

</TABLE>

56

<PAGE>

PHOENIX TECHNOLOGIES LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

   The fair value of options granted in fiscal 2001, 2000, and 1999 reported below has been estimated as of the date of the grant using a Black-Scholes multiple option pricing model with the following assumptions for the years ended September 30, 2001, 2000, and 1999:

<TABLE>
<CAPTION>

| | Employee Stock Options | | | Employee Stock Purchase Plan | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2001 | 2000 | 1999 | 2001 | 2000 | 1999 |
| | ---- | ---- | ---- | ---- | ---- | ---- |

| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|---|---|
| Expected life from vest date (in years)... | 0.70 | 0.70 | 0.70 | 0.50 | 0.50 | 0.50 |
| Risk-free interest rate................... | 5-6% | 6-7% | 5-6% | 5-6% | 6-7% | 5-6% |
| Volatility............................... | 0.76 | 0.88 | 0.56 | 0.76 | 0.88 | 0.56 |
| Dividend yield........................... | None | None | None | None | None | None |

</TABLE>

   The weighted average estimated fair value of employee stock options granted
during fiscal 2001, 2000, and 1999 was $7.27, $9.60, and $3.48 per share,
respectively. The weighted average estimated fair value of shares granted under
the 1991 ESPP during fiscal 2001, 2000, and 1999 was $6.28, $5.07, and $2.58,
respectively.

Note 14. Retirement Plans

   The Company has a retirement plan ("401(k) Plan") which qualifies under
Section 401(k) of the Internal Revenue Code. This plan covers U.S. employees
who meet minimum age and service requirements and allows participants to defer
a portion of their annual compensation on a pre-tax basis. In addition, the
Company's contributions to the 401(k) Plan may be made at the discretion of the
Board of Directors. In January 1996, the Company began making a matching
contribution of 25% of each participant's contribution, up to a match of $1,000
per year per participant. The matching contributions vest over a four-year
period, which starts with the participant's employment start date with the
Company. Effective January 1, 2000, the Company matches employee contributions
to the 401(k) plan at 100% up to the first 3% of salary contributed to the plan
and 50% on the next 3% of salary, up to a maximum company match of $3,000 per
participant per year. The Company's contributions to the 401(k) Plan for fiscal
2001, 2000, and 1999 were $0.9 million, $0.8 million, and $0.4 million,
respectively.

Note 15. Subsequent Events (unaudited)

   Restructuring Program

   In October 2001, due to continuing global economic downturn and industry
trends, Phoenix announced a restructuring program that would reduce its global
workforce by approximately 15%. This restructuring program will align the
Company's expense structure with current market conditions.

   In December 2001, inSilicon announced a restructuring program to realign
ongoing expense structure. This restructuring program includes a global
workforce reduction of approximately 20% and will also result in a substantial
non-cash write-down of previously capitalized software. The restructuring is
expected to be completed by the first quarter of fiscal 2002.

   Employee Stock Purchase Plan

   In November 2001, the Board of Directors adopted the 2001 Employee Stock
Purchase Plan ("2001 ESPP) and reserved 200,000 shares of common stock for
issuance, subject to stockholder approval. The 1991 ESPP will terminate in
February 2002 and be replaced by the 2001 ESPP.

                                    57

<PAGE>

                              SCHEDULE II
                       PHOENIX TECHNOLOGIES LTD.
                     VALUATION AND QUALIFYING ACCOUNTS

FOR EACH OF THE THREE YEARS ENDED SEPTEMBER 30, 2001
(in thousands)

<TABLE>
<CAPTION>

| Year Ended | Balance at Beginning of Year | Provisions | Deductions(1) | Other | Balance at End of Year |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| ALLOWANCE FOR DOUBTFUL ACCOUNTS | | | | | |
| September 30, 2001.............. | $ 790 | $1,491 | $(1,069) | $(60) | $1,152 |
| September 30, 2000.............. | $1,460 | $ 272 | $ (877) | $(65) | $ 790 |
| September 30, 1999.............. | $1,113 | $ 709 | $ (362) | $ -- | $1,460 |
| ALLOWANCE FOR SALES RETURNS | | | | | |
| September 30, 2001.............. | $1,492 | $1,443 | $(1,713) | $ -- | $1,222 |
| September 30, 2000.............. | $1,363 | $1,317 | $(1,188) | $ -- | $1,492 |
| September 30, 1999.............. | $1,410 | $ 670 | $ (717) | $ -- | $1,363 |
| ALLOWANCE FOR DEFERRED TAX VALUATION | | | | | |
| September 30, 2001.............. | $2,814 | $6,094 | $ -- | $ -- | $8,908 |
| September 30, 2000.............. | $2,814 | $ -- | $ -- | $ -- | $2,814 |
| September 30, 1999.............. | $2,814 | $ -- | $ -- | $ -- | $2,814 |

</TABLE>
---------------------
(1) Deductions in allowance for doubtful accounts primarily represent the
    write-off of uncollectable accounts receivable.

58

</TEXT>
</DOCUMENT>